EFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF OREGON
for the
OREGON DEPARTMENT OF EDUCATION

| | | |
|---|---|---|
| IN THE MATTER OF THE EDUCATION OF | ) | **FINAL ORDER** |
| | ) | |
| Student and Grants Pass School District | ) | Case No. DP 14-104 |
| | ) | |

## HISTORY OF THE CASE

On April 18, 2014, Parent of Student filed a request for a due process hearing with the Oregon Department of Education, alleging that the District had failed to provide a free and appropriate education for Student as required under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 USC §§ 1400 *et seq*. The parties held a resolution session on April 24, 2014. The parties did not reach agreement on all matters raised in the April 18, 2014 hearing request and did not agree in writing that no resolution was possible. The resolution period ended on May 17, 2014. The 45-day hearing timeline began on May 18, 2014. Accordingly, the final order must be issued on or before July 1, 2014. This Final Order is issued timely.

On April 21, 2014, the matter was referred to the Office of Administrative Hearings (OAH) for a due process hearing. On April 22, 2014, Senior Administrative Law Judge (ALJ) A. Bernadette House of the OAH was appointed by the Oregon Department of Education to conduct the due process hearing.

Pursuant to OAR 581-015-2360(3) ALJ House conducted a pre-hearing conference, by telephone, on May 22, 2014. Parent appeared *pro se* and represented Parent and Student. Rich Cohn-Lee, attorney at law, appeared and represented Grants Pass School District (District). ALJ House issued a Notice of Hearing (NOH) on May 28, 2014, scheduling a hearing time for June 16 and 17, 2014, and setting the deadlines for filing and exchange of exhibits and witness lists of June 11, 2014.

On June 2, 2014, District filed a Motion to Compel Production (Motion). The motion was assigned to Senior ALJ Joe Allen. On June 5, 2014, ALJ Allen denied the Motion. District filed a request with Chief ALJ Gary Tyler for immediate review, pursuant to OAR 137-003-0568(7). Chief ALJ Tyler delegated the matter to Presiding ALJ John Mann pursuant to OAR 137-003-0568(8). On June 9, 2014, Presiding ALJ Mann issued Ruling and Order, denying in part and granting in part, District's Motion. The June 9, 2014 Ruling and Order are included in the file for this matter.

On June 16 and 17, 2014, ALJ House convened the hearing in Grants Pass, Oregon. Parent appeared *pro se*, representing Parent and Student, and testified at hearing. Mr. Cohn-Lee, with co-counsel Joel Hungerford, Attorney at Law, both of the Hungerford Law Firm, accompanied by Kirk Kolb, Director of Special Education Services, appeared on behalf of District.

District called the following witnesses: Mr. Kolb; Dorothy Jewell, District special education teacher; and Kirby Erickson, regional autism consultant for Southern Oregon Education Service District (SOESD).

Parent called the following witnesses: Joseph A. Gentry, Ph.D., psychologist and former consultant for Student and Aletha Sutton, Ph.D., special education, emphasis in developmental disabilities, multi-culturalism, and early childhood.

## ISSUES

Whether District failed to provide Extended School Year Services (ESY) to Student in Student's Individualized Education Plan (IEP) for summer 2014 and, if so, whether the failure to provide ESY constitutes a failure to provide with a free appropriate education (FAPE) in compliance with 34 CFR §300.106(a)(1), (2), and (3); OAR 581-015-2065(1) through (7).

## EVIDENTIARY RULINGS

As determined in DP 14-102, District's Exhibits D1 through D7, D11 and D12 were entered into the record without objection. For this hearing record, Exhibits D8, D9, and D10, accepted for limited purposes in DP 14-102, were offered in whole by District and were admitted without objection.

In DP 14-102, Parent's Exhibits S11, S16 and S28 were admitted without objection. As explained in the previous Final Order in DP 14-102, Parent's Exhibits S3, S4, S6, S13, S20 and S21 were admitted over District's objections and are part of the record for this hearing. District's objections to Exhibits S2, S5, S7-S10, S17, S19, and S22-S27 were sustained and those exhibits were excluded from the record. Parent's Exhibits S2 and S5, were excluded on the basis that laws and rules are not evidence for purposes of an administrative hearing; Exhibit S1 was blank. Exhibits S12, S14, S15, and S18 were withdrawn by Parent.

Additional Exhibits D101 through D104, offered by District, were admitted without objection.

Parent's additional Exhibits S102 and S102 were withdrawn, and Exhibits S103 through S108 were admitted without objection.

## LIST OF ABBREVIATIONS

The following is a list of commonly used abbreviations, and the associated terms, as they appear throughout this Final Order

BSP:   behavior support plan
ESY:   Extended School Year
FAPE: free appropriate public education
FBA:   functional behavior assessment
IDEA: Individuals with Disabilities Education Improvement Act of 2004
IEE:    Individual Educational Evaluation

IEP:    Individualized Education Plan
PLEP:  Present Level of Performance
SLP:   Speech Language Pathologist

## FINDINGS OF FACT

*Relevant background facts (from DP 14-102)[1]*

(1)    Student qualifies for special education services in category of Autism Spectrum Disorder under IDEA.  (Test. of Kolb, Tr. Vol. I at 159.)  Parents and Student moved from another state to Oregon on or about June 27, 2013.  (*Id*.)

(2)    District has adopted policies and procedures, entitled "Extended School Year Guidance," (the policy) to guide staff in implementing ESY requirements.  (Ex. D1 at 1, 2.) District relied on information from the Oregon Department of Education's Internet site regarding ESY requirements as of August 28, 2013.  (Test. of Kolb, Tr. Vol. I at 68.)  Kolb, in his role as special education director, imported the District's guidance for ESY policies from the state's website by using a "cut and paste" method in word processing in August of 2013.  (*Id*. at 65.)  If the Department's guidance on ESY policies had been updated as of August 2013, Kolb intended that update to be incorporated into the District's ESY policies.  (*Id*.)  To Kolb's knowledge, the Department's policies and guidance regarding the provision of ESY, as implemented by the District, comply with the requirements of the federal regulations.  (*Id*. at 57-58, 64-65, 70.)

(3)    The District's policy provides as follows:

**General Guidelines:**
1.  The purpose of extended school year services is the *maintenance* of the child's skills or behavior.  ESY is *not* intended for the teaching of new skills or behaviors.
2.  ESY is intended to maintain a skill or behavior directly related to one or more IEP goals.
3.  All members of the IEP team can request ESY.
4.  Typically the initial or annual IEP is when the IEP team discusses the need for ESY.  However, if a student is new to the district/school, data will be necessary to make those decisions.  In these cases, teams can indicate on the IEP that the team will reconvene at a later date (prior to the end of the school year) to determine if ESY is appropriate and in which objective and goal areas.  See guidance below.
5.  ESY is possible for all students with an IEP.
6.  ESY services are to ensure that a disabled student receives a Free and Appropriate Public Education (FAPE).

**Criteria for ESY Services:**
1.  The student must demonstrate an "undue" regression and recoupment of a skill or behavior directly related to an IEP goal.

---

[1] By agreement of the parties, the evidence record from DP 14-102 in incorporated into the record for this hearing (DP 14-104).

2. GPSD defines this as data that shows a student has not recouped to their baseline when the interruption began.  The following are GPSD guidelines for the IEP team to consider:
    a. More than eight weeks after summer break
    b. More than 2-3 weeks after winter break
    c. More than 1-2 weeks after spring break
3. **"Regression"** means a significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services.
4. **"Recoupment"** means the recovery of skills or behaviors specified in the IEP to a level demonstrated before the interruption of education services.
5. If the team does not have documented evidence, then the decision can be made by "predictions according to the professional judgment of the team." (This is required by the OAR.)

**Specific Guidelines:**
1. **If the IEP team agrees to "consider at a later time" the case manager must identify the date that the IEP team will meet to consider the data as defined on the IEP.**
    (make subsequent arrangements for a future IEP and follow through with those arrangements.)
2. ESY must be based on measurable data such as DIEBELS or behavior charts.
3. ESY services are determined by the IEP team specifically for the student's specific needs; only those needs that relate directly to one or more IEP goals.
4. There are no "programs" available unless the need arises from multiple IEP teams for similar services.
5. ESY needs to be planned and documented for a targeted skill(s), time, location and duration.  Only those skills that are poorly recouped should be provided for.  The key here is that the ESY Plan (see attached document) needs to only address the narrow issue of the skill that is poorly recouped.  ESY services are not intended to replicate the IEP.
6. ESY may involve only related services.
7. Use the ESY Team Decision form and Data and Recommendations form when:
    a. An IEP team meets after previously agreeing to consider the decision later than the most recent IEP.
    b. If one or more members of the team is concerned about the need for ESY.

**When Parents Disagree:**
1. ESY decisions are based on the IEP team, including the family.
2. If the family is participating by phone or in writing, ensure that they have the opportunity to share in this decision.
3. If the family is the only team member to disagree, they may be referred to the Director of Special Services and should be offered a Procedural Safeguards booklet.
4. Note the disagreement and reasoning on the PWN of SPED Action form.

5. Complete a PWN of SPED Action form specifically for this decision, in addition to the Team Decision and Data and Recommendations form.

(Ex. D1 at 1, 2.) (list of attached forms omitted)(emphasis in original).

(4)    When Student experiences challenging circumstances (*e.g.* moving to a new school, changes in staffing) Student displays behaviors which interfere with his/her ability to access his/her education. Student's interfering behaviors (behaviors) include running away (eloping), flopping to the floor (flopping), and aggression towards education staff.  (Exs. S11 at 5, D3 at 7.) Transitions are particularly difficult for Student.  (Ex. S11 at 5.)

(5)    Student's 2013-2014 IEP from his/her former school district (former IEP) included an FBA and BSP.  (Ex. S11 at 5.)  The former IEP provided for special education and related services from March 1, 2013 until March 1, 2014.  (*Id.* at 16.)  In Student's PLEPs on the former IEP, Student's problem behaviors were noted to decrease drastically after he/she began to familiarize with new staff and his/her new environment.  (*Id.*)  The former IEP also noted Student continued to experience difficulty with transitions, especially from non-preferred activities, although the incidents of behaviors decreased over time.  (*Id.*)

(6)    Student's former IEP, dated May 23, 2013, provided for ESY services as follows:

For the 2012-2013 school year, the IEP team determines that ESY services are required for breaks longer than ten (10) calendar days.  ESY services will begin on the eleventh calendar day of the break.  Services will not be provided on State and Federal holidays.

- [Student] will receive special education from a special education teacher in the classroom for 360 minutes per day from 8:00 am – 2:00 pm
- [Student] will receive 360 minutes per day of 1:1 Instructional Support Services from 8:00 am – 2:00 pm
- For summer ESY, Educational Consultation (see clarification section for what this service entails) will consist of 15 hours per month.

- For summer ESY [Student] will receive Speech/language Therapy 2 hours per week.
- For summer ESY [Student] will receive occupational therapy consult for 80 minutes total.
- Team meetings:  bi-weekly (30 minutes each)

(Ex. S11 at 16.)

(7)    Parent contacted District prior to moving to District in June 2013.  (Test. of Parent, Tr. Vol. II at 193-194; Ex. S6.)  Parent communicated primarily with Kirk Kolb, District Special Education Director.  (Test. of Kolb, Tr. Vol. I at 39-40, 159:1-8.)  Parent began communicating with District approximately one month prior to Parents' and Student's move because Parent wanted District to be aware of Student's IEP requirements, especially the requirement that Student receive ESY for summer 2013 with no longer than 10 days break in services.  (Test. of Parent, Tr. Vol. II at 193-194; Ex. S6.)  Parent expressed concerns to Kolb about Student's

difficulties with transition.  Parent was especially concerned because Student was transitioning to a new school.  (Test. of Jewell, Tr. Vol. II at 76, 78-9.)  Bonding with staff was very important to Student, and based on prior experience, if Student had a break in service for longer than ten (10) school days, Parent would not be able to replicate the school setting for Student in the home, causing Student to regress and to fail to timely recoup skills related to his special education needs.  (Test. of Parent, Tr. Vol. II at 193-194.)

(8)    District received a copy of Student's IEP from the prior school district.  (Test. of Kolb, Tr. Vol. I at 126.)  On October 31, 2013, District issued a Notice of Team Meeting, scheduling an IEP meeting for November 20, 2014.   (Ex. D2.)  According to the October 31, 2013 Notice, the purpose of the meeting was to develop or review an IEP for Student and to consider Student's transition needs or services for a student age 16 or older.  (*Id*.)   District scheduled the meeting to develop the IEP as quickly as possible after the eligibility determination, to comply with District's understanding of its legal obligations for a student eligible for IDEA services who was a new student to Oregon.  (Test. of Kolb, Tr. Vol. I at 162.)

(9)    Student's level of cognitive function was assessed at age 5 years, 5 months, as of November 20, 2013.  (Ex. D3 at 7.)  Student's chronological age as of that date was 15 years. (*Id*. at 4.)

(10)   On November 20, 2013, District convened an IEP meeting (beginning at 10:30 a.m. and adjourning at 4:42 p.m.) and developed an IEP for Student.  (Ex. D4 at 1, 24; D9.)  District members of the team agreed to defer Student's ESY eligibility determination until after the upcoming winter and spring breaks.  (Test. of Jewell, Tr. Vol. II at 20, 134; Ex. D4 at 23.) Parent disagreed, but after conferring with the meeting facilitator, parent believed he would not be able to discuss the issue further.  (Test. of Parent, Tr. Vol. II at 167-170.)  Parent then agreed with the team to defer the discussion.  He disagreed with the District's proposal to defer it until April 16, 2014.  (Ex. D4 at 23.)

(11)   The November 20, 2013 IEP was implemented and in place for four school days prior to the November 2013 Thanksgiving break when schools were closed.  (Test. of Kolb, Tr. Vol. I at 184, 185.)  In addition to the Thanksgiving break, District schools were also closed due to snow on December 6, 9, and 10, 2013.  (*Id*. at 184.)  From the time the November 2013 IEP was implemented until the start of Winter break, District schools were open for sixteen and a half (16.5) instructional days.  (*Id*. at 185.)

(12)   District scheduled an IEP team meeting on March 18, 2014 to review an IEE for Student's FBA.  (Test. of Kolb, Tr. Vol. I at 190-191.)  At Parent's request, discussion of ESY was added to the agenda for the meeting.  (*Id*. at 191.)  During the meeting of March 18, 2014, Parent asked the IEP team to discuss Student's ESY eligibility for summer 2014 but was told the ESY discussion would occur in April as stated in the November 20, 2013 IEP.  (Test. of Kolb, Tr. Vol. I at 191, Jewell, Tr. Vol. II at 70-71-3; Ex. D5 at 8.)

(13)   By prior written notice dated March 20, 2014, District scheduled an IEP team meeting for April 10, 2014 to determine Student's eligibility for ESY.  (Ex. D7.)

(14)   On April 10, 2014, Student's IEP team met to determine Student's eligibility for ESY.  (Test. of Kolb, Tr. Vol. III at 19; Ex. D9.)  The following individuals attended the meeting:  Parent; Kirk Kolb, director of special education and District representative; Doug Ely,

Student's Middle School principal; Dorothy Jewell, Student's special education teacher and case manager; Cindy Picton, speech and language pathologist (SLP); Pamela Schwerdt, Ph.D., school psychologist; and Emily Luka, administrative assistant to Kolb. (Test. of Kolb, Tr. Vol. III at 23, 24; Ex. 9 at 1.)  District also invited Kirby Erickson, regional autism consultant for Southern Oregon Education Service District (SOESD), to attend the April 10, 2024 IEP meeting but she was unable to attend due to a family emergency. (Test. of Kolb, Tr. Vol. III at 24, Erickson, *Id*. at 145.)

(15)    Ely attended the April 10, 2014 IEP meeting in the role of the regular education teacher for the team. (Ex. D11 at 2.)  Luka took notes which reflected the course and scope of the ESY discussion. (Test. of Kolb, Tr. Vol. III at 25; Ex. D11.)

(16)    Kolb explained to the team how the data for ESY would be reviewed.  For each IEP goal, the team would discuss the data related to that goal, including the regression-recoupment data gathered following the winter and spring breaks.  Kolb asked Jewell to distribute copies of her data for the team to review and discuss. (Ex. D11 at 2; test. of Kolb, Tr. Vol. III at 27.)  When Jewell had a question as to how to proceed in discussing the data, Kolb gave her instructions. (*Id*. at 2, 3.)

(17)    Jewell summarized the math data results following Student's return from breaks.  She explained how she collected the data and the summary she had prepared to explain the results.  After Jewell presented the material, Kolb suggested that the team consider Jewell's data and make a recommendation as to whether Student qualified for ESY on the math goal. (D11 at 3.)

(18)    Parent requested clarification on the data.  Parent's analysis of Jewell's data resulted in different percentages for Student's success rate pre-and-post-break.  In response to Kolb's request, Jewell explained that she had used two scores prior to break and two scores after to get an average.  That average was then transferred to the ESY tracking summary as Student's highest pre-and-post-break scores.  Kolb reiterated and confirmed Jewell's explanation of the data analysis and requirements to Parent. (Ex. D11 at 3.)

(19)    Jewell collected and analyzed data for regression-recoupment as she had been trained in her former school district and as an employee of District. (Test. of Jewell, Tr. Vol. II at 111-112, 114; Ex. D11 at 3.)

(20)    Jewell earned a Bachelor of Arts (BA) degree in Elementary Education from Concordia University, Portland, Oregon in 1993. (Test. of Jewell, Tr. Vol. III at 94; Ex. D102 at 1.)  She achieved a special education endorsement, severely handicapped, through Lewis and Clark University and she is designated as "highly qualified."  Jewel holds a Standard Teaching, Basic Elementary License, with a Standard Exceptional Learner I Endorsement issued by the Oregon Teachers Standards and Practices Commission. (Test. of Jewell, Tr. Vol. III at 94-95, 98; Ex. D102 at 1.)  Jewell has been licensed as a teacher for approximately twenty-three years and has worked in special education for approximately thirteen years. (Test. of Jewell, Tr. Vol. III at 95.)

(21)    Jewell has participated in multiple IEP decisions including ESY determinations.  She has participated in most of the IEP meetings for Student.  Jewell has either taught Student or

worked on Student's education an estimated two hours per day for the past school year.  (Test. of Jewell, Tr. Vol. III at 96-97.)

(22)    Jewell tracked Student's behaviors on a daily basis using a different form than the data sheets correlating to Student's AGs and STOs.  (Test. of Jewell, Tr. Vol. II at 66-67, 68; Ex. S21.)  The behaviors listed on the form do not necessarily align with an IEP's goals and objectives but they provide information helpful to develop IEP goals and objectives or to see if the goals and objectives in an existing IEP correctly address a student's needs.  (*Id*. at 68-69.) Parent asked for and was given copies of the data collected on Student's behaviors.  (*Id*. at 68.)

(23)    The IEP team did not have consensus on the issue of Student's eligibility regarding the math goal and ESY eligibility.  The IEP team members from the District agreed with Jewell's analysis of Student's performance data showing Student did not demonstrate regression-recoupment necessary to qualify for ESY.   Parent did not agree.   Kolb, acting as District representative, made the decision and determined that Student was not eligible for ESY services. (Ex. D11 at 3; Test. of Kolb, Tr. Vol. III at 35.)

(24)    In Kolb's opinion, Jewell appropriately collected data on Student's performance on each identified IEP goal regarding the following variables:  choice of time periods within which to take base data prior to the winter break and prior to the spring break; number of data points chosen to create an average rate of success; the actual percentage rate Jewell calculated from the chosen data points; and choice of time periods and frequency for data samples post winter and spring breaks.  Kolb believed that Jewell's interpretation and application of the District policy on ESY when applied to Student was in accord with District policy, and state and federal law. (Test. of Kolb, Tr. Vol. III at 29-30, 32, 36, 39.)

(25)    Parent disagreed with the time period used to gather the regression-recoupment points at the April 10th IEP meeting.  (Ex. D11 at 3, 5; Test. of Kolb, Tr. Vol. III at 37, 38, 41.)

*The Relevant IEP Goals and STOs*[2]

(26)    Student's November 20, 2013 IEP, as modified for the ESY determination on April 10, 2014,  included, among others, the following Measurable Annual Goals (AG):

Math Readiness:

[Student] will increase the ability to independently select and apply numbers and functional mathematical concepts in a variety of contexts to 75% criteria as measured by (state scoring guide, teacher survey, performance assessments, etc.)

Language Arts/Reading -

[Student] will increase reading skills in the area(s) of print awareness, word recognition, comprehension to 75% as measured by (running records, probes,

---

[2] The facts in this Order contain only the AGs and STOs which were both used for ESY determination and which were the subjects of testimony by various experts regarding the analysis used and the application of the data to Student's ESY determination.  Student's IEP, in evidence in whole as Exhibit D9, contains additional AGs and STOs which were not relevant to that determination and thus are not reproduced here.

anecdotal records, work samples, etc.) utilizing a word recognition program such as Edmark.

Adaptive Behavior

[Student] will display productive school behavior, demonstrate appropriate peer relations and cooperative learning on a daily basis to 75% criteria as measured by (behavioral checklists, anecdotal records, probes, observations, etc.).

(Ex. D9 at 14-15, 17, 21.)

(27)    For measuring progress towards the AG for Math Readiness, Student's IEP included the following, among others, Measurable Short-Term Objectives (STOs), labeled and set out as follows:

M1 - [Student] will identify by emitting a verbal or non-verbal (e.g. touch, point) response numerals in print from 10 to 20.

* * * * *

M5 - [Student] will receptively identify paper money including $1, $5, $10, $20.

(Ex. D9 at 14, 15.)

(28)    For measuring progress towards the AG for Language Arts/Reading, Student's IEP included the following, among others, Measurable Short-Term Objectives (STOs), labeled and set out as follows:

R1 - [Student] will increase sightword recognition to include 2 unfamiliar words per week.

(Ex. D9 at 17.)

(29)    For measuring progress towards the AG for Adaptive Behavior, Student's IEP included the following Measurable Short-Term Objectives (STOs), labeled and set out as follows:

B1 - [Student] will utilize verbal, gestural, or visual communication instead of physical protest with 2 or less prompts.

B2 - [Student] will follow verbal or visual directives to "sit, stand, give, go" during daily routines and transitions, with 2 or less prompts in 3 out of 4 trials.

B3 - [Student] demonstrate awareness of other's physical space by first providing a verbal cue prior to initiating physical contact with another in 3 out of 4 opportunities (shaking hands, high fives, knuckle bump) with 2 or less prompts.

B4 - [Student] will transition from preferred activity ([*i.e.*] breaks, lunch) to non-preferred activity ([*i.e.*] work) with 2 or less prompts and without displaying challenging behaviors.

(Ex. D9 at 21, 22.)

*The data*

(30)    Jewell was the IEP team member responsible for collecting the data and ensuring its integrity on a daily basis, with one exception.  Cindy Picton, Student's SLP, collected data for the functional language goals and STOs.  She used similar collection methods and similar forms. (Test. of Jewell, Tr. Vol. III at 150-151.)  Jewell, Student's EA, and Picton were the three individuals collecting the data.  (*Id*.)

(31)    Data was collected for Student's progress in behavior sheets which reflect, in part, the AGs and STOs in Student's IEP.  The raw data was used to generate the ESY summary scores for each AG and STO being tracked for the data presented to the IEP team on April 10, 2014 in the Regression-Recoupment Documentation Forms.  (Test. of Jewell, Tr. Vol. III at 157-160, 179; Exs. S105, D10.)

(32)    Data was collected on, among others, the following behavior STO:

B2 - [Student] will follow verbal or visual directives to "sit, stand, give, go" during daily routines and transitions.

Above the STO on the first data tracking sheet, Jewel wrote "(Track 10 directives to start)." (Exs. S105, D10 at 13; test. of Jewell, Tr. Vol. III at 156-159.)

(33)    District also collected raw data on tracking sheets for Math and Reading which corresponded to Student's AGs and STO's from Student's IEP.  District provided copies of the raw data to Parent.  The sheets were similar to the behavior tracking sheet and the data was collected in a similar manner. (Test. of Parent, Tr. Vol. III at 229-248; Exs. S103, S104, S105.) The raw data was used to generate the ESY summary scores for each AG and STO being tracked for the data presented to the IEP team on April 10, 2014 in the Regression-Recoupment Documentation Forms.  (*Id*.)

(34)    For the STO tracking Student's performance on B2, page one, District tracked the following data:  December 12th, 90%, 2 prompts; December 13th, 90%, 4 prompts, December 16th, 100% (no notation on number of prompts), December 18th, 70% (notation "check schedule), and January 6th, 90%, 4 prompts.  (Ex. S105 at 1.)  Continuing on page 2, for STO B2, District recorded the following:  January 15, 80%, 4 prompts; January 17th, 70%, 5 prompts; January 22nd, 80%, 5 prompts; January 24th, 100%, (notation: P.E., math, [E]dmark, bathroom) 3 prompts.  (*Id*. at 2.)  District continued to track Student's performance on behavior STOs through April.  (Ex. S105 at 3-9.)

(35)    For Student's highest pre-break score on STO B2, Jewell averaged the two data points closest to the winter break (70% and 100%).  Jewell reported the average of 85% on the Summary Sheets to provide to the IEP team for the ESY determination.  Jewell followed the same method, averaging the scores from January 6th (85%) and 15th (85%), to arrive at the reported highest post-break score of 85%.  (Exs. S105 at 1-2; D10 at 13.)

(36)    The Math data sheets included a statement of each STO being tracked, underneath which were columns for data collection on the task for each day data was collected.  (Ex. S103.)

The first Math STO (correlating with Math STO M1 on Student's IEP (Ex. D9 at 14)) on the page read as follows:

> [Student] will identify by emitting a verbal or non-verbal (e.g. touch, point) response number in print from 10 to 20.

(Ex. S103 at 1.)  The individual or individuals recording the data handwrote in the date above each column, gave Student a "+" or "-" sign to indicate whether Student accomplished or did not accomplish the task.  The individual day's data was summarized as a fraction, success rates over total number of available successful choices.  (*Id*.)

(37)   Student's performance was as follows:  December 16, 9/11 (indicating Student met the STO for 9 of 11 numbers) and "81%" written out to the side; December/18, 1/11 numbers (with the following notation - 12/18, 4/5 #10, 4/5 #11, n/c after 5 prompts) (with "10%" written in the data column; December 19, 2013, 9/11 (with "81%" written at the end of the data column). The column continues: January 7, 2014, 7/11 ("63%" written at the end of the data column); January 9, 2014, 8/10 ("72%" written at the end) and notes on the outside right margin of the page "Report %'s as of 1/13/2014" and "74%" in the right margin by the M1 column.  (S103 at 1.)

(38)   On the second data collection page, the column for STO M1 continued, with a handwritten note above each printed column corresponding with the date and data as follows:  3 card @ time, January 14, 3/11; 4 card @ time, January 15, (no summary) and the note "7 prompts n/c" added;  3 card @ time, January 22; (5 "+" marks and one "+" followed by 5/c, and no summary); 2 cards @ time, and January 24 (9 "+" marks but no legible total).  On the last column of page 2 of M1 data, each number from 10-20 is followed by a percentage as follows:  10-75, 11-75, 12-75, 13-50, 14-50, 15-25, 16-50, 17-25, 18-0, 19-50, 20-50.  (S103 at 2.)  The M1 column is followed at the end by the notation of 47% in a circle.  (*Id*.)

(39)   The M1 data continues on page 3 as follows:  "Every other day minimal" is written to the left of the data columns; January 28, ("+" signs after #'s 10 and 20, "-" after #14 and the note "9 prompts, short walk, no change[;]" January 30, (4 "+" signs and 7 "-" signs, no summary), February 5, (7 "+" signs and 5 "-" signs, no summary), February 7, (6 "+" signs and 5 "-" signs, no summary), and "47%" circled in the outer right hand margin of the page at M1. (S103 at 2.)

(40)   Jewell and/or the EA also collected data for Student's Math STOs M2, M3, M4 and M5 (S103, D9 at 14, 15) and Reading STOs, including R1.  (S104; D9 at 17)

(41)   Jewell analyzed collected data and presented it to the team using a form entitled Regression-Recoupment Documentation Form: ESY Summary.  (Test. of Jewell, Tr. Vol. III at 104-105; Ex. D10 at 1-15.)  The first column of the form, first row, is titled "Targeted Critical Goals/Benchmarks/Objectives or Skills for ESY Monitoring."  (Ex. D10 at 1-15.)  Moving across the form to the right, the middle column is titled Break 1 and the dates on the completed form are December 21, 2013 to January 5, 2014.  Following the report of the percentages for the first break is a column entitled "<u>Regression-Recoupment Problem</u>?" followed by the question "Was the highest post-break score lower than the highest pre-break score?"   The right hand column is titled Break 2 and the dates on the completed form are March 21, 2014 to March 3, 2014.  (*Id*.)

(42)  For each of the targeted goals and STO's listed, Jewell completed the highest pre-break score and highest post-break score based on her analysis of the data collected on tracking sheets specific to Student's performance.  (*Id.*; test. of Jewell, Tr. Vol. III at 150-151, 157-159.)

(43)  For B2, the second STO in Behavior, Jewell reported the following percentages for the first break from December 21, 2013 to January 15, 2014 (with the note that the break equaled 16 days):

| | | |
|---|---|---|
| B2: | Highest Pre-break score | 45% |
| | Highest Post-break score | 52% |

Jewell checked the box "no" indicating there was no regression/recoupment problem based on the reported percentages.  (D10 at 3.)

(44)  For M1 percentages for the second break, from March 26, 2014 to March 30, 2014 (which she noted was 10 days), Jewell reported the following percentages:

| | | |
|---|---|---|
| M1 | Highest Pre-break score | 45% |
| | Highest Post-break score | 58% |

Jewell checked the box "no" indicating there was no regression/recoupment problem based on the reported percentages.  (D10 at 3.)

(45)  Similar data and data summaries for Student's M2, M3, and M4 goals resulted in determinations that Student did not demonstrate regression-recoupment problems after either the winter or the spring break periods.  (D10 at 3.)  For M5, Jewell determined that Student's highest pre-winter break score was 87% and highest post-winter break score was 75%.  Jewell checked "yes" on the form to indicate a regression-recoupment problem but added a note to "see attached data."  (D10 at 4.)  On a second reporting ESY summary sheet, Jewell reported separate scores for three individual days in January 2014, post-winter break.  She wrote an additional note stating that "Winter Break- presentation of task and teaching style changed directly following break.  Only actual money/bills were used in task instead of distractor variables used (as in previous IEP.)"  (D10 at 5.)

(46)  Jewell's report on data collected for Student's STOs in reading were based, in part, on tasks using the Edmark system.  (Test. of Jewell, Tr. Vol. II at 54, 55; Gentry, Tr. Vol. III at 57-58; Ex S104).  Student's scores, as collected by Jewell, Picton, or the EA under Jewell's supervision, and reported by Jewell, did not support ESY based on a lack of significant regression-recoupment on each STO.  (Ex. D10 at 8.)

(47)  In Jewell's opinion, Student's eligibility for ESY could not be determined without data on Student's regression/recoupment after both the winter break for 2013 and spring break for 2014.  Jewell based her opinion on her understanding that data had to be collected after both breaks, and that data had to show significant regression/recoupment for any student to be eligible for ESY because it was required by District policy and, for Student, because data collected on Student before and after the winter break would not produce valid data.  (Test. of Jewell, Tr. Vol. II at 39-40, 114-117, Vol. III at 115, 193.)  Based on her opinion that the data was unreliable, Jewell could not have made a determination, or recommend that the IEP team make a

determination, regarding Student's ESY eligibility based on the pre-and-post-winter break data. (Test. of Jewell, Tr. Vol. III at 201.)

(48)   Parent believed that spring break analysis was irrelevant. Parent contended that Student suffered significant regression-recoupment issues for breaks of 10 or more school days. The spring break did not result in a break of 10 or more school days.  (Test. of Parent, Tr. Vol. III at 214.)

(49)   Regarding Student's ESY eligibility determination, Jewell opined that the pre-and-post winter break data she, the EA, and Picton collected was invalid based on the following factors:  the number of days between development and implementation (including new teaching methods) of the November 20, 2013 IEP and the winter break; the pre-holiday activities and excitement in the classrooms; breaks in instruction due to snow days; Student being ill; and Student's EA being ill.  (Test. of Jewell, Tr. Vol. II at 39-40, Vol. III at 115.)

(50)   To create the percentages reported on D10, Jewell used two data points, regardless of the number of available data points.  (Test. of Jewel, Tr. Vol. III at 151-155.)  Jewell used data on tasks she observed directly and recorded, or ones recorded by the EA but that Jewell discussed with the EA.  (*Id*. at 151-152.)  Where Jewell did not personally collect the data for Student's performance on the behavior STO B2, she filled in the number of prompts the EA told her the EA had given Student on that day.  (*Id*. at 163-165.)

(51)   Parent told the IEP team that he would not be able to replicate the school setting, or the programing that District's teachers and staff provided, at home.  (Test. of Jewell, Tr. Vol. II at 76.)  Parent expressed concerns that Student would be unable to bond with staff, which was essential to Student's success.  Parent was especially concerned with the impact on Student's ability to transition to high school without maintaining bonds with staff.  (*Id*. at 76-77.)  Parent had voiced similar concerns regarding Student and the impact if Student did not have ESY to District staff from the first meeting District held in which Jewell was a participant.  (*Id*. at 78.)

(52)   Jewell and Ely responded to Parent's concerns by stating that no one knew how Student would do without ESY because Student had always had ESY.  (Test. of Jewell, Tr. Vol. II at 77.)

(53)   Joseph Gentry, Ph.D., psychologist, is a Board Certified Behavior Analyst - Doctoral.  Dr. Gentry's doctoral degree is in school psychology with a pre- and post-doctoral fellowship in clinical psychology.  (Test. of Gentry, Tr. Vol. IV at 18; Ex. S108.)  He is licensed as a psychologist in Arizona, as well as a licensed behavior analyst, and as a certified school psychologist by the Arizona Department of Education.  (Test. of Gentry, Tr. Vol. IV at 17; Ex. S108.)  Dr. Gentry has been licensed as a psychologist since 2007.  He has worked with behavior analysis for 13 years, becoming Board Certified in 2008.  (*Id*.)  Dr. Gentry owns a private psychology practice, conducting certified diagnostic and educational evaluations as well as consulting with the school district and parents regarding behavior modification, school placement, educational interventions, as well as behavior management and classroom intervention.  (Test. of Gentry, Tr. Vol. IV at 18.)

(54)   Prior to his present practice, Dr. Gentry was the director of school consultation at the Southwest Autism Research and Resource Center (SARRC).  At SARCC, Dr. Gentry consulted with public schools for IEP development in Maricopa County, Arizona for

approximately one and a half years before leaving to open his practice approximately six years ago. (Test. of Gentry, Tr. Vol. IV at 19.) He is a member of the American Psychological Association as well as the Association of Behavior Analysis, at both the local and national levels. Dr. Gentry is the current president-elect of the Arizona Applied Behavior Analysis Association. (*Id*.)

(55) Dr. Gentry worked with Student for approximately two and a half years from 2007 through February 2010 when Student lived in Arizona. (Test. of Gentry, Tr. Vol. IV at 19, 75.) In August of 2011, when Student first started school in another state, Dr. Gentry consulted with the other district's Board Certified behavior analyst in charge of Student's program. (*Id*. at 20.) Dr. Gentry consulted with the new district staff regarding Student and Student's program in Arizona during two telephone consultations lasting approximately 30 minutes each. (*Id*. at 20, 75.) Afterwards, while Student remained in the other state, Dr. Gentry and Parent remained in somewhat regular contact via telephone for updates and clarification on Student's progress in the program in that other state. (*Id*. at 20.)

(56) As part of his doctoral program, Dr. Gentry studied data analysis and statistical analysis. Data analysis is a pre-requisite for obtaining board certification in behavior analysis. When collecting data for analysis, the concept of "fidelity" in collection is the "keystone" to data analysis. (Test. of Gentry, Tr. Vol. IV at 22.) Data must be collected in a very systematic manner in order to diminish the impact of confounding variables. Relevant to the current matter, if data is being collected on a behavior or on a skill, the data being collected must be collected in the same manner each time. If it is not, there exists the possibly that multiple confounding variables or multiple issues could come in that could skew the data. As a result, the data may not then be applicable to the actual goal being measured. (*Id*. at 22-23.)

(57) Dr. Gentry's experience includes data collection and analysis for school districts and clients on behavioral and academic goals. Dr. Gentry consults mostly for individuals with autism but he has experience with students diagnosed with a multitude of disabilities, including ADHD (attention deficit hyperactivity disorder), emotional disabilities, and intellectual disabilities. (Test. of Gentry, Tr. Vol. IV at 23.) When Dr. Gentry contracts with a district or consults with a family, he is responsible for analyzing all of the data for all of the student's IEP, including both behavior and academic goals. (*Id*. at 23-24.)

(58) In Dr. Gentry's opinion, District's raw data collection sheet (S105 - Behavior Goals), second row (for STO B2) contains insufficient data points to determine a reliable average on the particular STO. As a data analyst, Dr. Gentry opined that Jewell's average score for Student's pre-break performance on STO B2, which she created from two data points, is "a very weak way" of determining a good estimate of an average score. (Test. of Gentry, Tr. Vol. IV at 30, 31.) Behavior analysis generally requires a minimum of three data points but using more points is more desirable to create a more reliable "average" score for a student's behavior. (*Id*. at 31.)

(59) Regarding Student's performance on B2 (Ex. S105 at 1) measured in percentages recorded for December 16, 2014 at 100% and December 18, 2014 at 70%, Jewell averaged those two scores to report Student's highest pre-break average score at 85%. (Test. of Jewell, Tr. Vol. III at 159-161, Gentry, Tr. Vol. IV at 32; Ex. S105 at 1.) Based on Dr. Gentry's experience with Student, Student's variability in the behavior scores reflected by his scores on District's raw data

sheets was consistent with the variability Dr. Gentry observed with Student's behavioral skills and ability to succeed academically.  (Test. of Gentry, Tr. Vol. IV at 32-33.)

(60)  Dr. Gentry has observed significant variability from day to day in Student's academic and behavioral performance.  Students who have a similar diagnosis of similar severity show similar variability.  Because Student's behavior is affected by multiple factors, Student may score 70% one day because Student is having a really bad day and Student' score of 100% could be more accurate of overall skill.  Or the opposite may be true; Student's score of 100% could be the exception where Student's actual mastery of the measured skill is closer to the 70%. Using only two day's data does not produce a reliable picture of Student's performance.  (Test. of Gentry, Tr. Vol. IV at 32.)  By using more data points, for example for 10 days, or two school weeks, the chances of confounding factors skewing the data decrease with every additional data point taken.  (*Id*. at 31, 32.)

(61)  As a data analyst and behavior analyst specialist, Dr. Gentry would consider a student to have recouped a skill when the student has three or more days consecutive days at or above what was calculated to be the student's pre-break score on that skill.  (Test. of Gentry, Tr. Vol. IV at 34.)  When considering District's data on B2 for Student's scores measured after the winter break, Dr. Gentry found it unclear if Student ever regained three data-collected days in a row after the break at the District's pre-break score of 85%.  Dr. Gentry found District's score of 85% unreliable because statistical analysis using only two data points is deficient.  District's data did not include the three or more data points on consecutive days that Gentry would deem minimal to determine performance.  The District also appeared to vary the number of discrete trials per day which also created unreliable data.  Reviewing the data produced by the District, Dr. Gentry found that the most reliable data showing Student met the pre-break highest score of 85% after the break for STO B2 on February 17, and February 19, 2014.  (*Id*. at 34-39; Ex. S105 at 4.)

(62)  Dr. Gentry also looked at the way the data was collected.  The handwritten directive by Jewell on the first page of the data collection sheet, following the printed STO B2, reads "Track 10 directives to Student."  (Test. of Gentry, Tr. Vol. IV at 35.)  Dr. Gentry assumed the note meant the percentages recording Student's success rate were based on tracking 10 discrete trials on one day.  (Test. of Gentry, Tr. Vol. IV at 35.)

(63)  Jewell changed the number of trials per day for Student for the same goal, B2, for dates after January 6, 2014.  The EA was using different numbers of discrete trials on different days and Jewell made the notations to select data that would represent Student's performance. (Test. of Jewell, Tr. Vol. III at 164.)  For example, below the data row for B2 on the second page of data, Jewell included a handwritten note "choose 4 trials."  (Test. of Jewell, Tr. Vol. III at 163-165.)  On January 15, Student scored a reported 80% success rate with a note below "4 prompts".  (Id. at 160; Ex. S103 at 2.)  On January 17, Student scored a reported 70 % with a note below "5 prompts[;]" on January 22, Student scored 80% with a note below "5 prompts[;]"and on January 24, Student scored 100% with the notes "P.E., math, Edmark, bathroom, 3 prompts."   (*Id*.)

(64)  In Dr. Gentry's opinion, even if one assumes Student's scores accurately reflect Student's skill level on B2, Student did not meet the pre-break score of 85% until approximately one and a half months after the break.  On February 17, Student scored of 4 out of 5, and

February 19, Student scored of 5 out of 5.  (Test. of Gentry, Tr. Vol. IV at 33-35; Ex. S105 at 1-4.)  The number of variables, in the changes in numbers of discrete trials, reflected in District's data undermines the reliability that Student's scores accurately reflect Student's skill level. (Test. of Gentry, Tr. Vol. IV at 35-39.)

(65)    Gentry is familiar with the Edmark program because many of his clients use the program in their curriculum.  (Test. of Gentry, Tr. Vol. III at 57.)  District's data collection for STOs in reading was also flawed.  The data collected for R1 was not reliable because it did not use words consistent with the Edmark program for data probes reported after the winter break. District staff tested Student on new words, which is inconsistent with the Edmark system for assessing a student's skill in recognizing previously identified words.  Additionally, staff used words that were not within the Edmark system, making data based on Student's recognition of those words invalid for measuring the STO set out in R1.  (*Id*. at 57-61.)  Similar inconsistent conditions existed in District's Math data collection, which rendered the data questionable as to its reliability.  (*Id*. at 61-62.)

(66)    Aletha Sutton holds a doctoral degree in special education, with an emphasis in developmental disabilities, multi-culturalism and early childhood.  (Test. of Sutton, Tr. Vol. IV at 84; Ex. S108 at 10.)  Her bachelor's degree is in elementary education (1996), with a certification in special education, mild to moderate disabilities (1997).  She has a master's degree in arts and special education, mild to moderate (2000.)  (Test. of Sutton, Tr. Vol. IV at 85; Ex. S108 at 10.)

(67)    Dr. Sutton currently works for her State[3] Education Department as her district's Educational Specialist for the Autism Program.  She has held the position since 2009.  (Test. of Sutton, Tr. Vol. IV at 82.)  Dr. Sutton supervises approximately 65 employees, including autism consultant teachers, behavior health specialists, school psychologists, and autism educational assistants.  (*Id*.)  She is responsible for all district-provided autism services, including setting up employee training and creating centers for training teachers.  (*Id*. at 83.)  Dr. Sutton has been licensed as a teacher in her state in the past but is not currently licensed.  (Test. of Sutton, Tr. Vol. IV at 84.)

(68)    Dr. Sutton consulted with Parents and Student's service providers before Student moved to her state and while Student resided in her state prior to Student's move to Oregon. (Test. of Sutton, Tr. Vol. IV at 85, 120-121.)  She participated in some but not all of Student's IEP meetings while Student resided in her district.  (*Id*. at 86.)

(69)    Dr. Sutton's position involves oversight of staff directly involved with Student.  She was more intensively involved with Student than is usual because of Student's intensive need for services, including behavioral components.  (Test. of Sutton, Tr. Vol. IV at 126-127.)  Dr. Sutton was very familiar with Student's behavior patterns because she was very involved with the data collection for Student.  (*Id*. at 91.)

(70)    When gathering baseline data regarding a student's behavior, Dr. Sutton's practice is to try to gather at least two weeks of data.  Having more data provides more information on variables that affect behavior on any particular day.  (Test. of Sutton, Tr. Vol. IV at 90.)

---

3 Dr. Sutton's state, not Oregon, and district of employment are in the evidentiary record but are not included in this Order to preserve Student's anonymity.

Student's behavior fluctuated a great deal because Student was affected by a number of environmental variables. Sutton, with her staff, found that Student required a lot of planning, organization, together with close observation to ensure instructional control and motivation for Student to work. (*Id*. at 91.)

(71) Regarding District's data collection sheet for STO B2, Dr. Sutton would not put much weight on the reported baseline for Student's performance before the winter break. The data did not include sufficient data points to provide a reliable baseline. (Test. of Sutton, Tr. Vol. IV at 92, 93.)

(72) Dr. Sutton also believes that the STO B2 data was flawed because criteria on the data sheet did not provide discrete numbers for trials but reported data as percentages to record Student's progress. Failing to report discrete trials did not correspond with the STO as written on the IEP (requiring two or less prompts in three out of four trials). It is unclear how District derived the reported percentages on Student's data sheets. (Test. of Sutton, Tr. Vol. IV at 94-98.) The number of trials varied without explanation. (*Id*. at 99.)

(73) In reviewing District's data on Student's STO B4, Student did not return to the reported 90% pre-break highest score until approximately one month after returning to school. However, the data showing post-break scores includes changes in number of trials. Changing the number of trials should affect the percentage of correct responses but the reported percentages did not reflect those changes. (Test. of Sutton, Tr. Vol. IV at 100-104.)

(74) While Student was served within Dr. Sutton's district, the district determined Student eligible for ESY services. Student's former district had a different break schedule than Oregon. District staff collected "copious amounts of data and did a lot of analysis on Student's performance after Student returned from a break." (Test. of Sutton, Tr. Vol. IV at 104-105.) Student's behaviors fluctuated a majority of the time. Because of the fluctuations, establishing a stable performance baseline was difficult. Student required consistency to maintain even a baseline, and with consistency, Student progressed, slowly, on his goals and objectives. (*Id*. at 105, 112.) Consistency was necessary to reduce Student's behaviors, which could be aggressive or dangerous, for Student to be a contributing member of society. (*Id*.)

(75) In Student's former district, the majority of Student's IEP program was to prevent Student's problem behaviors from occurring. The behavioral program was necessary because without controlling Student's behavior, Student was not able to learn. (Test. of Sutton, Tr. Vol. IV at 106-107.) Dr. Sutton's district relies heavily on data for behavior analysis and her district has the most board certified behavior analysts in her state. The district provides teachers and EAs training and consultation assistance to ensure the fidelity of the data recorded. (*Id*. at 107-108.)

(76) Based on Dr. Sutton's education, experience, and training, in addition to her personal experience with Student, more likely than not, Student would not have progressed in the following school year if he had experienced a break in structured educational programing of two and a half or three months in the summer prior. (Test. of Sutton, Tr. Vol. IV at 110-111.)

(77) Dr. Sutton also reviewed the District's behavioral daily tracking sheets for Student. The data reflected similar behavior (verbal protests, physical protests, bolting and eloping, dropping and flopping) to that exhibited by Student when Student was in her district. (Test. of

Sutton, Tr. Vol. IV at 127, 128; Ex. S-21.)  Based on the data collected prior to and after the winter break, Student showed "pretty significant increases" in physical behavior, bolting and eloping, and dropping and flopping. (Test. of Sutton, Id. at 129; Ex. S-21.)  In Sutton's experience, those behaviors were the type of behavior Student exhibited and which impeded Student's ability to learn.  (Test. of Sutton, Tr. Vol. IV at 129-130.)

(78)    Student was determined eligible for ESY at least annually while in Student's former district.  At some point, based on Student's behavioral data, Student was determined eligible for structured educational services for breaks in educational services of 10 or more days in the former district.  (Test. of Sutton, Tr. Vol. IV at 130-132.)

(79)    Kirby Erickson is employed with Josephine County Early Intervention Services (JCEIS) as an autism specialist.  (Test. of Erickson, Tr. Vol. IV at 142-143; Ex. D103.)  She has been employed in that position for approximately the last 10 years.  (Test. of Erickson, Tr. Vol. IV at 143.)  Ms. Erickson has a bachelor's degree in Human Physiology in addition to a degree as a registered nurse.  She holds a master's degree in Early Childhood Special Education.  (*Id*. at 144; Ex. D103.)

(80)    Erickson provided services to Student for ESY during the summer of 2013 under the prior district's IEP.  (Test. of Erickson, Tr. Vol. IV at 146-147.)  Erickson observed Student say "home" and pick up his/her back-pack before noon during the days she was providing services.  Erickson believed she was providing a "really well done" instructional program and that Student wanted to go home because the program day was too long. (Test. of Erickson, Tr. Vol. IV at 150-151.)  Erickson inferred from Student's behavior that he/she needed and would have benefited from a break in education.  (*Id*. at 147.)  She and Student had had a very good first day, but Student's interfering behaviors increased over the days following because Student was tired and because Student preferred home to school.  (*Id*. at 147, 148, 151.)  She did not consider other factors which might have been influencing Student's behaviors.  (*Id*. at 147, 148.)

## CONCLUSIONS OF LAW

District failed to provide ESY to Student in Student's IEP for summer 2014.  District's failure to provide ESY constitutes a failure to provide with a free appropriate education (FAPE) to Student as required under IDEA.

## OPINION

### *Burden of Proof*

The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.  *Schaffer v. Weast*, 126 S Ct 528 (2005).  In this case Parent sought relief and bore the burden of persuasion.  The standard of proof applicable to an administrative hearing is preponderance of the evidence.  *Cook v. Employment Div.* 47 Or App 437 (1980) (in the absence of legislation specifying a different standard, the standard of proof in an administrative hearing is preponderance of the evidence).  Proof by a preponderance of the evidence means that the fact finder is persuaded that the facts asserted are more likely true than not true.  *Riley Hill General Contractors v. Tandy Corp.,* 303 Or 390 (1989).

### Relationship between DP 14-102 and DP 14-104

Parent filed a due process complaint previously against District.  A contested case was held and a Final Order issued on the merits in that case (DP 14-102) on June 6, 2014.  Parent's April 18, 2014 due process complaint, at issue in this case, raised a new issue which is closely related to the issues in the prior due process complaint.   Both complaints involve the determination of Student's ESY eligibility for the 2014 summer break.  However, DP 14-102 was based on Parent's complaint regarding the timing of the ESY determination and Parent's claim that Parent was prevented from meaningful participation in determining when the ESY decision would be made.  However, at the time the due process complaint was filed in DP 14-102 (March 19, 2014) Student's eligibility for ESY had not yet been determined.

The decision in DP 14-102 was issued based on the evidence in the record for that hearing.  The record for this hearing includes the prior evidence, in addition to the testimony and documentary evidence from the contested case hearing held on June 16 and 17, 2014.   Similar to the opinion in DP 14-102, the opinion below sets out the fundamental background of the IDEA and the relationship between the federal requirements as implemented by Oregon.

### Federal and state requirements for use of funds under IDEA

Student is eligible for educational services under the IDEA.  Parent alleges that District has failed, under the specific allegations set out below, to meet its requirement to provide those services as required under IDEA to Student.

States may access federal funding to provide education to children with disabilities, but states must provide that education in accordance with federal law.  *see* 20 U.S.C. §1411 *et. seq*. States receiving funds must have in effect certain policies and procedures as required by federal law.  *see* 20 U.S.C. §1412 *et seq*.  To receive these funds, a state must provide that a "free and appropriate education is available to all children with disabilities[.]  20 U.S.C §1412(a)(1)(A).

Congress, in amending IDEA in 2004 stated the following:

The purposes of this chapter are—
(1)
(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
(B) to ensure that the rights of children with disabilities and parents of such children are protected [.]

20 U.S.C. § 1400(d).

The Supreme Court set out what was required to provide a "free appropriate public education" in the seminal case of *Board of Educ. Of Hendrick Hudson School District v. Rowley*, (1982).  Under *Rowley*, a school district has the duty first, to comply with the procedural requirements of the IDEA and, second, to develop an IEP that is reasonably calculated to enable Student to receive educational benefits.  *Rowley*, at 207, 208.  However, the Ninth Circuit has

held that "only those "* * * procedural inadequacies that result in the loss of educational opportunity * * * or seriously infringe on the parent[s]' opportunity to participate in the IEP formulation process * * * clearly result in the denial of FAPE." *W.G. v. Bd. Of Trustees of Target Range School D.* 960 F2d 1479, 1484 (9th Cir 1992). The 9th Court of Appeals has determined that IDEA 2004 did not change that standard and that *Rowley* standard remains the law. *See J.L. v. Mercer Island School Dist.*, 592 F. 3rd 938 (9th Cir. 2010)

Pursuant to the requirements of the IDEA, under 34 U.S.C. part 300 *et. seq.*, the United States Department of Education promulgated rules for state use of funds used to carry out the provisions of the Act. OAR chapter 581 division 015, promulgated under ORS chapter 343 mirrors, for the most part, the requirements set out in the federal rules.

*District's obligation to provide FAPE*

Following identification and evaluation requirements, the cornerstone for educating a student under IDEA occurs through developing a procedurally and substantively sufficient IEP which provides an offer of FAPE.

*When an IEP must be in place*

IDEA requires that "at the beginning of the school year, each local educational agency * * * shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program[.] 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. §300.323(a). OAR 581-015-2220 mirrors the federal requirement, requiring that:

(1) General:

(a) At the beginning of each school year, a school district must have in effect an IEP for each child with a disability within the district's jurisdiction.

(b) School districts must provide special education and related services to a child with a disability in accordance with an IEP

If a student on an IEP transfers from another state to an Oregon school district, OAR 581-015-2230(2) requires the following:

Out of state: If a child with a disability (who had an IEP that was in effect in a previous school district in another state) transfers to a new district in Oregon, and enrolls in a new school within the same school year, the new school district (in consultation with the child's parents) must provide a free appropriate public education to the child (including services comparable to those described in the child's IEP from the previous district), until the new district:

(a) Conducts an initial evaluation (if determined necessary by the new district); and

(b) Develops, adopts and implements a new IEP, if appropriate, that meets applicable requirements.

*ESY requirements for Students under IDEA*

The IDEA itself does not explicitly provide for ESY. However, when promulgating rules to implement the IDEA, the US Department of Education included the requirement that the public agency responsible for providing FAPE must provide for services to children with disabilities during periods when regular school services are not provided if necessary for an individual student to receive a FAPE. 34 CFR § 300.106, entitled "Extended school year services," provides as follows:

(a) General.

(1) Each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

(2) *Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.*

(3) In implementing the requirements of this section, a public agency may not—

(i) Limit extended school year services to particular categories of disability; or

(ii) Unilaterally limit the type, amount, or duration of those services.

(b) Definition. As used in this section, the term extended school year services means special education and related services that—

(1) Are provided to a child with a disability—

(i) Beyond the normal school year of the public agency;
(ii) In accordance with the child's IEP; and
(iii) At no cost to the parents of the child; and

(2) Meet the standards of the SEA.

(Emphasis added.)

As referred to in 34 CFR§ 300.106(a)(2), 34 CFR §§ 300.320 through 300.324 set forth the requirements for individual education programs under the IDEA. ESY must be provided if the needs of the child require a structured summer program for that child to receive a FAPE. *See*

*U.S. Office of Education's Analysis of Comments and Changes,* 71 CFR 46540, 46583-83 (August 14, 2006); *see also U.S. Office of Education's Analysis of Comments and Changes, Attachment 1,* 64 CFR 12537, 12575-12577 (March 12, 1999).[4] Because the provisions of the section of the rules regarding ESY did not change in substance, the U.S. Office of Education (the Department) Analysis of the 1999 rules (the 1999 Analysis) remains relevant.  In 1999, the Department responded, in part, to commentators on the proposed rules by incorporating what had been proposed as Notes 1 and 2 following § 300.309 into the rule itself.  Significantly, paragraph (a)(2) of *former* § 300.309 was revised and a new paragraph, (a)(3) was added "to specify that (1) ESY services must be provided only if a child's IEP team determines the services are necessary for the provision of FAPE to the child; and (2) [p]ublic agencies may not limit eligibility for ESY services based on category of disability, and may not unilaterally limit types and amounts of ESY services."  *US Office of Education's Analysis of Comments and Changes, Attachment 1,* 64 CFR at 12577.   As of 2006, those requirements are now found at 34 CFR§ 300.106(a)(2) and (3).

In its extensive discussion of proposed changes to the rules in 1997 and its explanation for the changes it made, the Department emphasized that States should have flexibility in determining eligibility for ESY standards, but ESY must be provided if the individual child's entitlement to FAPE requires it.  The changes to the rule were made to incorporate examples of standards (*i.e.* likelihood of regression, slow recoupment, and predictive data based on the opinion of professionals) that were "derived from well-established judicial precedents and have formed the basis for many standards that States have used in making these determinations."  *Analysis, Attachment 1,* 64 CFR at 12576 (*citing with approval Johnson v. Bixby ISD 4,* 921 F. 2d 1022 (10th Cir. 1990); *Crawford v. Pittman,* 708 F. 2d 1028 (5th Cir. 1983); *GARC v. McDaniel,* 716 F. 2d 1565 (11th Cir. 1983)).  Within the discussion, the Department reiterated that the responsibility of the IEP team to specify the type and amount of ESY to be provided on the basis of the IEP consistent with the individual disabled child's right to FAPE.  *Id.*

Oregon has implemented the requirements of 34 CFR§ 300.106 under OAR 581-015-2065 as follows:

(1) School districts must ensure that extended school year services are available as necessary to provide a free appropriate public education to a child with a disability.

(2) Extended school year services must be provided only if the child's IEP team determines, on an individual basis, that the services are necessary for the provision of free appropriate public education to the child.

(3) A school district may not:

(a) Limit extended school year services to particular categories of disability; or

(b) Unilaterally limit the type, amount, or duration of those services.

---

[4] *Former* 34 CFR § 300.309, *renumbered* 34 CFR§ 300.106 (2006).

(4) The purpose of extended school year services is the maintenance of the child's learning skills or behavior, not the teaching of new skills or behaviors.

(5) School districts must develop criteria for determining the need for extended school year services. Criteria must include regression and recoupment time based on documented evidence or, if no documented evidence, on predictions according to the professional judgment of the team.

(6) For the purposes of section (5) of this rule:

(a) "Regression" means significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services;

(b) "Recoupment" means the recovery of skills or behaviors specified on the IEP to a level demonstrated before the interruption of education services.

(7) For the purposes of this rule, "extended school year services" means special education and related services that:

(a) Are provided to a child with a disability:

      (A) Beyond the normal school year of the school district;
      (B) In accordance with the child's IEP; and
      (C) At no cost to the parents of the child; and

(b) Meet the standards of the Department.

As argued by District previously in case number DP 14-102, a district may rely on regression-recoupment data to determine ESY eligibility. However, a child's eligibility determination must account for "the individual needs of the child and [a denial of ESY] results in denial of FAPE when the child has unique needs and requires special education and related services in excess of the academic year. * * * Under federal law, regression-recoupment is not the standard for availability of ESY services." *Moser v. Bret Harte Union High School District*, 366 F. Supp. 2d 994, 972 (E.D. Cal 2005) (citing with approval *Johnson by and through Johnson v. Independent School Dist. No. 4 of Bixby, Tulsa County, Okla.*, 921 F. 2d 1022 (10 Cir. 1990); *Alamo Heights Ind. Et. School Dist. v. State Board of Education,* 790 F. 2d 1153 1158 n. 3 (5th Cir. 1986)).

In *Johnson*, the 10th Circuit Court of Appeals considered an appeal from a student whose parents' request for ESY services at a regular IEP meeting in January, was denied by the school district at a later April IEP meeting. *Johnson*, 921 F. 2nd at 1024. During the period the IEP was subject to Parent's due process appeal, and a contested case hearing, the student did not have ESY for the summer (though she attended a recreational camp for special needs children). The hearing officer concluded ESY was not warranted. First, the hearing officer relied on the legal premise that predictions of future regression are insufficient to compel the schools to provide an ESY to a child with a disability. Second, the hearing officer found that the facts did not support a finding that the student had in fact regressed during the summer previously. *Id*. at 1025. On appeal, the 10th Circuit Court of Appeals, reversed the hearing officer's decision. The Court

remanded the case for further proceedings, to include presentation and consideration of other factors, in addition to the regression-recoupment evaluation previously conducted, relevant to what should have been a "multifaceted inquiry" of whether ESY should be included in the student's program. *Id*. at 1031.

The Johnson Court, citing *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 202 (1982), reiterated that the Supreme Court explicitly held that analysis of the appropriateness of the IEP may not be limited to any single criterion. "This restraint is as applicable to a specific educational program element, such as whether a child should be provided a structured summer educations experience, as it is to a generalized issue such as the "adequacy of educational benefits conferred upon all children covered by the Act."" *Johnson*, 921 F. 2nd at1028. "The issue is whether the benefits accrued to the child during the regular school year will be significantly jeopardized if the student is not provided an educational program during the summer months." *Id*. at 1027. The 10th Circuit's decision in the Johnson case was cited with approval by the U.S. Department of Education when promulgating rules to implement both the 1997 and 2004 reauthorizations of the IDEA.[5]

The *Johnson* Court listed possible factors that may be considered for ESY eligibility. (*Johnson*, 921 F. 2d. at 1027 and 1032, ftn. 9.) The list, not intended to be exhaustive, includes: the degree of impairment suffered by the child; the ability of the child's parents to provide the educational structure at home, the child's rate of progress, the child's behavioral and physical problems, the availability of alternative resources, the ability of the child to interact with non-handicapped children, the areas of the child's curriculum which need continuous attention, the child's vocational needs, and whether the requested service is extraordinary for the child's condition, as opposed to an integral part of a program for those with the child's disability. (*Id*.)

Parent alleges that District's refusal to provide ESY services to Student constitutes a denial of FAPE because Parent alleges that Student suffers significant regression and recoupment in skills and behaviors necessary to provide Student with FAPE if Students suffers breaks in instructional education for periods of ten or more days. District argues to the contrary. The expert's differed in opinion as to whether District's regression-recoupment analysis was valid, and if not, whether other factors supported finding Student eligible for ESY. In order to decide the issues in this case, I must address those differences.

In *K.S. v. Fremont Unified School District*, 545 F. Supp. 2d 995 (N. D. Cal. 2008), the Court addressed the deference accorded to the administrative law judge's (ALJ) allocation of weight given to expert opinions within what was otherwise a decision "entitled to considerable deference." *Id*. at 1000. Citing 9th Circuit decisions in addition to other jurisdictions, the Court stated that credibility determinations receive deference but "there must be a rational and supportable connection between the reasons cited and the conclusion that the [witness] is not credible. *Id*. at 1003, *quoting Aguilere-Cola v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990). In *K.S.*, the Court determined that the ALJ erroneously afforded excessive deference to the school district's witnesses based only on their experience with the Student. Looking to another 9th Circuit case, *Ojai Unified School District v. Jackson*, 4 F.3d 1467 (9 Cir. 1993), the Court in *K.S.* agreed with the Plaintiff (Parent) that "giving deference only to school personnel based on their

---

[5] *US Office of Education's Analysis of Comments and Changes, Attachment 1,* 64 CFR at 12577, *U.S. Office of Education's Analysis of Comments and Changes,* 71 CFR 46582 (August 14, 2006)

personal experience with a student and their perspective of the record would eliminate the need for a due process hearing." *K.S.*, 545 F. Supp. 2d at 1004.  Accordingly, the Court remanded the matter finding that the ALJ's determination that witnesses who had opinions contrary to the District's position were less credible was "improper because the District's position is the *root of the controversy between the parties.  Finding witnesses more credible because they agree with the District's position constitutes a serious error in reasoning." *Id.*  (Emphasis added.)

Applied to the current case, I will address the evidence to discern the expertise of each witness in the area upon which an opinion was offered as well as the extent that the expert's opinion was given based on the facts in the case.[6]

*Application of the District's policy to Student for eligibility determination*

As in the previous hearing, District established that it based its policy regarding ESY on guidance for ESY requirements published by the Oregon Department of Education.  However, additional testimony regarding the application of the District's policy revealed that the policy was not applied in accordance with the requirements of IDEA.

Ms. Jewell was Student's special education teacher, and she was delegated as the IEP team member in charge of implementing and monitoring Student's IEP during the 2013-2014 school year.  Other than data collected for the speech/language goals, Ms. Jewell, or her EA pursuant to her guidance and supervision, collected the only data used for compilation and analysis to determine Student's eligibility for ESY services for summer 2014.  Ms. Jewell performed the data analysis, formed conclusions on whether the data did or did not show regression-recoupment, and whether the results supported ESY eligibility or not.  Ms. Jewell made a recommendation to the team on her report as to Student's eligibility on each specified STO, finding on each (with an explanation on one) that Student was not eligible for ESY because the data did not demonstrate that Student suffered significant regression/recoupment after winter break or after spring break.  Ms. Jewell's conclusions are not persuasive for two reasons.

First, Ms. Jewell consistently expressed her understanding, according to her experience and her training in her prior school district and by her current employer, that ESY for any student could not be determined without collecting regression/recoupment data before and after both winter and spring breaks of any given school year.  Counsel's attempt to rehabilitate Ms. Jewell by cross-examination was not persuasive.  Ms. Jewell's application of a single standard, requiring regression-recoupment data as the sole basis for ESY eligibility is not in accord with federal or state law (see above discussion of *Johnson v. Bixby ISD No. 4*, 921 F. 2nd at 1028. Additionally, Ms. Jewell's belief that regression-recoupment data was required after both winter and spring break was not in accord with District policy as it complied with state or federal law.

Second, although Ms. Jewell is entitled to deference as a special education teacher in matters within her expertise, she is not entitled to deference in the manner of data analysis utilized in measuring Student's progress on the STOs tracked for determining ESY eligibility, or

---

[6] Only evidence on data concerning Student's performance before and after the winter break is discussed in the Opinion.  Spring break created a break of five school days.  As noted by Parent and by Parent's experts, Student suffers significant regression-recoupment problems after a break of 10 days or more. Data collected for Spring break, which consists of only five school days, is not relevant to that issue.

in the analysis of the data that was collected.  In the expert opinion of Dr. Gentry, relying on his education, training, and experience in data collection and statistics and behavior analysis, Ms. Jewell, or the EA or EAs, failed to test Student on the same STO in the same manner on consecutive days, for a sufficient number of trials.   Even if the data used were relied upon, the analysis of the data was faulty.  For the example set out in the findings above, using the two data points prior to break, which was less than the four available data points, created a questionable pre-break performance percentage.

According to Dr. Gentry's analysis, the data averaged and reported for Student's goal B2 (the average of 85% for the pre-break highest score) did not account for the behavioral variability that Student exhibits.  Two data points creates a very weak "average" to determine Student's actual skill level because Student's disability results in behaviors that impact his ability to perform academically and behaviorally.

Dr. Gentry was asked to assume that the pre-break reported average of 85%, taken from two data points, was a valid score for Student and, looking at the reported data for the period following winter break, to determine when Student reached an 85% average again.  In Dr. Gentry's opinion, the data failed to show that Student regained the skill level in B2 that he had pre-break until, if at all, February 17 and 19, 2014.  According to Dr. Gentry, the reliability of the post-winter break data was compromised by lack of consistent methodology and non-consecutive days of testing in addition to a lack of a sufficient number of consecutive, consistently collected samples.

Dr. Sutton agreed that District's data on Student's STOs was not reliable based on a similar analysis to Dr. Gentry.  In Dr. Sutton's opinion, based on her experience with Student and her training, education, and experience, the daily behavioral tracking data maintained by District more accurately reflected Student's interfering behaviors.  When Student was in Dr. Sutton's district, Student's behaviors were the primary focus of his/her IEP because they impeded Student's ability to access his/her education.  District's analysis was not persuasive.

Therefore, weighing the testimony of the experts, I give greater weight to those who testified that District's data was not reliable. The testimony of Gentry and Sutton was more persuasive, logical, and based on a long history of working with Student.  In addition, their observations regarding the flaws in District's data collection established that the District's decision was not based upon valid criteria. In the alternative, even if it were determined to be reliable, and if it were analyzed in a consistent manner, the District's data, as testified to by Drs. Gentry and Sutton, would support Student's eligibility for ESY.

If a district has no data, or in the current case, no reliable data, the rules provide that the determination may rely on "predictions according to the professional judgment of the team." OAR 581-015-2065(5); District Policy - Criteria for ESY Services - para. 5.  In this case, the members of the team who testified, to the extent that there was a true discussion of eligibility, relied upon Ms. Jewell's data.   Ms. Jewell's data was faulty.   Ms. Jewell and Mr. Kolb repeatedly stressed that the IEP team did not have experience with Student and Student had been subjected to a move, including a change of schools, in addition to a change in teaching methods and in goal expectations under the November 20, 2013 IEP. Ms. Erickson's opinion that Student did not need ESY was based on her inferences drawn from Student expressing that he/she wanted to go home.  She inferred from her experience of a positive first day that she had

established a relationship with Student sufficient to support her inference without consideration of other factors.  Based on the lack of consideration of Student's demonstrated interfering behaviors or of his prior regression as testified to by Parent, little weight is given to the professional opinion of the District's team, to the extent any opinion was expressed, on predictions of Student's need for ESY.

To the contrary, Parent's witnesses, Drs. Gentry and Sutton have advanced degrees in behavior analysis and considerable experience with Student and with students with similar diagnoses, developmental levels, and behavioral issues as Student.  Dr. Gentry has additional qualifications for data and statistics analysis.  Both Dr. Gentry and Dr. Sutton opined that, based on Student's unique needs, Student requires a structured educational program over the summer break to maintain instructional control and to prevent significant regression-recoupment in Student's behavior and academic goals.  In the opinion of both, Student's diagnosis and rate of development is slow and Student's need for continued structured programing over breaks had remained constant in the past and would, in their experience, education and training as applied to Student, remain so in the future.  The testimony of both Dr. Gentry and Dr. Sutton is given greater weight in support of Student's eligibility for ESY.

Both of Parent's experts questioned the reliability of District's data.  However, given the flaws in the data, both determined that the data recorded after winter break supported a finding that Student regressed and did not recoup previous performance levels until well after the District's relevant recording period (two to three weeks) in some areas and not all in others.  Based on District's informal behavioral data tracking, Dr. Sutton opined that Student showed significant regression and recoupment problems.

Parent has participated in excess of 10 years of IEP meeting regarding Student.  Parent tracks and analyzes Student performance data and is able to discuss that analysis in a meaningful way with those experts with whom he and Student worked in the past.  Parent's opinion that Ms. Jewell's data was inconsistent, and, even if it were relied upon, did not support the conclusions Ms. Jewell drew from the data was supported by Dr. Gentry and Dr. Sutton. Parent's evidence supporting Student's unique need for a structured education program for any break in educational days of 10 or more days was based on Parent's demonstrated history of 10 years of involvement with Student's IEP determinations, including ESY eligibility.  Therefore, Parent's testimony as to the need for ESY to prevent significant regression in Student's ability to access his/her education is also given weight and supports a finding that Student requires ESY for the summer of 2014.

Referring back to the list of factors to consider, set forth in *Johnson* in the discussion above, Parent presented persuasive evidence of the following:  Student has a severe impairment; Parent is unable to provide the educational structure required to prevent significant regression for Student in the home environment; Student progresses slowly when educational control is maintained but regresses if Student has a break in structured educational programing of 10 days or longer; there was no evidence of alternative resources available; Student's behavioral and educational goals need continuous attention; and the requested service has been an integral part of Student's program for over 10 years.

In summary, Parent met the burden to show that District's denial of ESY services to Student in the April 10, 2014 IEP constitutes a denial of FAPE.  The evidence supports finding

Student eligible ESY for the summer of 2014 in a program based on the Student's AGs and STOs which District selected to track for ESY eligibility (as set out in D10.)

**ORDER**

District is hereby ORDERED to provide ESY of 360 minutes per day, at a schedule mutually agreeable to the parties, sufficient to maintain student's skills and behavior with regard to Student's Annual Goals and Short Term Objectives as set forth in the May 23, 2013 IEP.

_/s/ A. Bernadette House_
A. Bernadette House
Senior Administrative Law Judge
Office of Administrative Hearings

**APPEAL PROCEDURE**

**NOTICE TO ALL PARTIES**: If you are dissatisfied with this Order you may, within 90 days after the mailing date on this Order, commence a nonjury civil action in any state court of competent jurisdiction, ORS 343.175, or in the United States District Court, 20 U.S.C. § 1415(i)(2).  Failure to request review within the time allowed will result in **LOSS OF YOUR RIGHT TO APPEAL FROM THIS ORDER.**

**ENTERED** at Salem, Oregon this 1st of July, 2014 with copies mailed to:

Oregon Department of Education, Public Services Building, 255 Capitol Street NE, Salem, OR 97310-0203.

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing FINAL ORDER in Case No. DP 14-104 on the foregoing parties on the 1st day of July 2014 by depositing a copy of said document in a sealed envelope in the United States Mail at Salem, Oregon, with the postage thereon fully prepaid, and addressed to:

<u>By: US Mail and via e-mai1</u>

Raymond Parenteau
Parent(s) of CP
1370 SW David Drive
Grants Pass, OR  97527

Andrea L. Hungerford
Hungerford Law Firm LLP
PO Box 3010
Oregon City, OR   97045

Rich Cohn-Lee
Hungerford Law Firm LLP
PO Box 3010
Oregon City, OR   97045

*John Higgins, Superintendent*
*Grants Pass School District*
*725 NE Dean Drive*
Grants Pass, OR   97526-1649

By: Shuttle and e-mail

Claudette Rushing, Legal Specialist
Department of Education
255 Capitol Street NE
Salem, OR  97310-0203

<u>/s/ Carol Buntjer</u>
Carol Buntjer
Hearings Coordinator