**Richard G. Cohn-Lee, OSB No. 952331**
E-mail: Rich@hungerfordlaw.com
**Joel E. Hungerford, OSB No. 140940**
E-mail: Joel@hungerfordlaw.com
THE HUNGERFORD LAW FIRM
PO Box 3010
Oregon City, Oregon 97045
Telephone: (503) 781-3458
Facsimile: (503) 655-1429

      Attorneys for Plaintiff–Appellant

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **GRANTS PASS SCHOOL DISTRICT**,<br><br>      **Plaintiff-Appellant**,<br><br>   v.<br><br>**STUDENT,**<br><br>      **Defendant-Appellee**. | Civil No. 1:14-cv-01115-CL<br><br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER ("TPO")**<br>Individuals with Disabilities Education Act ("IDEA")<br>Request for Oral Argument |

     This is a Motion for Stay of Remedies in regard to the administrative final order issued in

ODE DP 14-104. A substantive appeal of that order has been filed simultaneously with this

Motion.

1 – MOTION FOR TEMPORARY RESTRAINING ORDER

## I. INTRODUCTION

This is a Motion for Temporary Restraining Order in regards to the remedies arising out of the Final Order issued by Administrative Law Judge ("ALJ") Bernadette House in Oregon Department of Education ("ODE") Due Process 14-104 ("the Final Order") until a substantive appeal of such Order is completed. A substantive appeal of the Final Order has been filed with this Court pursuant to 20 U.S.C. § 1415(i)(2).

The Remedies set forth in the Final Order are as follows: "[The] District is hereby ORDERED to provide ESY [i.e., extended school year services] of 360 minutes per day, at a schedule mutually agreeable to the parties, sufficient to maintain student's skills and behavior with regard to Student's Annual Goals and Short Term Objectives as set forth in the May 23, 2013 IEP." DP 14-104 Final Order at 28 (bracketed language added).

## II. ARGUMENT

A court may stay an administrative order if the movant demonstrates that the circumstances justify a stay pending appeal. *See Nken v. Holder,* 556 U.S. 418, 433–34, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (citing *Clinton v. Jones,* 520 U.S. 681, 708, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)).

When there is a dispute as to whether a ALJ's Final Order must be implemented pending an appeal in federal court, such dispute typically is resolved in the civil action in which the appeal has been brought. *See, e.g., District of Columbia v. Oliver,* 2013 WL 6000889, at *2 (D.D.C.2013); *Friendship Edison Pub. Charter Sch. Chamberlain Campus v. Suggs,* 562 F.Supp.2d 141, 143 (D.D.C.2008). As stated above, an appeal of the Final Order has been filed with this court.

2   – MOTION FOR TEMPORARY RESTRAINING ORDER

Courts considering motions to stay or otherwise enjoin parties from taking certain actions in federal court arising from the IDEA have treated motions to stay the same as motions for temporary restraining orders ("TROs") or preliminary injunctions. *Aliah K. ex rel. Loretta M. v. Hawaii, Dept. of Educ.*, 78 F Supp 2d 1176, 1186 (D Haw 2011).

The standard applied to either a TRO or a request for a preliminary injunction are the same and are as follows:  (1) a showing of a likelihood of success on the merits, (2) the likelihood that if the injunction is not granted the requesting party will suffer irreparable harm, (3) that the balance of equities is in the moving party's favor, and (4) that an injunction is in the public interest. *Id.* (*citing Am. Trucking Ass'ns v. City of Los Angeles*, 559 F3d 1046, 1052 (9th Cir 2009).

In the preliminary injunction context, these factors traditionally have been evaluated on a "sliding scale," such that if a movant makes a particularly strong showing on one factor, then he or she need not necessarily make a strong showing on another factor. *See Davis v. Pension Ben. Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C.Cir.2009); *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir.2006) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991)).

For the reasons listed below, the District believes that the four factors taken as a whole show that granting a Motion for TRO until the underlying appeal is finished is appropriate.

A.      **The ALJ's Disregard Of Legal Authorities Without Any Support of Case Law and Selective Citation Of The Record Weighs In Favor Of The District Being Successful In Its Substantive Appeal.**

Grants Pass School District's ("the District's") substantive appeal is likely to be successful on the merits for numerous reasons, including the fact that the ALJ ignored on point

legal authorities and legal arguments as well as being overly selective in her citations of the testimony and record.

In the recent case of *Forest Grove School Dist. v. Student*, 2014 WL 2592654 (D. Or. 2014) Oregon District Court judge, John Acosta, clarified the standard for ALJ decision's when he found that, in cases such as this one, where an ALJ fails to cite legal authority or address key testimony and evidence, her Findings of Fact and Conclusions of Law in an IDEA Due Process were due little deference. In reversing the ALJ, Judge Acosta stated,

> "In her analysis of the issues, the ALJ fails to adequately support her conclusions with caselaw [sic]. Instead, she applies an arbitrarily high standard which bears little resemblance to the legal standards established by decades of court interpretation of the IDEA […] Because the ALJ's opinion is factually selective to the detriment of an accurate factual record and inadequately develops the applicable legal standards, the court affords the ALJ's opinion little deference."
> *Id.* at 11 (bracketed language added).

Here, like in *Forest Grove*, the ALJ held the District to arbitrarily high standards without providing *any* legal authority whatsoever establishing that the District must meet such standards.

For example, one of the Parent's expert witnesses spent significant time testifying about what he considered best practices in data collection, such as collecting regression/recoupment data on consecutive days and using three data points, rather than two data points as the District did. Tr. Vol. 4[1], 31:1-11 and 34-39. The ALJ then held the District to this standard in her Conclusions of Law. However, the ALJ did not cite any legal authority establishing that the District was legally required to meet the standards set forth by the Parent's witnesses, or that the

---

[1] In DP 14-104 Final Order the ALJ referred to the transcript differently than the transcripts were labeled by the court-reporting firm. The court-reporting firm labeled each transcript by day, whereas the ALJ referred to them as Vol. 1-4. For ease of reference, this Motion uses the same system as the ALJ. As such, Tr. Vol. 1 correlates to DP 14-102 hearing day May 13, 204; Tr. Vol. 2 refers to hearing day May 14, 2014; Tr. Vol. 3 refers to testimony from DP 14-104, June 16, 2014; and Tr. Vol. 4 refers to testimony from June 17, 2014.

standards proposed by the Parent's witnesses aligned with state or federal law. DP 14-104 Final Order at 26.

Similarly, the ALJ made no reference to testimony by the Parent's expert witnesses that the standards they were discussing were what they thought was "best" or "preferable". *See* Tr. Vol. 4, 38:23-39:7 (Gentry testifying that 10 or more trials is "preferable"); Tr. Vol. 4, 49:25-50:11 (Gentry testifying that more data points create "a better average."); Tr. Vol. 4, 31:6-11 (Gentry testifying that "the more data points you can use to create an average the better * * *"); Tr. Vol. 4, 58:21-22 (Gentry testifying to what he thinks would provide "a better baseline"). However, the ALJ at no point distinguished this testimony from what is legally required under IDEA.

Not only did the Parent's experts only testify about best practices, rather than legal requirements, but these witnesses testified with a minimal knowledge of the District's data collection and analysis methodology. Neither of the Parent's expert witnesses ever interviewed, communicated with, or requested additional documents from the District in order to assist in the formation of their opinions – the hearing was the first time the District had heard from either of the Parent's witnesses. Tr. Vol. 4, 64:16-19; Tr. Vol. 4, 74:7-75:1; Tr. Vol. 4, 113:11-20; Tr. Vol. 4, 114:12-16; Tr. Vol. 4, 120:11-123:3. Again, this testimony was never mentioned by the ALJ, despite her heavy reliance on them for analyzing the fidelity of the District's data collection.

Meanwhile, the ALJ concluded that the District's expert witnesses were not entitled to deference, but she did not provide any reasoning why. For instance, the ALJ concluded that Ms. Jewell was "not entitled to deference in the manner of data analysis utilized in measuring Student's progress on the STOs tracked for determining ESY eligibility, or in the analysis of the

data that was collected." DP 14-104 Final Order at 25-26. The ALJ did not provide any reasoning why Ms. Jewell was not entitled to such deference even though she was the person who was in charge of collecting and analyzing such data, the person who oversaw and managed the collection of data by others, and had an extensive history of collecting and analyzing such data in this District as well as previously in other districts. Tr. Vol. 3, 150-151.

More importantly, the ALJ failed to address, let alone distinguish, extensive case law establishing that (1) questions of educational methodology should be left to the discretion of educational professionals, and (2) ESY data collection is a matter of educational methodology.

Courts, including those in the Ninth Circuit, have routinely held that decisions surrounding educational methodologies are left to the educational professionals serving a student and, as such, it is not for the courts to second-guess the educational policies and methods used by a district to address the complex question of when a student requires ESY services. *See Rowley,* 458 U.S. at 207 (footnote omitted) ("In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *See also, Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990) (quoting *Rowley,* 458 U.S. at 206) ("'The 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'").

In particular, federal case law from within the Ninth Circuit has held that questions of ESY eligibility criteria and methodology are "classic examples of technical questions of

6  – MOTION FOR TEMPORARY RESTRAINING ORDER

educational policy." *Virginia S. ex rel. Rachael M. v. Department of Educ., Hawaii*, 2007 WL 80814, * 12 (D Haw Jan 8, 2007) (noting that reviewing courts lack the expertise necessary to resolve persistent and difficult questions of educational policy and that they should likewise not "second-guess" conclusions regarding ESY determinations absent contrary evidence) (citations omitted).

The court must give "due weight" and "accord deference" to the policy decisions of the District, as "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. den*, 513 U.S. 965, 115 S. Ct. 428, 130 L.Ed.2d 341 (1994) [citations omitted]; *Ojai Unified Sch. Dist. et al v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S. Ct. 90, 130 L.Ed.2d 41 (1994); *Pachl v. School Board of Independent School District No. 11*, 42 IDELR 264, at 18 (D Minn Feb 23, 2005), *aff'd* 46 IDELR 1 (8th Cir July 14, 2006) (rejecting distinction by parents between ESY and other areas of IEP and placement development where school district personnel are afforded deference based on their educational expertise).

Similarly, The U.S. Department of Education has specifically stated, "there is nothing in the [IDEA] that requires an IEP to include specific instructional methodologies." 71 Fed. Reg. 46,665 (2006) (bracketed language added). *See also* 34 CFR § 300.320(d)(1); *Shakopee Indep. Sch. Dist.*, 52 IDELR 210 (SEA MN 2009) (finding that neither the IDEIA nor its implementing regulations require an IEP to include a specific methodology or one that would maximize the student's abilities); *See also Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 US 176, 178, 102 S Ct 3034, 73 L Ed 2d 690 (1982) (holding that once it has been determined that the general requirements of IDEA have been met,

7  – MOTION FOR TEMPORARY RESTRAINING ORDER

"questions of methodology are for resolution by the States."); *Carlson v. San Diego Unified School Dist.*, 380 Fed Appx 595, 597 (9th Cir 2010) (unpublished opinion) (holding same).

Within Oregon, the district court in *Forest Grove School District v. Student*, 2014 WL 2592654, *25 (D Or June 9, 2014) reiterated that "'parents, no matter how well-motivated, do not have the right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child.'" (citing *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir 1988). The district court emphasized "it is not the prerogative of outside actors to usurp the authority of school districts by substituting their own ideas about sounds educational policy for that of the schools." *Id.*

The District briefed these and multiple other cases in its Posthearing Brief, but the ALJ did not address any of them in her Final Order. She cited no contrary case law or legal authority, she did not distinguish the cases cited, nor did she provide any reasoning as to why it was appropriate for the court to determine the methodology that the District must use. Instead, she went about engaging in the precise type of second-guessing of methodology (e.g., stating the District needed collect three data points instead of two) that numerous courts have held to be inappropriate.

Similarly, the Parent did not cite any legal authority establishing that he could determine the methodology the District used in collecting and analyzing ESY data. In fact, not only did the Parent not provide any legal authority in his posthearing brief establishing that it is appropriate for him to determine which methodology the District has to use, he actually conceded that it was inappropriate for him do so. Specifically, the Parent wrote, "I am keenly aware that I as a parent have no say in teaching methodology or even how data is collected, but when I have access to the raw data collected, I can hold the district culpable for the results of its efforts with said data."

8  – MOTION FOR TEMPORARY RESTRAINING ORDER

Petitioner Posthearing Brief at 6.  Again, the Parent provides no legal authority for this proposition.  Additionally, the testimony on the record is clear that the "raw data" that the Parent refers to is inappropriate for making ESY determinations. Tr. Vol. 3, 106:6-107:9 (testimony that raw or preliminary data was subject to review, interpretation, and scrutiny by educational professionals serving Student, and that it was not intended as a final determination of ESY); Tr. Vol. 3, 149:13-156:1.

Not only did the ALJ ignore extensive case law and legal arguments, she also ignored testimony and evidence contrary to her conclusions.  For instance, the ALJ disregarded all of the ESY data collected over spring break as "irrelevant". DP 14-104 Final Order Footnote 6 at 18. That data was uncontested by the Parent and his expert witnesses, and demonstrated that the Student did not suffer from regression.  Even though the ALJ held in an earlier hearing (i.e., DP 14-102) that the District was reasonable in waiting to make an ESY until after spring break so it collect more ESY data to supplement the data gathered over winter break, she now dismisses all of that data. *Id.*  Essentially, the ALJ penalized the District for what she perceived as flaws in the District's winter break data, but when the District shared the same concerns and took action to supplement the winter break data with data collected over spring break, she dismissed any additional data as irrelevant.

Similarly, even though the ALJ relies heavily on the testimony of the Parent's witnesses, she fails to make any reference to key testimony from those same witnesses contradicting her findings.  For example, the ALJ extensively cites testimony from Dr. Gentry about the fidelity of the District's data collection process, but she makes no reference to his testimony that he could not make any judgment concerning the fidelity of the District's data collection process.  In fact, Dr. Gentry testified,

9   – MOTION FOR TEMPORARY RESTRAINING ORDER

"In a case like this where I have only the raw data in front of me, it is almost
impossible to judge fidelity just because, as a consultant, I would be training and
sitting in with the data collector to make sure they're collecting data correctly
when they collect it [...] So without those things, I can't say whether or not this
data meets the standards of fidelity or not." Tr. Vol. 3, 24:14-25:8.

Lastly, even if it were found that the District denied Student FAPE, the Remedies ordered

by the ALJ would still be inappropriate.  The ALJ ordered ESY to be provided "with regard to

Student's Annual Goals and Short Term Objectives as set forth in the May 23, 2013 IEP." DP

14-104 at 28.  The May 2013 IEP was written over a year ago by a school district in Hawaii, and

since then the District in Oregon has met with the Parent on multiple occasions to write and

rework a new IEP.  As noted by the ALJ in the *CP I* Final Order[2], and as required by the District

policies and procedures (which the ALJ concluded was in line with state and federal law), "ESY

is intended to maintain a skill or behavior directly related to one or more IEP goals." DP 14-102

Final Order at 5.  However, the ALJ is now requiring the District to provide ESY that are not

connected to any of Student's current IEP goals.  Courts have held that an award of ESY based

on a prior IEP is not entitled to deference where there was little to no evidence at hearing

regarding the appropriateness of this remedy or how it would address any failures by District to

provide FAPE.  *Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 521 (D.C.Cir.2005)

("[T]he district court, obligated by IDEA to ensure that relief set forth in the administrative

award was 'appropriate,' could not simply rely on the hearing officer's exercise of discretion.").

It should be noted that when the Parent and District implemented a new IEP for Student

in November 2013 they decided that the old goals and objectives were no longer appropriate for

Student and that there needed to be a substantial shift in the educational curriculum and

methodologies that would be used with Student. Tr. Vol. 2, 30:19-21 (testimony that the

10  – MOTION FOR TEMPORARY RESTRAINING ORDER

"objectives [on the new IEP] differed greatly" from the Hawaii IEP); Tr. Vol. 2, 40:8-23

(testimony that there were changes in the instructional approach and methodology in the new

IEP). Moreover, the testimony at hearing was that Parent was involved in determining these new

goals and objectives. Tr. Vol. 2, 23:17-21. Nevertheless, the ALJ is requiring the District to

work on goals and objectives that everyone, including the Parent, agreed are no longer

appropriate for the Student. Requiring the District to work with Student on goals and objectives

that the Parent and District have been moving Student away from for over half-a-year is not just

illogical, it also could be detrimental to Student.

Similarly, the ALJ is requiring the District to provide ESY to in all educational areas

even though the testimony at hearing and in the record is that the Parent agreed that it was not

appropriate to provide Student ESY in the area of writing. Tr. Vol. 3, 38:17-39:2; Ex. D11 at 5.

In summary, the ALJ is requiring the District to provide ESY in areas that everyone, including

the Parent, agrees are not appropriate and for goals and objectives that everyone, including the

Parent, agrees are no longer appropriate.

Lastly, the Parent presented no evidence or testimony at hearing regarding what an

appropriate remedy would be. Even when a parent proves that a school fails to offer FAPE, the

parent must still present evidence regarding the appropriate scope of services or remedy he is

seeking. *Parenteau v. Prescott Unified School Dist.*, 2008 WL 5214997, *10 (D Ariz Dec 11,

2008) (noting that even if parent had proven that prior school district had failed to offer a FAPE,

fact that parent failed to put on any evidence regarding the appropriate scope of services or any

specifics about the specific remedy he was seeking resulted in parent not being entitled to any

remedy). Instead, the Parent merely stated in his posthearing brief that, "The details of requested

---

[2] *CP I* was included in the record of *CP II* at the agreement of both parties.

11  – MOTION FOR TEMPORARY RESTRAINING ORDER

ESY compensatory education are outlined and enumerated in the Hawaii IEP which was in effect prior to the current IEP." The Parent presented no testimony or evidence as to why this remedy would be appropriate and the District never had the opportunity to cross-examine the Parent on the issue of why he believes that this remedy is appropriate.

**B.      Implementing The Remedies Set Forth By The ALJ Which Require The Student To Work On Goals And Objectives Everyone, Including The Parent, Have Agreed Are No Longer Appropriate For Student Would Be Irreparably Harmful To Both The District And The Student.**

If this Motion were to be denied and the District then was successful in it substantive appeal, then the District would be irreparably harmed because the District would be unable to recover any costs it expended in the meantime (e.g., any costs it occurred in providing ESY to Student). As the D.C. Circuit has noted, "[i]t would be absurd to imagine a trial court ordering parents to reimburse a school system for the costs of a hearing examiner's erroneous placement of their child [.]" *Jenkins v. Squillacote,* 935 F.2d 303, 307 n. 3 (D.C.Cir.1991); *see also District of Columbia v. Vinyard,* 901 F.Supp.2d 77, 90–91 (D.D.C.2012). Courts have recognized such non-recoverable economic costs as irreparable harm. *See District of Columbia v. Vinyard,* 901 F.Supp.2d at 90; *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt,* 704 F.Supp.2d 50, 53 (D.D.C.2010). Here, the costs of providing ESY are significant. In fact, for the same amount of money as it would take to provide ESY to Student for one summer the District could hire two full-time special education assistants (i.e., educational assistants) for the regular, nine-month academic year.

Second, a stay is appropriate to preserve a school district's right to appeal what it considers to be an erroneous decision. Here, the District's claim on appeal may become moot if a

12  – MOTION FOR TEMPORARY RESTRAINING ORDER

stay is not granted and it is compelled to provide the summer services while pursing an appeal that may take several months to resolve.  Preserving the right of appeal is a meaningful consideration. *See District of Columbia v. Vinyard,* 901 F.Supp.2d at 90 ("The Court finds compelling the District's arguments that a stay of these holdings is necessary to preserve the District's meaningful right to appeal the HOD.").

Moreover, case law in the Ninth Circuit is clear that any delay in providing ESY now can be remedied through compensatory education such that Student would not suffer irreparable harm.  *See, e.g., Park ex rel. Park v. Anaheim Union High School Dist.*, 464 F3d 1025, 1034 (9th Cir 2006) (recognizing that administrative law judge could order compensatory education in the form of extended school year services); *Tyler W. ex rel. Daniel W. v. Upper Perkiomen School Dist.*, 963 F Supp 2d 427, 439 (ED Pa 2013) (recognizing and affirming ALJ award of compensatory services to address school district's failure to provide appropriate services, including denial of ESY services); *I.H. ex rel. D.S. v. Cumberland Valley School Dist.*, 2012 WL 2979038, *7 (July 20, 2012) (noting ALJ's award of compensatory education during the summer of 2010 to address school district's failure to consider and award ESY services during the prior summer of 2009).

As stated above in the previous section, implementing the Remedy set forth by the ALJ could result in an irreparable harm to Student.  The ALJ is requiring the District to work on goals and objectives that everyone, including the Parent, agreed are no longer appropriate for the Student, and that the District has been trying to move Student away from for over half-a-year. Additionally, the testimony on the record is clear that Student struggles greatly with change. Tr. Vol. 1, 188:22-189:4 ("[Student] struggles greatly with change in routines, change in staff, change in even the presentation of materials set in front of [Student].  If he's used to a certain

13  – MOTION FOR TEMPORARY RESTRAINING ORDER

way of that being done, he's really going to struggle with understanding or processing what the expectations are for [Student].").  Having Student work on one set of goals and objectives for the regular school year and then requiring him to work on entirely different goals and objectives winter and summer breaks would be confusing, taxing, and generally detrimental to Student.

**C.     The District Has Consistently Acted In Good Faith To Gather And Analyze All Relevant Data In Making The Appropriate ESY Determination But Has Received Minimal Cooperation From The Parent.**

The District has acted in good faith throughout these proceedings, seeking appropriate information from the Parent, and prior districts.  In contrast, the Parent has failed to provide timely and complete information.  For instance, the Parent argued at hearing that the District should provide ESY to Student in part because Student has received ESY in the past.  However, the Parent has refused to provide information and data about past ESY.

The record is full of testimony that the District has made numerous requests for complete copies of Student's educational records (which include information about Student's previous ESY) from the Hawaii school district, Department of Education and even the Parent. Tr. Vol. 1, 178:18-179:15 (testimony that Hawaii district told the District that records had been provided to the Parent to give to the District); Tr. Vol. 2, 189:6-25 (testimony that the District has made "numerous" requests of records from the Parent).  The testimony in the record is that the number of times the District has tried to obtain Student's records numbers in the "high teens or low twenties at a minimum." Tr. Vol. 2, 238:5-21.

In fact, the District had to ask one of the Parent's witnesses during hearing whether she could forward the Student's records to the District. Tr. Vol. 4, 134:7-135:14.  The Parent did not provide any previous ESY data at November meeting.

14  – MOTION FOR TEMPORARY RESTRAINING ORDER

Next, when the District set it up so that a member of Student's previous IEP team from Hawaii could call in and share her knowledge of the Student, it was the Parent who dismissed her. Tr. Vol. 2, 184:16-185:1.

When the Parent has requested meetings to discuss Student's IEP the District has agreed to meet. Tr. Vol. 2, 34:14-35:10.  In fact, the District has even brought in an ODE facilitator to make sure all of the Parent's concerns were addressed. Ex. D4 and Tr. Vol. 1, 107:17-108:4. Additionally, the District complied with all records request with the Parent, and when the Parent requested that the District keep track of daily behaviors ("tally data") the District complied. Ironically, it is now this data that the Parent is using to attack the District's ESY determination.

Additionally, the District has proceeded with the underlying case (i.e., DP 14-104) and appeal in an expeditious manner.  For instance, the District has filed an appeal of the Order within two weeks of the Order even though (1) the vast majority of District staff is currently on summer break, and (2) the District has 90 days as a matter of law to file an appeal.  The timeliness of action by the District and a District's willingness resolve a disagreement in a timely manner is an important issue to consider when looking at the equity of the District. *See Eley v. District of Columbia*, WL 2507937, 15 (D.D.C., 2014) (the fact that parent had been, "struggle[ing] over the last four years to obtain a FAPE from the [district], with the majority of administrative decisions and Court opinions in the plaintiff's favor, and the long delay until the middle of the most recent school year in the defendant's designation, for the first time, of a location for implementation of the IEP, the equities decidedly do not favor the [district].").

In summary, this is a District that has gone above and beyond to acquire all of the information it can to make an appropriate ESY determination in a comprehensive and timely manner.

15  – MOTION FOR TEMPORARY RESTRAINING ORDER

**D.     It Is In The Public's Interest To Wait To Give Out Public Funds Until It Is Certain That Such A Remedy Is Appropriate And To Grant Remedies That Are Not Detrimental To Students**

Granting this Motion would not affect any member of the public other than Student. And, as stated before, if the District's substantive appeal was unsuccessful the Student could be made whole by granting compensatory education. On the other hand, if the Motion is denied and then the District is successful in its substantive appeal the District will not be able to collect for services already provided to Student. Courts have noted that it is "in the public interest for government costs to be minimized." *Washington v. District of Columbia,* 530 F.Supp.2d 163, 173 (D.D.C.2008)).

Lastly, it is in the best interest of the public for courts to grant remedies under current IEPs, unless those IEPs have been found to be deficient. Here, nothing in the Student's IEP (including the Short-Term Goals and Objectives) has been found to be lacking by the ALJ other than the fact that the District denied ESY to Student. However, without any explanation the ALJ has ordered the District to provide services under a long-outdate IEP. Even assuming it is appropriate for ESY services to be provided immediately, before the appeal is decided, this is still the wrong remedy to implement.

### III. CONCLUSION

Because the (1) the District's substantive appeal will likely be successful on its merits, (2) a denial of this Motion for TRO would cause the District to suffer irreparable harm, (3) the balance of equities is in the District's favor, and (4) a Motion to Stay is in the public's interest, the court should grant this Motion to Stay.

Dated:  July 14, 2014.

THE HUNGERFORD LAW FIRM


/s/ Rich G. Cohn-Lee_____
Rich G. Cohn-Lee, OSB No. 952331
E-mail:  Rich@hungerfordlaw.com
Joel E. Hungerford, OSB No. 140940
E-mail:  Joel@hungerfordlaw.com
THE HUNGERFORD LAW FIRM
Telephone:  (503) 781-3458
Facsimile:  (503) 655-1429

Of Attorneys for Plaintiff–Appellant

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DISTRICT'S OPENING BRIEF** on the

following named person on the date indicated below by:

[   ]    mailing with postage prepaid;

[   ]    hand delivery;

[ x ]    electronic delivery;

[   ]    overnight delivery

to said person a true copy thereof at their last-known address indicated below:

Ray Parenteau
1370 SW David Drive
Grants Pass, OR 97527

*Pro se* for Defendant-Appellee

DATED:  July 14, 2014.


THE HUNGERFORD LAW FIRM


/s/ Rich G. Cohn-Lee_____
Rich G. Cohn-Lee, OSB No. 952331
E-mail:  Rich@hungerfordlaw.com
Joel E. Hungerford, OSB No. 140940
E-mail:  Joel@hungerfordlaw.com
THE HUNGERFORD LAW FIRM
Telephone:  (503) 781-3458
Facsimile:  (503) 655-1429

Of Attorneys for Plaintiff–Appellant