BEFORE THE SUPERINTENDENT OF PUBLIC INSTRUCTION

| | | |
|---|---|---|
| IN THE MATTER OF THE EDUCATION OF STUDENT | ) ) ) | Case No. DP 14-104 |
| and | ) ) | |
| GRANTS PASS SCHOOL DISTRICT | ) ) ) ) | DISTRICT'S POSTHEARING BRIEF |

## I.  INTRODUCTION

The sole issue in this proceeding ("*CP II*") is whether the Grants Pass School District's (the "District") determination that Student did not qualify for extended school year ("ESY") services for the summer of 2014 denied Student a free, appropriate public education ("FAPE").  (DP 14-104 Prehearing Report and Order at 3; Tr. (6/16/14) 7:19-25.)  The evidence at hearing, combined with the findings and conclusions from the first hearing in DP 14-102 ("*CP I*"), established that the District applied appropriate ESY guidelines in analyzing data from both the winter and spring breaks and that this analysis complied with Federal and state law concerning ESY.  The District's analysis, based on reasonable data collection and observation, supported a finding that Student did not qualify for ESY services for this summer.

At hearing, Parent argued primarily that the District's data collection process lacked "fidelity" and, therefore, this Court should rely on his preferred data collection method or another source of data in making an ESY determination. This argument, however, amounts to a dispute over methodology and the overwhelming case law has held that matters of educational methodology – including methodology about appropriate data collection and reporting – are decisions vested in the judgment of the educational

professionals serving students and should not be second-guessed by the courts. Moreover, even assuming that the District's methodology could be scrutinized by a court, Parent's arguments lack merit as the District utilized reasonable data collection techniques and professional judgment regarding the interpretation of that data.

Finally, the evidence at hearing established that the data relied on by Parent to support a finding of ESY eligibility was not appropriate as it did not align with Student's IEP goals and was not based on factors relating to recoupment and regression from breaks in instruction.

Accordingly, Student's complaint should be dismissed with prejudice.


## II.     LEGAL ARGUMENT

### A.     The District Applied an Appropriate ESY Analysis And Reasonable Data Collection Did Not Support A Need For ESY.

Unlike in *CP I*, there is only one issue in this case:  Whether the District's decision at the April 10, 2014 IEP meeting to not offer ESY for the summer of 2014 was a denial of FAPE. *See* DP 14-104 Prehearing Report and Order at 3 and Tr. (6/16/14) 7:19-25 ("the issue for hearing is whether the District failed to provide extended school year services to Student in the Student's IEP for summer 2014, and, if so, whether the failure to provide ESY constitutes a failure to provide a free, appropriate public education in compliance with Federal and State law.").  As set forth below, the District properly applied its ESY guidelines and relied on reasonable data to support its findings that Student did not qualify for ESY services for the summer of 2014.

/////

/////

1.    **The District's ESY Analysis Used in the April 10, 2014 Meeting Complied with Applicable Law and the District Relied on Reasonable Data Collection Techniques and the Professional Judgment of Staff to Support Its Conclusion That Student Did Not Qualify for ESY Services.**

Parent's objections to the April 10 ESY determination are fairly narrow.  Parent does not take issue with the individuals present or not present at the April 10th meeting.  Tr. (6/16/14) 24:21-23.  Moreover, as to the experience of the individuals at the meeting, the ESY determination was made by a team consisting of individuals who had all worked with and knew Student. Tr. (6/16/14) 25:3-6.  Everyone on the team had the opportunity to contribute and share input on the issue of ESY eligibility and only the Parent objected to the determination that ESY services were unnecessary. Tr. (6/16/14) 25:12-23.  Similarly, the Parent never contested the length of the meeting which lasted just over an hour, nor did he protest the amount of time spent discussing ESY, about 50 minutes of the meeting. Tr. (6/16/14) 25:24-26:11.

Similarly, Parent does not contest the amount of information discussed at the April 10th meeting, nor does he take issue with the extent to which information was discussed.  The evidence at hearing was that the data collected by the District was thoroughly reviewed, covering not just all of the Student's IEP goals areas but also all of the short-term objectives on the Student's IEP. Tr. (6/16/14) 28:7-23.

Instead, Parent takes issue only with the ultimate decision made at the April 10th determination based on his disagreement with the methodology he contends the District used to collect the data and information for the ESY determination.  As explained, *infra*, however, Parent's attempt to second-guess the manner in which District professionals

collected ESY data amounts to a dispute over educational methodology that should not be entertained by this Court.

      **2.**     **This Court Has Already Found The District's ESY Policies And Procedures To Be Compliant With State And Federal Law.**

This Court has already ruled in *CP I* that the District's policies and procedures were aligned with state and Federal law. *See* DP 14-102 Final Order at 16 (stating, "First, District's policy and guidance to staff regarding ESY was based on guidance for ESY requirements published by the Oregon Department of Education, the relevant State Educational Authority (SEA) in the current matter. Although at the hearing, Parent questioned District personnel at length regarding its ESY policy and the implementation of that policy, Parent failed to prove that District's policy regarding ESY, as applied to Student, violated the federal requirements for ESY."). Given this prior ruling, the only remaining issue is whether the District followed those policies and procedures when making its ESY determination. The testimony at hearing was conclusive that the District did follow its policies and procedures in making the April 10 ESY determination. Tr. (6/16/14) 29:5-30:2 (testimony that data was collected in compliance with District policies and procedures, and those policies and procedures align with Oregon and Federal law).

      **3.**     **The District Was Reasonable In Collecting Data Over Spring Break To Supplement The Data It Collected Over Winter Break.**

Not only did the District's data collection not fail to meet any requirements set forth in IDEA or any case law, it also did not fail to meet any requirements set forth in the District's policies and procedures. While the District's ESY policies and procedures provide guidelines for the *periods* of data collection relating to ESY

recoupment/regression analysis, they do not dictate any particular methodology for data collection such as the number of trials that must be used or how many data points need to be analyzed for pre- and post-break recoupment/regression. *See generally* Ex. D1. The policies and procedures, therefore, give substantial discretion to staff with regard to the manner in which data is collected, recorded, or analyzed.

Throughout his case in chief Parent attempted to criticize the data collected over the winter break period. While the District does not agree with the Parent's attempt to dictate the methodology for data collection, it did concur that the winter break data alone was insufficient to make a final ESY determination. As established in *CP I,* the testimony on the record was clear that the District did not have sufficient confidence in the winter break recoupment/regression data, which made it impossible to gather valid baseline data. *See* DP 14-102 Final Order Finding of Fact 31 and 32.

For instance, the IEP was brand new on November 20, 2013, had significantly revised goals and objectives and involved a substantial shift in the educational curriculum and methodologies that would be used with Student. Tr. (5/14/14) 30:19-21 (testimony that the "objectives [on the new IEP] differed greatly" from the Hawaii IEP). The Parent did not disagree with these new goals and objectives. Tr. (5/14/14) 23:17-21; Tr. (5/14/14) 211:11-212:3 (Parent stating, "I didn't agree; I didn't dissent," and the Court noting that if the Parent did not actively dissent the District would not know that he disagreed).

Moreover, because the November IEP could only be implemented for 16.5 days before the winter break, Student's IEP team did not have adequate data to conduct a meaningful recoupment/regression analysis from the winter break. Tr. (5/14/14) 35:25-

40:1 and DP 14-102 Finding of Fact 31. The testimony at hearing was that that period of time, with the upcoming holiday break, was atypically chaotic in the classroom. *Id.* Additionally, there were changes in instructional approach or methodology with the new IEP. Tr. (5/14/14) 40:8-23. Student even had different staff working with Student before the break versus after the break. Tr. (5/14/14) 53:34-54:4. All of these factors combined--the short period of time, the new instructional approach, the changes in staff, and the recent changes in the IEP objectives--led to a low level of confidence in the baseline data that was collected. Tr. (5/14/14) 39:20-40:1; Tr. (5/14/14) 63:23-64:3. Therefore, the District felt it needed to gather more data over Spring Break to make an ESY determination. Tr. (5/14/14) 40:2-5 and Tr. (6/14/14) 115:4-116:3. Similarly, even after the winter break, during the early to mid-January period criticized by Parent, there were still less than 30 days under the still relatively new November 20 IEP. Tr. (6/16/14) 194:21-195:10.

Given these factors, the District was reasonable in waiting to make a final ESY determination after gathering and analyzing data over Spring Break. At hearing, Parent never contested the Spring Break data and none of the data analyzed over Spring Break showed regression/recoupment under District ESY policies and procedures. *See* Ex. D10 at 1-5 and Tr. (6/16/14) 116:4-125:21 (Ms. Jewell going, page by page, through the data she collected over Spring Break and testifying that there was nothing that led her to believe ESY services were needed by the Student).

/////

/////

/////

**B.** **Parent's Argument That There Was A Better Way To Collect Data Amounts to an Attempt to Dictate Methodology and the "Tally Data" Relied on by Parent Was Not Appropriate for an ESY Determination.**

At hearing, the Parent's argument was essentially that the data collection process/methodology used by the District was inappropriate or not the "best", and that other data, referred to during the hearing as the "tally data" existed which could support a finding of ESY eligibility. Parent's first argument fails because courts have routinely rejected attempts to second-guess the methodological choices and professional judgment of educators, including in the area of progress reporting and data collection. Further, the testimony during both *CP I* and *II* was that the "tally data" was not an appropriate data set for use in ESY recoupment/regression analysis.

**1.** **The Parent's Arguments Amount To A Dispute Over Methodology, Which Relevant Case Law Has Clearly Established Is An Area Reserved To The Discretion of District Education Professionals.**

The evidence at hearing was that Parent disagreed with the method the District used to collect data to determined ESY. *See, for example,* Ex. D11 at 4 (April 10 meeting notes reading, "To summarize the discussion [Kirk Kolb] explained that the way [Parent] came up with the data and the way the district came up with the data are two different methods, so the data will not match. [Parent] indicated he understood that now." *See also* Ex. D11 at 7 ("[Parent's] data explanation involved his methodology for determining ESY, which included a longer period of time to determine the averages using highest scores for both pre- and post-break data. Discussion was held regarding both methods of determining the data to use for determining ESY.").

Case law from around the country including the Ninth Circuit, however, is clear that decisions surrounding educational methodologies are left to the educational

professionals serving a student. As such, it is not for the courts to second-guess the educational policies and methods used by a district to address the complex question of when a student requires ESY services.

The Supreme Court has cautioned that "[i]n assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley,* 458 U.S. at 207 (footnote omitted). "The 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.' " *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990) (quoting *Rowley,* 458 U.S. at 206).

In particular, federal case law from within the Ninth Circuit has held that questions of ESY eligibility criteria and methodology are "classic examples of technical questions of educational policy." *Virginia S. ex rel. Rachael M. v. Department of Educ., Hawaii*, 2007 WL 80814, * 12 (D Haw Jan 8, 2007) (noting that reviewing courts lack the expertise necessary to resolve persistent and difficult questions of educational policy and that they should likewise not "second-guess" conclusions regarding ESY determinations absent contrary evidence) (citations omitted).

The court must give "due weight" and "accord deference" to the policy decisions of the District, as "courts should not substitute their own notions of sound educational

policy for those of the school authorities which they review." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. den*, 513 U.S. 965, 115 S. Ct. 428, 130 L.Ed.2d 341 (1994) [citations omitted]; *Ojai Unified Sch. Dist. et al v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S. Ct. 90, 130 L.Ed.2d 41 (1994); *Pachl v. School Board of Independent School District No. 11*, 42 IDELR 264, at 18 (D Minn Feb 23, 2005), *aff'd* 46 IDELR 1 (8th Cir July 14, 2006) (rejecting distinction by parents between ESY and other areas of IEP and placement development where school district personnel are afforded deference based on their educational expertise).

Parent presented two expert witnesses to argue that the District's "raw data" sheets lacked fidelity or that different methodologies should have been employed in analyzing that data. For example, one expert asserted that the District should have used three data points instead of two data points when collecting pre- and post-break data averages. Tr. (6/17/14) 31:1-11. However, the IDEA does not require that the IEP identify the specific methodology that the district will use. The U.S. Department of Education has specifically addressed this issue, stating, "there is nothing in the [IDEA] that requires an IEP to include specific instructional methodologies." 71 Fed. Reg. 46,665 (2006) (bracketed language added). *See also* 34 CFR § 300.320(d)(1); *Shakopee Indep. Sch. Dist.*, 52 IDELR 210 (SEA MN 2009) (finding that neither the IDEIA nor its implementing regulations require an IEP to include a specific methodology or one that would maximize the student's abilities); *See also Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 US 176, 178, 102 S Ct 3034, 73 L Ed 2d 690 (1982) (holding that once it has been determined that the general requirements of IDEA have been met, "questions of methodology are for resolution by

the States."); *Carlson v. San Diego Unified School Dist.*, 380 Fed Appx 595, 597 (9th Cir 2010) (unpublished opinion) (holding same).

In the recent decision of *Forest Grove School District v. Student*, 2014 WL 2592654, *25 (D Or June 9, 2014), in substantially reversing an Oregon ALJ, the Oregon federal district court reiterated that

> "'parents, no matter how well-motivated, do not have the right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child.'" (citing *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir 1988).

The district court also emphasized "it is not the prerogative of outside actors to usurp the authority of school districts by substituting their own ideas about sounds educational policy for that of the schools." *Id.*

In stark contrast, Parent has not provided any legal authority supporting his contention that the District should have used other methodologies or should have used certain types of data. Rather, Parent relies on experts who have never worked or practiced in Oregon to opine about "best practices" in terms of ESY data collection. Tr. (6/17/14) 63:17-24 (Gentry testifying that he is neither certified as a school psychologist in Oregon, nor is he licensed as a board psychologist in Oregon) and Tr. (6/17/14) 114:17-115:14 (Sutton stating that she did not have a teaching license in Oregon, nor does she have one in Hawaii; she believes she was last licensed, in any state, in 2009, but she is "not sure" when she was last licensed to teach). Similarly, neither of Parent's experts ever interviewed, communicated with, or requested additional documents from the District in order to assist in the formation of their opinions – this was the first time the District had heard from either of these individuals. Tr. (6/17/14) 64:16-19; Tr. (6/17/14) 74:7-75:1; Tr. (6/17/14) 113:11-20; Tr. (6/17/14) 114:12-16; Tr. (6/17/14) 120:11-123:3.

In fact, one of Parent's witnesses has not had any contact with Student since February of 2010, over four years ago. Tr. (6/17/14) 75:2-77:21. The other expert witness has never provided a direct, formal evaluation or observation of Student for purposes of educational programming, and has not held any teaching licensure since 2009, possibly longer. Tr. (6/17/14) 4-10 and Tr. (6/17/14) 114:17-115:14.

Relatedly, multiple courts including those within the Ninth Circuit have held that the same deference with regard to methodology applies with equal force when it comes to arguments that a school district did not employ the "correct" or optimal approach to data collection. *See, e.g., P.K. ex rel. S.K. v. New York City Dept. of Educ. (Region 4)*, 819 F Supp 2d 90, 108-09 (EDNY 2011) (affirming ALJ's conclusion that while school district did not establish that methodology used for tracking progress on IEP goals and objectives accurately measured progress and did not specify a method of measuring progress, these deficiencies did not impede student's right to FAPE where testimony of teacher providing services was that progress was based not only on data sheets but also on informal assessments of progress including observations of student by teacher and summarizing extensive case law holding that courts have been skeptical of finding a denial of FAPE based on the methods of measuring progress and that such decisions are "precisely the type of issue upon which the IDEA requires deference * * *") (citations omitted); *Bridges ex rel. F.B. v. Spartanburg School Dist. Two*, 2011 WL 3882850, *6 (D SC Sept 2, 2011) (even where methods of progress measurement were not aligned with the method that parents viewed as being optimal, where student's progress was expressed in terms of percentages and were sufficiently measureable to reasonably gauge progress, school district did not violate IDEA and, even if it had, such a technical deficiency would not

amount to denial of FAPE where it was not shown that the deficiency had deprived student of educational opportunity necessary for provision of FAPE); *E.H. v. New York City Dept. of Educ.*, 2014 WL 1224417, *5 (SDNY March 21, 2014) (school district's reliance on progress report that aligned with previous goals and a specific methodology that would not be implemented at school district's new proposed placement was not unreasonable where reality was that in addition to data in report, student had been observed by school staff daily and thus use of progress report by school district did not violate requirements of IDEA); *Parenteau v. Prescott Unified School Dist.*, 2008 WL 5214997, *8-9 (D Ariz Dec 11, 2008) (federal district court rejecting claims by same parent in instant case against prior school district that district had failed to provide "quantitatively measureable" methods of measuring progress towards IEP goals and that IEP failed to provide services pursuant to parent's desired methodology and accompanying "intensive, quantitative data collection" where court noted that school district was not compelled to rely on numerically precise quantitative data, but could also rely on qualitative information to measure progress and, at any rate, IDEA does not require that districts utilize specific methodologies or strategies; rather, district reasonably relied on "qualified educators who make professional judgments regarding the most appropriate teaching methods [and] strategies * * *.")

The above cases make clear that even with regard to the methodology for the measurement of progress towards IEP goals, courts are reluctant to second-guess the professional judgment of educators regarding the quality, methodology or criteria for such data collection. Here, Parent's argument is even weaker than those in the cases above because he is not attacking the data generated as part of actual IEP progress

reporting. Rather, Parent attacks not the actual ESY data discussed by the team in Ex. D10, but rather seeks to second-guess the preliminary, *raw data* sheets used by various district staff, before staff had an opportunity to do a final review of the data. As testified by Dorothy Jewell, Student's special education teacher and case manager, this raw or preliminary data was then subject to review, interpretation and scrutiny by the educational professionals serving Student. Tr. (6/16/14) 106:6-107:9. Only after this review and interpretation, which involved direct observation by staff to confirm that certain trials and tasks were performed in an appropriate manner to assure fidelity, was data used in the preliminary ESY worksheet at Ex. D10. Tr. (6/16/14) 149:13-156:1. Moreover, Ms. Jewell testified that even the data and figures set forth in Ex. D10 were not intended as a final determination of ESY but were themselves preliminary data worksheets that were subject to review and discussion by the IEP team at the April 10 meeting. Tr. (6/16/14) 106:9-107:9. Consequently, Parent's reliance on and criticism of the raw data sheets is misplaced, both factually and as a matter of law.

2. **Even if the Court Could Scrutinize These Methodological Issues, Parent Failed to Meet His Burden of Proving That The District's Method of Analyzing ESY Was Unreasonable.**

As discussed immediately above, the Parent relies heavily on the raw data sheets generated and used by various staff in developing preliminary data to assess ESY recoupment and regression. However, as a fundamental issue, Parent ignores the testimony from staff, including Dorothy Jewell, that these raw data sheets were never intended as a final data collection system for determining ESY. Rather, as their name implies, the "raw data" sheets are just that: raw or preliminary information. This information was then subject to review and interpretation by the education professionals

who filtered, refined and in some cases supplemented the raw data with additional information necessary to present a complete set of data. The testimony at hearing was clear that the raw data sheets needed to be interpreted and combined with professional knowledge and judgment to address the issue of recoupment and regression. Tr. (6/16/14) 106:25-107:9. And again, the testimony at hearing was that even Ex. D10, the recoupment/regression worksheet, was not a final determination of ESY but was itself a part of an ESY worksheet that was subject to further discussion and review by the IEP team at the April 10 meeting. Tr. (6/16/14) 106:6-24.

Beyond this fundamental misunderstanding by the Parent of the intent and purpose of the raw data sheets, Parent's attempts to question the methodology used in the raw data sheets is not only inappropriate based on the case law, but is also factually meritless. For example, Parent questioned the use of non-Edmark words in the reading goal raw data as grounds that the data was somehow suspect, but the notes from the April 10th meeting show that this issue was specifically addressed by the team which made it clear that the IEP goals did not require the use of Edmark words exclusively and could include words from Student's daily activities. Ex. D11 at 6 (noting that while "[Parent] is using only Edmark data to make his ESY determination," team clearly explained that non-Edmark words could be used in this goal area). Moreover, Parent's contention that Student already knew the words "office" or "delivery" was not based on actual evidence but rather his mere assumption at hearing. Tr. (6/16/14) 244:6-8 ("So if [Student] was going to do an office delivery, I assume that there was a card that said 'office delivery.'").

Next, Parent took issue with an apparent variation in the number of prompts used for certain IEP goal areas, asserting that this undermined the fidelity of the raw data. This assertion, however, ignores the testimony of staff that the raw data was reviewed precisely for such variations, that staff witnessed or conducted trials personally to determine which data points were consistent and reliable and then relied on that subset of data to make the preliminary ESY calculations at Ex. D10. Tr. (6/16/14) 155:1-156:1.

Finally, Parent's experts questioned the use of two data points pre- and post-break, but the reality is that the District's own experts indicated that this was an appropriate methodology.  Further, Ms. Jewell testified that for many objectives, an objective might only be taught twice in a two-week period. Tr. (6/16/14) 152:23-153:12. The District's experts, who were designated as experts not just in special education, but specifically ESY procedures in Oregon, and who all had more recently served Student during the IEP school year at issue, were entitled to greater weight than Parent's experts and at a minimum counterbalanced the testimony of Parents' experts, none of whom were licensed to teach or practice in Oregon, but rather out of state (and in fact the Parent's expert Dr. Sutton was no longer licensed to teach or practice in her home state of Hawaii). Tr. (6/17/14) 114:17-115:14.  *Manteca Unified School District,* 50 IDELR 298 at 3-4 (SEA Ca June 27, 2008) (expert who actually met, assessed or worked with child entitled to greater weight than expert who had not); *Omey v. Senior and Disabled Services Div.*, 124 Or App 112, 115, 861 P2d 394 (1993) (not disturbing administrative hearings officer's decision to give greater weight to witness who had more recently treated claimant); *Aetna Casualty v. Robinson*, 115 Or App 154, 158, 836 P2d 1362 (1992) (witnesses lack of current licensure impacting weight given opinion).

Moreover, Parent's expert, Dr. Gentry, made the critical admission that it was "impossible" for him to gauge data fidelity without consulting with the staff that took the data or without some oversight of what occurred. Specifically, Dr. Gentry conceded early in his testimony that

> "In a case like this where I have only the raw data in front of me, it is almost impossible to judge fidelity just because, as a consultant, I would be training and sitting in with the data collector to make sure they're collecting data correctly when they collect it […] So without those things, I can't say whether or not this data meets the standards of fidelity or not." Tr. (6/16/14) 24:14-25:8.

And, as the Parent's witnesses both conceded, neither one of them *ever* consulted with District staff regarding the meaning of the raw data or whether additional interpretation, data and data analysis had occurred after the raw data sheets were generated. Tr. (6/16/14) 74:10-18 and (6/16/14) 114:12-16. Rather, the testimony of Parent's expert witnesses was based solely on assumptions about what they saw on the raw data sheets provided to them; Tr. (6/16/14) 35:15-23 (in regards to the number of trials used, Gentry testifying "I would assume if its not written […] So I'm assuming that if it doesn't say less than 10, that it was 10." Tr. (6/16/14) 42:25-43:12 (Gentry testifying to his understand of Student's IEP, stating, "I mean, so I have to assume that the IEP team chose these IEP goals for – and I don't know – I don't know [Student] now like I knew [Student] years ago […] "I would assume that the IEP team created an IEP and chose goals that were a significant need for [Student] * * * " and "you have to assume that these goals are the five or four goals that are really important to increasing or decreasing problematic social behavior."); Tr. (6/16/14) 88:18-89:1 (Gentry having to assume how the District collects data, "I'm assuming the 12/12, 12/13 are the dates […] I'm assuming, because it's a goal, that that's their form of data collection."); Tr. (6/16/14)

100:13-22 (Sutton testifying that she had to assume why the District chose to collect certain data after Parent directly asked her about the fidelity of the raw data – "And it looks like somebody decided to change it. And I don't know the reason why. But I'm assuming there was a reason for it. I don't know.")

In fact, Parent's experts own testimony supported the approach used by the District, namely, collecting raw data but then subjecting that data to review and interpretation by qualified educational staff, including rejecting certain data points where there was insufficient data or a question as to whether the task or probe was done in a consistent manner. Tr. (6/17/14) 39:15-20 (Gentry testifying that if a data point was incomplete or questionable a professional could either retake the data or discard the data point); Tr. (6/17/14) 92:12-19 (Sutton testifying that you use the data available to you given the restrictions that exist). In fact, that is precisely what Ms. Jewell did. Tr. (6/16/14) 105:20-107:9.

Ultimately, greater weight should be afforded to the District's witnesses, *all of whom* worked not only directly with Student, but did so recently during the current school year and under Oregon's rules and guidelines for special education in Oregon. As stated above, neither of Parent's witnesses are familiar with the ESY data collection and determination requirements in the state of Oregon. Similarly, neither of Parent's experts ever talked to a single member of the District to inquire about the District's policies and procedures, data collection processes, training on data collection, data interpretation, or observations of the Student. Similarly, Dr. Gentry admitted that since he hasn't spoken to or interacted with Student since 2010 (i.e., over four years ago) he doesn't "know [Student] now like [he] knew [Student] years ago," (Tr. (6/17/14) 43:2-3 and Tr.

(6/17/14) 75:2-77:21), while Dr. Sutton conceded that she has never provided direct services or formal evaluations to the Student. Tr. (6/17/14) 4-10 and Tr. (6/17/14) 114:17-115:14.  In light of these factors, Parent's expert testimony not only fails to carry his burden of proving that the District erred in adopting certain ESY data collection methodologies; in fact, these factors are such that the District's expert testimony outweighs that of the Parent's experts.

Additionally, Parent himself offered contradictory testimony about whether the methodology of data collection should be consistent or not: On the one hand, Parent's expert witnesses discussed the need for consistency in the collection of ESY data (e.g., using a consistent number of prompts and trials).  On the other hand, Parent criticized the District for being overly consistent in the way it analyzed the ESY data. Tr. (6/16/14) 233:2-5 (Parent testifying, "I mean that – sticking to wanting to be consistent and not individualizing the inquiry for the Student is not doing [Student] any favors. It's short-shrifting [sic] or short-changing [Student]"); Tr. (6/16/14) 146:25-147:4 (Parent asking Ms. Jewell on cross-examination, "Is consistency of the analysis more important than individualized inquiry in your opinion?  Is it more important to stay consistent than it is to look at every factor that potentially comes into play?").  It is illogical to ask the District to be both more consistent and more flexible in its data collection and analysis, merely in order to justify the outcome of finding Student eligible for ESY.

Next, much of the Parent's expert testimony focused on what should be the optimal or "best" approach to data collection.  For example, Dr. Gentry testified that using his data analysis approach of using three or more data points would be "preferable" or "better" than using just two data points but this argument again amounts to a dispute

over methodology and is similar to the argument that school districts should use the "best" educational approaches for students which case law makes clear is not the purpose of IDEA. Tr. (6/17/14) 38:23-39:7 (Gentry testifying that 10 or more trials is "preferable"); Tr. (6/17/14) 49:25-50:11 (Gentry testifying that more data points create "a better average."); Tr. (6/17/14) 31:6-11 (Gentry testifying that "the more data points you can use to create an average the better * * *"); Tr. (6/17/14) 58:21-22 (Gentry testifying to what he thinks would provide "a better baseline".). It is black-letter law, however, that districts are not required to use the "best" methodology. *See, e.g., Forest Grove School District v. Student*, 2014 WL 2592654 at *25 (finding no legal support for argument that school district staff must use educational methodology "which works best for that student.")

Further, Dr. Gentry testified later that if a data point was incomplete or questionable, a professional could either try to retake the data or could even discard that data point. Tr. (6/17/14) 39:15-20. Similarly, Dr. Sutton testified that while she would prefer to use more data, if more data was not available, then a professional could use the data at hand. Tr. (6/17/14) 92:12-19 (Sutton answering to if you could look at two data points, "It depends. It is a data point to look at. [Student] did that percentage on those days. And if that's the only data you have to go by, then that's I guess what you can look at."). Again, this Court has already decided that because of the newness of the November IEP, the changes in methodology and staff, and the other factors surrounding winter break, the District had limited amounts of and confidence in the data from winter break. DP 14-102 Final Order. In light of this, District staff acted reasonably by reviewing the raw data sheets from this period, making professional judgments about the amount and

quality of that data, supervising or personally retaking data, and in some cases deciding that some data points should not be used. Tr. (6/16/14) 105:20-107:9. Similarly, the ESY form at Ex. D10 clearly documents for the IEP team, including the Parent, when there were variations in data collection, staff or teaching methodology for the winter break period that could impact the ESY analysis. *See* Ex. D10 at 5, 7, 12, and 15. Lastly, the testimony at hearing was clear that the data collection methodology that was used was chosen for a reason and this reason was reasonable. Tr. (6/16/14) 116:21-117:16. For example, the methodology was chosen because although each goal was covered every day, not each short-term objective was taught every day. *Id.*

Finally, while not entirely clear from hearing, Parent may argue that the District should have used the bi-weekly percentage data collected and summarized at Ex. D10 starting at page 16 to make an ESY determination. However, as Dorothy Jewell explained in detail, this data would not be an appropriate basis for an ESY determination because it did not separate or distinguish pre- and post-break periods and data and focused primarily on an approximately nine week period when no break in instruction occurred. Tr. (6/16/14) 32:22-33:12. Thus, Parent's contention at hearing appeared to focus on the level of the Student's progress during these instructional periods but, as set forth in the District's posthearing brief in *CP I*, whether a student is or is not making sufficient progress on IEP goals during periods of instruction is not germane to the ESY analysis. *See In the Matter of Centennial School District*, Case No. 02-054-029 at 4-5 (ODE set out the regulatory requirements for determining ESY eligibility and held that, although the student had not shown much, if any progress during the regular school year, he also did not demonstrate regression, and therefore was not eligible for ESY); *See also*

*Letter to Given*, 39 IDELR 129 (OSEP 2003) (in line with a 2002 Fourth Circuit ruling, OSEP advising that a determination for ESY services based solely on a "lack of progress" during the school year would be inconsistent with the court's enunciation of either of two factors that must be considered:  Significant regression or detrimental effect on progress toward a goal); *See also Lakeview Local Sch. Dist.*, 5 ECLPR 95 (SEA OH 2007) (eligibility for ESY services does not turn on whether such services would benefit the child, but on whether they are a necessary for the child to make meaningful educational progress).

### 3.  Parent's Reliance On The "Tally" Data Is Fundamentally Flawed.

Parent's remaining argument at hearing appeared to be that the District's ESY "raw data" was flawed, so by default, the District should have relied on the so-called "tally data" regarding behaviors.  Even assuming that the "raw data" was flawed, or the District's analysis of ESY was incorrect (and they were not), the evidence at hearing was clear that the tally data was not appropriate for ESY determinations.

As discussed in *CP I*, the tally data did not align with Student's IEP goals and objectives, as required by District ESY guidance and policy. DP 14-102 Final Order Finding of Fact 35.  While some limited strands of tally data could be compared to IEP behavior goals, the testimony at hearing was that, taken as a whole, the data did not align with Student's goals and objectives.  Tr. (6/16/14) 58:6-9.

Moreover, the flaw in Parent's reasoning as to why the tally data showed ESY recoupment/regression was demonstrated at hearing:  Ms. Jewell explained that the tally data captured many variables relating to behaviors that went beyond behaviors caused by breaks in instruction as required for ESY.  For example, Ms. Jewell was able to

specifically view the Parent's graph of tally data and could explain that on certain dates showing post-break increases in behaviors, these increases related to other factors other than breaks in instruction such as changes in staff or medical issues with Student. Tr. (6/16/14) 198:7-199:11 (spikes in behavior were the result of changes in medicine, food issues, illness, etc.); Tr. (6/16/14) 148:6-149:6 (Student was impacted by allergies, changes in sleeping patterns, etc.); Tr. (6/16/14) 198:2-13 (spike of over 20 behaviors occurred on day when primary education assistant was gone).

Finally, the testimony at hearing was that during the April 10 meeting the IEP team fully discussed the option of using either the tally data or data that aligned with IEP goals. Ex. D11 at 8. After a full and thorough discussion, the District concluded that using the goal/objective data was appropriate, not just for the reasons above, but for the additional reason that the other areas of need for the student used the goal/objective data, and thus would be consistent with the approach used for the other IEP goal areas. *Id.*

4.      **To the Extent That Parent Is Contending That ESY Should Be Provided Based on Historical Need, This Argument Runs Counter to IDEA and the Evidence at Hearing.**

Sutton testified that Student had previously received ESY services under his Hawaii IEPs and that these determinations were based on "copious data". Tr. (6/16/14) 105:2-5. The testimony at hearing, however, including the *CP I* hearing, was that, despite numerous requests to the Hawaii school district, Department of Education and even the Parent, the District had never been provided this "copious data" relating to ESY determinations. DP 14-102 Final Order Finding of Fact 7. In fact, in another attempt to obtain this data, the District even asked Dr. Sutton during hearing whether she could

forward this information to the District, which had never been previously provided. Tr. (6/17/14) 134:7-135:14.

The reality, however, is that as of the April 10 ESY meeting, the District did not have this information despite its good faith attempts to obtain the information and therefore the District's April 10 ESY determination could not be judged in hindsight even if it ultimately received ESY data from Hawaii at some later date. *Forest Grove School District v. Student*, 2014 WL 2592654 at *20 (describing "snapshot rule" whereby school district actions under IDEA are judged not in hindsight but rather only in context of data and information available to IEP team at the time of the IEP meeting).

Moreover, as explained on page 24 of the District's *CP I* posthearing brief, the Hawaii standard for ESY determinations is quite different from the standard in Oregon. The same is true for Arizona, which employs a different ESY standard than Oregon's. For example, ESY services are considered necessary in Arizona if either: (1) The benefits that the pupil gained during the regular school year would be significantly jeopardized if the pupil is not provided educational services, or (2) The pupil would experience severe or substantial regression if the pupil is not provided educational services during recesses or the summer months and the regression would result in substantial skill loss of a degree and duration that would seriously impede the pupil's progress toward educational goals. A.R.S. §15-881(A). Additionally, the factors that an IEP team in Arizona must consider include both retrospective (e.g., such as past regression and the rate of recoupment) and predictive data (i.e., when empirical data is not available, may be proven by expert opinion, based on a professional individual assessment) A.R.S. §15-881(B). This again stands in contrast to Oregon, where ESY can be based on future predictions only when no

regression/recoupment data is available. OAR 581-015-2065(5) (Criteria must include regression and recoupment time based on documented evidence or, *if no documented evidence, on predictions according to the professional judgment of the team*.) (emphasis added). Additionally, the Arizona Department of Education has stated that predictive data can be based on circumstantial considerations (e.g., information based on unique situations in the child's home, neighborhood, or community) or anecdotal reports (e.g., reports from teachers, parents, caregivers, and related service personnel). Arizona Dept. of Ed., Guidelines For Extended School Year Services (February 2007) at 6. Lastly, the State of Arizona has explicitly stated that although "regression-recoupment measures are part of the determination process, they are not the only measures." *Id*.

     Thus, the mere fact that Student obtained services previously in Hawaii and Arizona is not relevant to the determination of whether Student required ESY services years later under a markedly different Oregon IEP. As the Court stated in the *CP I* Final Order, "determining a student's ESY eligibility based solely on past eligibility is in direct contravention of the requirement that 'ESY must be provided only if the child's IEP team determines, on an individual basis, that the services are necessary for the provision of free appropriate public education to the child.' OAR 581-015-2065(2)." DP 14-102 Final Order at 20.

     Next, Sutton asserted that students with autism benefit from year-round instruction but this was clearly rebutted by the District's own expert in autism who stated that while this may apply to younger children, this was not the case with students with autism who were Student's age. Tr. (6/17/14) 145:22-146:20 (students are not "homogenous" and each student should be looked at as an individual). Moreover,

Erickson had actually provided direct ESY services to Student during the summer of 2013 and observed that Student appeared fatigued by the ESY and clearly wanted to go home.  Tr. (6/17/14) 146:21-147:13 (opining that, based on personal observation, Student would have benefited by having a break from instruction rather than ESY services during the summer of 2013); Tr. (6/17/14) 151:2-25 (observing that Student would put on hat and coat, and say, "Home," implying Student wanted to go home).

Finally, and critically, Sutton conceded in response to a direct question from the Court that she could not speak to whether Student should qualify for ESY this year, instead responding "I can't answer [that question] with certainty * * *" Tr. (6/17/14) 110:16-22.

## C.     Parent Again Failed to Present Any Evidence Relating to the Scope and Type of Remedy.

Just as in *CP I*, even assuming that Parent could meet his burden of proving an IDEA violation (which he has not), Parent failed to present any evidence as to the scope and extent of a remedy.  Even when a parent proves that a school fails to offer FAPE, the parent must still present evidence regarding the appropriate scope of services or remedy he is seeking. *Parenteau v. Prescott Unified School Dist.*, 2008 WL 5214997, *10 (D Ariz Dec 11, 2008) (noting that even if parent had proven that prior school district had failed to offer a FAPE, fact that parent failed to put on any evidence regarding the appropriate scope of services or any specifics about the specific remedy he was seeking resulted in parent not being entitled to any remedy).

Parent made no mention at hearing about in which areas he would like ESY services provided, how often he would like ESY provided, or to what extent (i.e., how much) ESY is appropriate.  Additionally, during the April 10th meeting Parent even

agreed that ESY was not required in every area. *See* Ex. D11 at 5 (Parent agreeing that ESY was not required for writing goals).

Lastly, Parent has not provided any affirmative data or evidence that ESY services are necessary for Student. Parent merely relies on the argument that a lack of ESY will result in increased behaviors, which would restrict Student's ability to access Student's educational instruction. Again, Parent has provided no evidence that a significant break in instruction will prevent Student from accessing his education; rather, Parent has only presented minimal evidence that negative behaviors could potentially impede a student's ability to access his or her education. *See* Tr. (6/17/14) 129:23-130:8 (Sutton testifying that behaviors could impede Student's education, but "it depends" on what those behaviors look like); Tr. (6/17/14) 147:12-20 (Jewell testifying that behaviors can impact Student's goals and objectives, but behaviors can also be positive).

## III. CONCLUSION

Based on the foregoing legal authorities and on the testamentary and documentary evidence presented at hearing, Student failed to meet his burden of proof and his complaint should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 24th day of June, 2014.

/s  Richard Cohn-Lee
THE HUNGERFORD LAW FIRM, L.L.P.
Richard Cohn-Lee, OSB No. 952331
Joel Hungerford, OSB No. 140940

Of Attorneys for Grants Pass School
  District