**BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS**
**STATE OF OREGON**
**for the**
**OREGON DEPARTMENT OF EDUCATION**

| | | |
|---|---|---|
| IN THE MATTER OF THE EDUCATION OF | ) | **FINAL ORDER** |
| | ) | |
| Student and Grants Pass School District | ) | Case No. DP 14-102 |
| | ) | |

## HISTORY OF THE CASE

On March 19, 2014, Parent of Student filed a request for a due process hearing with the Oregon Department of Education, alleging that the District had failed to provide a free and appropriate education for Student as required under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 USC §§ 1400 *et seq*. The parties held a resolution session on April 1, 2014 but did not reach an agreement.

On March 20, 2014, the matter was referred to the Office of Administrative Hearings (OAH) for a due process hearing. Administrative Law Judge (ALJ) A. Bernadette House of the OAH was appointed by the Oregon Department of Education to conduct the due process hearing.

Pursuant to OAR 581-015-2360(3) ALJ House conducted a pre-hearing conference, by telephone, on April 21, 2014. Parent appeared *pro se* and represented Parent and Student. Rich Cohn-Lee, attorney at law, appeared and represented Grants Pass School District (District). During the prehearing conference, the hearing date and relevant deadlines were set. Parent requested a waiver of the 45-day deadline to a date certain. The hearing was set for May 13 and 14, 2014. The Final Order was due on or before close of business June 6, 2013. Pursuant to OAR 137-003-0520, ALJ House authorized the parties to file documents by electronic mail (email), with the exception of exhibits for the hearing.

District's filing of a Motion for Summary Determination, filed via electronic (email) on April 21, 2014, was accepted as filed. Parent acknowledged receipt of the Motion. ALJ House reviewed the requirements for filing a response to the motion as required by OAR 137-003-0580(10). Parent's Response to Motion for Summary Determination was timely received. By ruling issued May 1, 2014, ALJ House denied District's Motion.

On April 22, 2014, Parent filed a Motion to Compel Discovery. On April 30, 2014, District filed District's Response to Motion to Compel Discovery (Response). On April 24, 2014, Parent filed a request to consolidate OAH case numbers DP 14-102 and DP 14-104. On April 25, 2014, District filed a response to Parent's request. On May 5, 2014, ALJ House issued a consolidated ruling on Parent's April 22, 2014 Motion and Parent's April 24, 2014 request. Parent's Motion to Compel Discovery was granted in part and denied in part as set out in the Ruling. Parent's request to consolidate was denied.

On May 12 and 13, 2014, ALJ House convened the hearing in Grants Pass, Oregon. Parent appeared *pro se*, representing Parent and Student, and testified at hearing. Mr. Cohn-Lee,

with co-counsel Joel Hungerford, Attorney at Law, both of the Hungerford Law Firm, accompanied by Kirk Kolb, Director of Special Education Services, appeared on behalf of District. In addition to Parent, the following witnesses testified: Mr. Kolb; Dorothy Jewell, special education teacher; Kirby Erickson, regional autism consultant for Southern Oregon Education Service District (SOESD); and Emily Luka, District employee.

This Final Order is being issued timely on June 6, 2014, the date established at the pre-hearing conference.

## ISSUES

(1) Whether, during Individual Education Plan (IEP) meetings to address Student's IEP development, including November 20, 2013, and March 18, 2014, District failed to consider, and provide for, Extended School Year Services (ESY) to Student in compliance with 34 CFR §300.106(a)(1), (2), and (3); OAR 581-015-2065(1) through (7).

(2) If so, whether the failure to consider ESY resulted in a substantive violation of Student's rights under the IDEA.

(3) Whether District prohibited discussion of ESY at the November 20, 2013 and March 18, 2014 IEP meetings, and if so, whether District violated Parent's right to participate in the development, revision, and review of Student's IEP under 34 CFR§300.322(a), 300.324(a) and (b), and 300.501(b)(1)(ii); OAR 581-015-2190(1), 581-015-2195(1), 581-015-2205(1)(b), and 581-015-2225(1)(b)(C) and (E).

(4) If District's alleged violations occurred and if the violations resulted in a substantive violations of Student's rights under the IDEA, what is the appropriate remedy.

## EVIDENTIARY RULINGS

District's Exhibits D1 through D7, D11 and D12 were entered into the record without objection; Exhibits D8, D9, and D10, objected to by Parent on relevancy, were entered into evidence for the limited purposes stated on the record.

Parent's Exhibits S11, S16 and S28 were admitted without objection. As explained further below, Parent's Exhibits S3, S4, S6, S13, S20 and S21 were admitted over District's objections. District's objections to Exhibits S2, S5, S7-S10, S17, S19, and S22-S27 were sustained and those exhibits were excluded from the record.

Parent's Exhibits S2 and S5, copies of statutes and rules, were excluded on the basis that laws and rules are not evidence for purposes of an administrative hearing; Exhibit S1 was blank; District's objections to Exhibits S3 and S4, on relevancy, were overruled and Exhibits S3 and S4 were admitted. I reserved ruling on District's objection to S6 based on relevancy. Following a review of the record, District's objection is overruled and Parent's Exhibit S6 is admitted. Parent failed to lay a foundation for Exhibits S7, and S8, which, on the face of each exhibit, are not relevant. Therefore, Exhibits S7 and S8 are excluded from the record. District's objection to Exhibit S10, based on relevancy, was sustained. Parent failed to lay a foundation for Exhibit S9, which is deemed irrelevant under the same basis as S10. Exhibits S9 and S10 are excluded from

the record. Exhibits S12, a portion of the document entered as a whole as Exhibit D3, S14, a portion of the complete document entered as D5, and Exhibit S15, a portion of the complete document entered as D4, were withdrawn by Parent. Exhibit S13 was admitted over the District's objection. Parent did not lay a foundation for Exhibit S17; therefore it is not entered into evidence. Exhibit S18 was withdrawn by Parent. Exhibit S19, a copy of the Individual Education Plan (IEP) team meeting notes of April 10, 2014, were not relevant to the issues for DP 14-102, and are not therefore admitted into evidence. District's objections to Exhibits S20 and S21 were overruled and Exhibits S20 and S21 were admitted. District's objections to S22, S23, and S24 were sustained. Parent did not provide sufficient foundation for S25-S27; therefore, those exhibits are excluded.

## LIST OF ABBREVIATIONS

The following is a list of commonly used abbreviations, and the associated terms, as they appear throughout this Final Order

BSP:  behavior support plan
ESY:  Extended School Year
FAPE: free appropriate public education
FBA:  functional behavior assessment
IDEA: Individuals with Disabilities Education Improvement Act of 2004
IEE:  Individual Educational Evaluation
IEP:  Individualized Education Plan
PLEP: Present Level of Performance
SLP:  Speech Language Pathologist

## FINDINGS OF FACT

*Relevant background facts*

(1)     Student qualifies for special education services in category of Autism Spectrum Disorder under IDEA. (Tr. Vol. I, 159:23-24.) Parents and Student moved from another state to Oregon on or about June 27, 2013. (Tr. Vol. I, 159:25-160:2.)

(2)     Student's level of cognitive function was assessed at age 5 years, 5 months, as of November 20, 2014. (Ex. D3 at 7.) Student's chronological age as of that date was 15 years. (*Id*. at 4.)

(3)     When Student experiences challenging circumstances, *e.g.* moving to a new school, changes in staffing, Student displays behaviors which interfere with his/her ability to access his/her education. Student interfering behaviors (behaviors) include running away (eloping), flopping to the floor (flopping), and aggression towards education staff. (Exs. S11 at 5, D3 at 7.) Transitions are particularly difficult for Student. (Ex. S11 at 5.)

(4)     Student's 2013-2014 IEP from his/her former school district (former IEP) included an FBA and BSP. (Ex. S11 at 5.) The former IEP provided for special education and related services from March 1, 2013 until March 1, 2014. (*Id*. at 16.) In Student's PLEPs on the former IEP, Student's behaviors were noted to decrease drastically after he/she began to familiarize with

new staff and his/her new environment. (*Id.*) The former IEP also noted Student continued to experience difficulty with transitions, especially from non-preferred activities, although the incidents of behaviors decreased over time. (*Id.*)

(5)    Student's former IEP provided for ESY services as follows:

For the 2012-2013 school year, the IEP team determines that ESY services are required for breaks longer than ten (10) calendar days. ESY services will begin on the eleventh calendar day of the break. Services will not be provided on State and Federal holidays.

- [Student] will receive special education from a special education teacher in the classroom for 360 minutes per day from 8:00 am – 2:00 pm
- [Student] will receive 360 minutes per day of 1:1 Instructional Support Services from 8:00 am – 2:00 pm
- For summer ESY, Educational Consultation (see clarification section for what this service entails) will consist of 15 hours per month.

- For summer ESY [Student] will receive Speech/language Therapy 2 hours per week.
- For summer ESY [Student] will receive occupational therapy consult for 80 minutes total.
- Team meetings: bi-weekly (30 minutes each)

(Ex. S11 at 16.)

(6)    Parent contacted District prior to moving to District in June 2013. (Tr. Vol. II, 193:7-194:7; Ex. S6.) Parent communicated primarily with Kirk Kolb, District Special Education Director. (Tr. Vol. 1, 39:25-40:1, 159:1-8.) Parent began communicating with District approximately one month prior to Parents' and Student's move because Parent wanted District to be aware of Student's IEP requirements, especially the requirement that Student receive ESY for summer 2013 with no longer than 10 days break in services. (Tr. Vol. II, 193:7-194:7; Ex. S6.) Parent expressed concerns to Kolb about Student's difficulties with transition. Parent was especially concerned because Student was transitioning to a new school. Bonding with staff was very important to Student, and based on prior experience, if Student had a break in service for longer than ten (10) school days, Parent would not be able to replicate the school setting for Student in the home, causing Student to regress and to fail to timely recoup skills related to his special education needs. (Tr. Vol. II, 76:1-78-9, 193:13-194:7.)

(7)    District received a copy of Student's IEP from the prior school district. (Tr. Vol. I, 126:13-17.) District made multiple records-requests to both the former school district's state department of education and the local school because in that state, both entities maintain student records. District did not receive the information it had requested. (Tr. Vol. I, 178:18-179:9.) The District also made multiple requests to Parent to provide any additional documentation or records related to Student. (Tr. Vol. II, 189:6-25.) District did not receive a copy of Student's 2012 IEP. (*Id.*) Based on Parent's communications, Student's former IEP, and an expected transition date of June 27, 2013, District staff prepared to provide ESY for Student for summer of 2013. (Ex. S6 at 1.)

(8)     On or about June 11, 2013, District staff held an initial meeting regarding services for Student for the upcoming summer ESY period. (Ex. S6 at 2.) Based on Parent's information and on records that District had received from the prior school district, District reserved an iPad and a laptop for Student to use during ESY. (*Id*. at 1.) The only record for Student that District received was a copy of Student's 2013-2014 IEP from the former school district. (Tr. Vol. I, 136:24-137:5.) Because District, as of June 13, 2013, did not have other students enrolled for ESY during the summer of 2013, Kolb sought alternative locations to provide services where Student could interact with peers. (*Id*.)

(9)     Based on the former IEP, District provided ESY services to Student during the summer of 2013. (Tr. Vol. I, 126:18-22.) District provided those services at the District office's where there was space available for support staff to provide ESY to Student. The space was located next to Kolb's office. (*Id*., 159:9-20.) Kolb saw Student on a daily basis during the ESY period. He also observed Student during one or two lunch periods and when he assisted with blocking Student's attempts to bolt (to leave the area where the staff was working with Student or to leave the building) on some occasion(s). (*Id*., 159:14-20.)

(10)     District has adopted policies and procedures, entitled "Extended School Year Guidance," (the policy) to guide staff in implementing ESY requirements. (Ex. D1 at 1, 2.) District relied on information from the Oregon Department of Education's Internet site regarding ESY requirements as of August 28, 2013. (Tr. Vol. I at 68:9-19.) Kolb, in his role as special education director, imported the District's guidance for ESY policies from the state's website by using a "cut and paste" method in word processing in August of 2013. (Tr. Vol. I at 65:1-68:19.) If the Department's guidance on ESY policies had been updated as of August 2013, Kolb intended that update to be incorporated into the District's ESY policies. (*Id*.) To Kolb's knowledge, the Department's policies and guidance regarding the provision of ESY, as implemented by the District, comply with the requirements of the federal regulations for the same. (Tr. Vol. I at 57:1-58-22, 64:22-65:1, 70:21-25.)[1]

(11)     The policy provides as follows:

**General Guidelines:**
1. The purpose of extended school year services is the *maintenance* of the child's skills or behavior. ESY is *not* intended for the teaching of new skills or behaviors.
2. ESY is intended to maintain a skill or behavior directly related to one or more IEP goals.
3. All members of the IEP team can request ESY.

(12)     Typically the initial

---

[1] At hearing, Parent asked Kolb, in a lengthy period of questioning, for his opinion as to whether specific provisions of the Department's guidance were in compliance with the federal regulations governing ESY. That testimony is not reproduced here. Kolb's general understanding as a professional working in the area of special education and as the director of a district's special education services, was as set out above. The issue of whether the District's policy is in fact in compliance with the federal regulations is a matter of legal interpretation. To the extent the issue was raised in this due process hearing, it will be determined in the opinion and order portion of the decision.

4. Or annual IEP is when the IEP team discusses the need for ESY. However, if a student is new to the district/school, data will be necessary to make those decisions. In these cases, teams can indicate on the IEP that the team will reconvene at a later date (prior to the end of the school year) to determine if ESY is appropriate and in which objective and goal areas. See guidance below.
5. ESY is possible for all students with an IEP.
6. ESY services are to ensure that a disabled student receives a Free and Appropriate Public Education (FAPE).

**Criteria for ESY Services:**
1. The student must demonstrate an "undue" regression and recoupment of a skill or behavior directly related to an IEP goal.
2. GPSD defines this as data that shows a student has not recouped to their baseline when the interruption began. The following are GPSD guidelines for the IEP team to consider:
   a. More than eight weeks after summer break
   b. More than 2-3 weeks after winter break
   c. More than 1-2 weeks after spring break
3. **"Regression"** means a significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services.
4. **"Recoupment"** means the recovery of skills or behaviors specified in the IEP to a level demonstrated before the interruption of education services.
5. If the team does not have documented evidence, then the decision can be made by "predictions" according to the professional judgment of the team." (This is required by the OAR.)

**Specific Guidelines:**
1. **If the IEP team agrees to "consider at a later time" the case manager must identify the date that the IEP team will meet to consider the data as defined on the IEP.**
   (make subsequent arrangements for a future IEP and follow through with those arrangements.)
2. ESY must be based on measurable data such as DIEBELS or behavior charts.
3. ESY services are determined by the IEP team specifically for the student's specific needs; only those needs that relate directly to one or more IEP goals.
4. There are no "programs" available unless the need arises from multiple IEP teams for similar services.
5. ESY needs to be planned and documented for a targeted skill(s), time, location and duration. Only those skills that are poorly recouped should be provided for. The key here is that the ESY Plan (see attached document) needs to only address the narrow issue of the skill that is poorly recouped. ESY services are not intended to replicate the IEP.
6. ESY may involve only related services.
7. Use the ESY Team Decision form and Data and Recommendations form when:

a. An IEP team meets after previously agreeing to consider the decision later than the most recent IEP.

b. If one or more members of the team is concerned about the need for ESY.

**When Parents Disagree:**
1. ESY decisions are based on the IEP team, including the family.
2. If the family is participating by phone or in writing, ensure that they have the opportunity to share in this decision.
3. If the family is the only team member to disagree, they may be referred to the Director of Special Services and should be offered a Procedural Safeguards booklet.
4. Note the disagreement and reasoning on the PWN of SPED Action form.
5. Complete a PWN of SPED Action form specifically for this decision, in addition to the Team Decision and Data and Recommendations form.

[list of attached forms omitted]
(Ex. D1 at 1, 2.) (emphasis in original).

(13)   District scheduled, and conducted, an IEP team evaluation meeting regarding Student's eligibility for IDEA services on November 19, 2014.  (Tr. Vol. I, 162:6-23.)  On October 31, 2013, District issued a Notice of Team Meeting, scheduling an IEP meeting for November 30, 2014.  (Ex. D2.)  According to the October 31, 2013 Notice, the purpose of the meeting was to develop or review an IEP for Student and to consider Student's transition needs or services for a student age 16 or older.  (*Id.*)  District scheduled the meeting to develop the IEP as quickly as possible after the eligibility determination, to comply with District's understanding of its legal obligations for a student eligible for IDEA services who was a new student to Oregon. (Tr. Vol. I, 162:6-13.)

(14)   Based on his interactions with Parent, Kolb believed that Parent was unhappy with the District's provision of FAPE to Student prior to the November 20, 2013 IEP meeting.  (Tr. Vol. I, 163:10-17.)  In an effort to have a more productive IEP meeting on November 20, 2013, Kolb contacted the Oregon Department of Education (the Department) and asked to have the services of a neutral facilitator appointed by the Department to attend the meeting.  (*Id.*, 163:2-164:7.)

(15)   In response to Kolb's request, the Department appointed Julie Gentili-Ambrust to act as facilitator at the November 20, 2013 IEP meeting and she attended the meeting in that capacity.  (Tr. Vol. I, 163:3-5.)  Prior to beginning the IEP meeting, Gentili-Ambrust explained to the note-taker, Emily Luka, that she and Luka had to remain impartial.  She instructed Luka to be very exact in taking the meeting minutes and to record consensus decisions when Gentili-Ambrust directed her to do so.  (Tr. Vol. II, 154:4-9.)  Gentili-Ambrust informed the IEP team of her role as a facilitator, and her qualifications as an attorney, prior to the beginning of the meeting. (Ex. D4 at 1.)  She instructed the parties that parties could request a break to confer with her in private at any point during the meeting.  (*Id.*; Tr. Vol. II, 169:11-14.)  The parties signed statements at the beginning of the meeting, provided by Gentili-Ambrust, that, as reported by Luka, acknowledged Gentili-Ambrust was "[im]partial and that they were knowledgeable of that, that she could not provide content or direction of how the IEP was to be developed but she

was there only to provide confines of and compliance with law and making sure that the content of the IEP was done in whole and to facilitate between the two parties." (Tr. Vol. II, 154:10-18; Ex. D4 at 1.)

(16)    Multiple District personnel attending the IEP team perceived Gentili-Ambrust to be knowledgeable regarding the implementation of IDEA in Oregon, to have acted fairly and strictly to facilitate the meeting, to have treated each party similarly, and to not have provided substantive input regarding the content of the IEP. (Tr. Vol. I, 163:20-164:7, Vol. II, 108:2-24, 127:9-19, 130:10-131:2, 153:3-5, 153:25-154:24.)

(17)    Parent was provided the opportunity at his request to have staff from Student's former school district participate in the November 20, 2013 IEP meeting via telephone. (Tr. Vol. II, at 118:7-20.) Parent had invited Student's speech language pathologist (SLP) from the former school district to attend by telephone. Prior to the meeting, Student's former SLP told Parent that she had a family medical emergency and she would be traveling to another state to be present for the emergency. Parent told the SLP that, under those circumstances, he did not expect her to attend the IEP meeting. (*Id*. 184:19-185:3.) Parent informed the IEP team at the beginning of the meeting that Student's former SLP, who had been invited to attend, was unable to attend as expected. (Ex. D1 at 1.)

(18)    Parent did not intend Student's former SLP to provide information that would support the need to determine Student's ESY eligibility at the November 20, 2013 meeting. (Tr. Vol. II at 184:2-4.) Parent did not attempt to provide additional documentation supporting the provision of ESY to Student prior to the November 20, 2013 IEP meeting to the IEP team. He believed that the prior IEP included data sufficient to support the provision of ESY to be included in the IEP to be developed at the November 20, 2013 IEP meeting. (*Id*. 185:5-14.)

(19)    Gentili-Ambrust asked Parent if he was requesting that documentation he/she provided be distributed at the beginning of the meeting. Parent confirmed the request and the documents were distributed. Parent provided Parent's recommended goals and objectives, data sheets from prior school of SALT (acronym not defined) Language Sample Analysis, Word Root Tables, and Word and Morpheme Summary. (Ex. D4 at 2.)

(20)    Throughout the November 20, 2013 IEP meeting, Parent in addition to the other IEP team members provided input on each item on the agreed upon agenda, including but not limited to, writing Student's PLEPs. (Ex. D4.) The team discussed each portion of the IEP and where there was initial disagreement, as reflected in the meeting notes, the team eventually reached consensus on each portion of the IEP with the exception of whether or not to consider ESY eligibility at that time. (*Id*.)

(21)    When the agenda called for Parent's input regarding Student's PLEPs, Parent asked for additional time to organize his/her thoughts. (Ex.D4 at 2.) After the team completed its final review of the PLEPs for the IEP, Gentili-Ambrust reminded the team that Parent that the team needed his/her parent input. Parent agreed to provide his/her parent input regarding his/her comments/concerns in writing to be sent to Dorothy Jewell, Student's special education teacher, within one week. Jewel was directed to add Parent's comments/concerns to the final IEP without changes. (*Id*. at 8.)

(22)   Where Parent voiced particular disagreement and asked for inclusion of different wording or a different method or approach, the IEP team discussed the particular item at length. (Ex. D4.)  In many instances, the team discussion of Parent's input resulted in a change, by consensus of the team of the draft language (if language had been drafted) to reflect Parent's input.  (*Id*. at 2 (fifth item), 3 (second and fourth items), 4 (first and second items), 5 (first item continued through fifth item), and 6 (entire page)).  The team agreed, in response to Parent's input, to include within Student's PLEP on Speech Language, a statement based on data included in the former IEP.  (Id. at 7 (fourth item).)

(23)   In further discussion of Student's Speech Language PLEP, the team compared the format of the Student's former IEP with the Oregon IEP format for related services.  Cindy Picton, District's provider for Speech/Language services and a member of Student's IEP team, told the team what the former SLP had explained to Picton regarding Student's past performance using a direct therapy model.  The team reached consensus on the final wording.  The wording incorporated the historical information as relayed by Parent and by the former SLP through Picton.  (Ex. D4 at 8 (first item).)

(24)   Parent requested a private consultation with Gentili-Ambrust after the IEP team began to address ESY.  (Tr. Vol. II, 169:14-170:24.)  Parent had become frustrated after hearing Kolb state that Student's eligibility for ESY would not be determined at the current meeting because the team needed regression/recoupment data.  (*Id*.)  Based on Gentili-Ambrust's general explanation that Oregon used regression/recoupment data to determine ESY and that different states may provide differently for ESY, Parent assumed he would not be able to further discuss ESY determination at the meeting.  (*Id*., 170:1-11.) Parent had intended to introduce prior IEPs for Student which had provided for ESY as support for his position that Student needed ESY to be included on the November 20, 2013 IEP for the summer of 2014.  (*Id*.,170:12-15.)

(25)   Parent did not have additional data other than prior IEPs to support a determination at the November 20, 2013 IEP meeting that Student was eligible for ESY.  (Tr. Vol. II, 170:12-15.)  Parent did not provide documentation to the District to support his/her belief that the determination to provide ESY needed to be made at the November 20, 2013 meeting to avoid a detriment to Student's access to FAPE.  (Tr. Vol. II., 167:21-23.)

(26)   After consulting with Gentili-Ambrust, Parent agreed to defer determination of Student's ESY eligibility at a later time but prior to April, 2014.  (Tr. Vol. II, 170:21-171-2; Ex. D4 at 23.)  Parent did not agree that the ESY determination could be deferred until after Spring break 2014.  (Tr. Vol. II, 171:24-172:4; Ex. D4 at 23.)  The remaining members of the IEP team believed that regression/recoupment data collected after both Winter break 2013-2014 and Spring break 2014 was necessary to determine ESY eligibility.  (Tr. Vol. II, 20:1-21:3; 134:2-19; Ex. D4 at 23.)

(27)   The November 20, 2013 IEP meeting began at 10:30 a.m. and adjourned at 4:42 p.m.  (Ex. D4 at 1, 24.)

(28)   By email of December 4, 2013, Parent informed District that it could "let [the IEP] go without a parent concern section."  (Ex. D3 at 4.)

(29)   Parent believed that the November IEP team meeting should have determined Student's eligibility for ESY, in part, because Parent "operated under the assumption based on

federal law that ESY should be determined either yes or no at each annual IEP." (Tr. Vol. II, at 160:9-11.) Additionally, Student had historically received ESY services over the summer, including determinations over the most recent two or three years, that Student required ESY for the summer for breaks in excess of ten days. (*Id.*, 162:3-9.) The annual IEPs developed for Student's for the prior four years had determined ESY eligibility and Parent had become accustomed to that practice. (*Id.*, 164:14-16.)

(30) Parent did not believe that failing to determine ESY at the November 20, 2013 meeting would have a substantive impact on Student's ability to access his education. (Tr. Vol. II, 180:10-13.)

(31) The November 20, 2013 IEP was implemented and in place for four school days prior to the November 2013 Thanksgiving break when schools were closed. (Tr. Vol. I, 184:2-3; 185:9-11.) In addition to the Thanksgiving break, District schools were also closed due to snow on December 6, 9, and 10, 2013. (*Id.*, 184:19-25.) From the time the November 2013 IEP was implemented until the start of Winter break, District schools held school for sixteen and a half (16.5) instructional days. (*Id.*, 185:12-15.)

(32) District's IEP team members did not believe regression/recoupment data would be a reliable basis for ESY eligibility if it were only based on the period following the implementation of the new IEP before Winter break and the period after the school reconvened following the Winter break. Because Student was experiencing major changes stemming from moving to a new school, new staff, and new goals and objectives, as well as a natural lack of structure characteristic of schools just prior to a major holiday break, District staff did not believe that baseline data from before and after the Winter 2013 break would accurately reflect Student's ability to meet or to progress on the November 20, 2013 IEP goals and objectives. (Tr. Vol. I., 185:16-186:23; Vol. II, 39:14-49:5; 127:16-128:22.)

(33) On December 17, 2013, Parent requested that some changes be made to the November 20, 2013 IEP. Parent asked for wording changes, and for an addition to the service page, and for an objective or possibly two, to be removed. The changes to the IEP were made as requested by Parent. (Tr. Vol II, 34:21-35:10.)

(34) Dorothy Jewell, Student's special education teacher, collected data recording Student's progress on specific objectives using a worksheet she kept at her desk as part of a working file on Student's progress. (Tr. Vol. II, 42:19-47:4; Ex. D10.) Picton, Student's SLP, also collected data and recorded it on Jewell's worksheets. (Tr. Vol. II, 42:23-24.) Jewell tracked the data in order to be able to make a recommendation later about Student's ESY eligibility but it was not intended to be a formal determination. Jewell's understanding as a special education teacher is that Student's eligibility for ESY must be determined by the IEP team. (*Id.*, 46:21-47:15.) The data supported Jewell's agreement with the IEP team that the team needed more time in order to accurately measure regression/ recoupment data. (*Id.*, 42:20-65:1.)

(35) Jewell also used another form to track Student's behaviors, not his/her academic progress, on a daily basis. (Tr. Vol. II, 66:22-67:7, 68:4-7; Ex. S21.) The behaviors listed on the form do not necessarily align with an IEP's goals and objectives but they provide information helpful to develop IEP goals and objectives or to see if the goals and objectives in an existing

IEP correctly address a student's needs. (*Id*. 68:22-69:5.) Parent asked for and was given copies of the data collected on Student's behaviors but Jewell was not sure of Parent's reasoning for asking for the data. (*Id.* 68:8-22.)

(36)   District scheduled an IEP team meeting on March 18, 2014 to review an IEE for Student's FBA. (Tr. Vol. I, 190:23-191:3.) At Parent's request, discussion of ESY was added to the agenda for the meeting. (*Id*., 191:4-11.) During the meeting of March 18, 2014, Parent asked the IEP team to discuss Student's ESY eligibility for summer 2014. (Tr. Vol. I, 191:16-18, Tr. Vol. II, 70:22-71-3; Ex. D5 at 8.)

(37)   Prior to the last break before the end of the March 18th meeting, IEP team members Lee Savage, from Aspire Agency who had been present to discuss Student's FBA, and Cindy Picton, SLP, were excused from the meeting. (Ex. D5 at 1, 8.) When the meeting reconvened, Kolb told Parent that the District would comply with the IEP of November 20, 2013 and defer the discussion of ESY eligibility until April 16, 2014. (*Id*., at 8.) When corrected by Parent, Kolb agreed with Parent that the November 20, 2013 IEP said that ESY would be determined "by April 16th." (Ex. D5 at 8.) Parent told the IEP team that waiting until April 16th to determine Student's eligibility for ESY would not allow Parent time to exercise his rights if he did not agree with the decision. (Tr. Vol. II, 217:15-218:5; Ex. D5 at 8.) Kolb told Parent that the District was going to wait, as set out in the November 20, 2013 IEP, to meet by April 16th to discuss ESY. (Tr. Vol. II, 71:23-72:3, 218:8-11; Ex. D5 at 8.) Parent was not allowed to provide further input on March 18, 2014 regarding determining Student's eligibility for ESY at that time. (Tr. Vol. II, 70:22-72:3, 218:24-219:6; Ex. D5 at 8.)

(38)   Parent did not believe that failing to determine ESY at the March 18, 2014 IEP meeting would have a substantive impact on Student's ability to access his education. (Tr. Vol. II, at 180:10-13.) Parent believed that a detriment to Student's ability to access his education, specifically an increase in Student's avoidance behaviors, would occur if Student was actually denied ESY in the summer of 2014. (Tr. Vol. II at 182:11-183:20.) Parent believed that the District's decision to schedule an IEP meeting to determine Student's ESY on April 10, 2014 would result in a detriment to Student, if the District's determined that Student was not eligible for ESY, because the time required for Parent to pursue an administrative remedy could not be accomplished in time to prevent a break in Student's education of more than ten school days. (Tr. Vol. II. at 182:19-183:19.)

(39)   By prior written notice dated March 20, 2014, District scheduled an IEP team meeting for April 10, 2014 to determine Student's eligibility for ESY. (Ex. D7.) On April 10, 2014, the IEP team met and made a determination regarding Student's eligibility for ESY for summer 2014. (Ex. D9 at 2.)

## CONCLUSIONS OF LAW

(1)   During the Individual Education Plan (IEP) meetings of November 20, 2013 and March 18, 2014, Parent failed to show that District violated either federal and/or state requirements for determining ESY eligibility for Student.

(2)  District did not prohibit discussion of ESY at the November 20, 2013 and District did not violate Parent's right to meaningful participation in the development, revision, and review of Student's IEP.

(3)  District prohibited additional discussion of ESY eligibility at Student's March 18, 2014 IEP meeting.  However, District's conduct did not violate Student's rights regarding an ESY eligibility determination.  District's conduct did prohibit Parent's right to meaningful participation regarding Student's eligibility determination at the March 18, 2014 meeting. However, Parent did not show that the procedural error resulted in a substantive failure to provide FAPE to Student.

## OPINION

### Burden of Proof

The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.  *Schaffer v. Weast*, 126 S Ct 528 (2005).  In this case Parent sought relief and bore the burden of persuasion.  The standard of proof applicable to an administrative hearing is preponderance of the evidence.  *Cook v. Employment Div.* 47 Or App 437 (1980) (in the absence of legislation specifying a different standard, the standard of proof in an administrative hearing is preponderance of the evidence).  Proof by a preponderance of the evidence means that the fact finder is persuaded that the facts asserted are more likely true than not true.  *Riley Hill General Contractors v. Tandy Corp.,* 303 Or 390 (1989).

### Federal and state requirements for use of funds under IDEA

Student is eligible for educational services under the IDEA.  Parent alleges that District has failed, under the specific allegations set out below, to meet its requirement to provide those services as required under IDEA to Student.

States may access federal funding to provide education to children with disabilities, but the states must provide that education in accordance with federal law.  *see* 20 U.S.C. §1411 *et. seq*.  States receiving funds must have in effect certain policies and procedures.  *see* 20 U.S.C. §1412 *et seq*.  To receive these funds, a state must provide that a "free and appropriate education is available to all children with disabilities[.]  20 U.S.C  §1412(a)(1)(A).

Congress, in amending IDEA in 2004 stated the following:

The purposes of this chapter are—
(1)
(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
(B) to ensure that the rights of children with disabilities and parents of such children are protected [.]

20 U.S.C. § 1400(d).

The Supreme Court set out what was required to provide a "free appropriate public education" in the seminal case of *Board of Educ. Of Hendrick Hudson School District v. Rowley*, (1982). Under *Rowley*, a school district has the duty first, to comply with the procedural requirements of the IDEA and, second, to develop an IEP that is reasonably calculated to enable Student to receive educational benefits. *Rowley*, at 207, 208. However, the Ninth Circuit has held that "only those "* * * procedural inadequacies that result in the loss of educational opportunity * * * or seriously infringe on the parent[s]' opportunity to participate in the IEP formulation process * * * clearly result in the denial of FAPE." *W.G. v. Bd. Of Trustees of Target Range School D.* 960 F2d 1479, 1484 (9th Cir 1992). The 9th Court of Appeals has determined that IDEA 2004 did not change that standard and that *Rowley* standard remains the law. *See J.L. v. Mercer Island School Dist.*, 592 F. 3rd 938 (9th Cir. 2010)

Pursuant to the requirements of the IDEA, under 34 U.S.C. part 300 *et. seq*., the United States Department of Education promulgated rules for state use of funds used to carry out the provisions of the Act. OAR chapter 581 division 015, promulgated under ORS chapter 343 mirrors, for the most part, the requirements set out in the federal rules. The majority of the opinion below cites to the relevant OAR as the implementing rule for Oregon with which school districts are required to comply.[2]

*District's obligation to provide FAPE*

Following identification and evaluation requirements, the cornerstone for educating a student under IDEA occurs through developing a procedurally and substantively sufficient IEP which provides an offer of FAPE.

*When an IEP must be in place*

IDEA requires that "at the beginning of the school year, each local educational agency * * * shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program[.] 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. §300.323(a). OAR 581-015-2220 mirrors the federal requirement, requiring that:

(1) General:

(a) At the beginning of each school year, a school district must have in effect an IEP for each child with a disability within the district's jurisdiction.

(b) School districts must provide special education and related services to a child with a disability in accordance with an IEP

If a student on an IEP transfers from another state to an Oregon school district, OAR 581-015-2230(2) requires the following:

---

[2] Where more appropriate for purposes of clarity, the federal rule may be cited initially, accompanied by the implementing state rule(s).

Out of state: If a child with a disability (who had an IEP that was in effect in a previous school district in another state) transfers to a new district in Oregon, and enrolls in a new school within the same school year, the new school district (in consultation with the child's parents) must provide a free appropriate public education to the child (including services comparable to those described in the child's IEP from the previous district), until the new district:

(a) Conducts an initial evaluation (if determined necessary by the new district); and

(b) Develops, adopts and implements a new IEP, if appropriate, that meets applicable requirements.

In the March 19, 2014 due process request, Parent alleged that District was required, but failed, to determine Student's ESY eligibility when District developed Student's initial Oregon IEP in November 2013, and again, when District amended Student's IEP in March 2014. Parent also alleged that District's failure to comply with procedural requirements resulted in Student's losing an educational opportunity (a substantive defect), in violation of District's obligation to provide Student with FAPE. Parent also alleged that District failed to allow Parent to meaningfully participate in Student's ESY eligibility determination at either the November 20, 2013 or the March 18, 2014 IEP meetings. Parent alleged that failure to allow Parent participation resulted in a substantive violation of District's obligations under IDEA under the standard set by the Court in *Target Range*, 960 F2d at 1484. As explained below, Parent failed to meet his/her burden of proof.

*Background*

Student transferred into the District in June 2013 with an IEP that was in effect in Student's previous school district in another state. Prior to Student's arrival, Parent notified District that Student would be enrolling in the District upon arrival on or about June 27, 2013, and that Student's current IEP provided for ESY services for the summer break. As required under OAR 581-015-2230(2), District prepared for, and provided, ESY services to Student comparable to those set forth in Student's IEP from the former school district. District also implemented, as closely as possible, Student's IEP from the former school district at the start of 2013-2014 school-year. In accordance with federal and state law, District scheduled an eligibility determination and evaluation for Student. District also scheduled an IEP team meeting to develop an IEP for Student, incorporating among other things, the results of the newly completed evaluations and District staff experience with Student since his/her arrival in the District.

*ESY requirements for Students under IDEA*

The IDEA itself does not provide for ESY. However, when promulgating rules to implement the IDEA, the US Department of Education included the requirement that the public agency responsible for providing FAPE must provide for services during periods when regular school services are not provided if necessary for an individual student to receive a FAPE. 34 CFR § 300.106, entitled "Extended school year services," provides as follows:

(a) General.

    (1) Each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

    (2) *Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.*

    (3) In implementing the requirements of this section, a public agency may not—

        (i) Limit extended school year services to particular categories of disability; or

        (ii) Unilaterally limit the type, amount, or duration of those services.

(b) Definition. As used in this section, the term extended school year services means special education and related services that—

    (1) Are provided to a child with a disability—

        (i) Beyond the normal school year of the public agency;
        (ii) In accordance with the child's IEP; and
        (iii) At no cost to the parents of the child; and

    (2) Meet the standards of the SEA.

(Emphasis added.)

    Oregon has implemented the requirements of 34 CFR§ 300.106 under OAR 581-015-2065 as follows:

    (1) School districts must ensure that extended school year services are available as necessary to provide a free appropriate public education to a child with a disability.

    (2) Extended school year services must be provided only if the child's IEP team determines, on an individual basis, that the services are necessary for the provision of free appropriate public education to the child.

    (3) A school district may not:

(a) Limit extended school year services to particular categories of disability; or

(b) Unilaterally limit the type, amount, or duration of those services.

(4) The purpose of extended school year services is the maintenance of the child's learning skills or behavior, not the teaching of new skills or behaviors.

(5) School districts must develop criteria for determining the need for extended school year services. Criteria must include regression and recoupment time based on documented evidence or, if no documented evidence, on predictions according to the professional judgment of the team.

(6) For the purposes of section (5) of this rule:

(a) "Regression" means significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services;

(b) "Recoupment" means the recovery of skills or behaviors specified on the IEP to a level demonstrated before the interruption of education services.

(7) For the purposes of this rule, "extended school year services" means special education and related services that:

(a) Are provided to a child with a disability:

(A) Beyond the normal school year of the school district;
(B) In accordance with the child's IEP; and
(C) At no cost to the parents of the child; and

(b) Meet the standards of the Department.

Parent's due process complaint alleged, among other things, that District, in the IEP meetings held on November 20, 2013 and on March 18, 2014, was required but failed to consider and provide for ESY for Student.  Parent argued that District policy, as applied to Student, violated the federal requirements for ESY.  The evidence at hearing did not support Parent's complaint.

First, District's policy and guidance to staff regarding ESY was based on guidance for ESY requirements published by the Oregon Department of Education, the relevant State Educational Authority (SEA) in the current matter.  Although at the hearing, Parent questioned District personnel at length regarding its ESY policy and the implementation of that policy, Parent failed to prove that District's policy regarding ESY, as applied to Student, violated the federal requirements for ESY.

ESY is required by federal regulation but not directly provided for by the IDEA itself. Therefore, the guidance of the United States Department of Education (USDOE) as expressed in the *U.S. Office of Education's Analysis of Comments and Changes,* 71 CFR 46540-46845

(August 14, 2006) informs the application of all of the regulations USDOE has adopted to implement the IDEA, most especially those regarding ESY.

During the rule-making process for the 2006 rules, commentators recommended "removing § 300.106 because the requirement to provide [ ] ESY services to children with disabilities is not required in the Act." *USDOE Analysis*, 71 CFR at 46582. USDOE responded, in relevant part, that:

> The requirement to provide ESY services to children with disabilities who require such services in order to receive FAPE reflects a longstanding interpretation of the Act by the courts and the Department. The right of an individual child to receive ESY services is based on that child's entitlement to FAPE under [ ] the Act.

In response to a suggestion that language be added to § 300.106 clarifying that "regression and retention" should not be used as the sole criteria for determining [a] child's eligibility for ESY, the Department declined to make the suggested change. In explanation, the Department stated:

> The concepts of "recoupment" and "likelihood of regression or retention" have formed the bases for many standards that States use in making ESY eligibility determinations and are derived from well-established judicial precedents. [citations omitted.] States may use recoupment and retention as their sole criteria but they are not limited to these standards and have considerable flexibility in determining eligibility for ESY services and establishing State standards for making ESY determinations. * * * consistent with the individually-oriented requirements of the Act[.]

In § 300.106, USDOE included the requirement that ESY services must be provided "only" if a child's IEP Team determines on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child. The Department responded to a comment that the term was overly restrictive by stating that:

> We do not think this language is overly restrictive; instead, *we think it is necessary for providing appropriate parameters to the responsibility of the IEP team.*

71 CFR at 46582.

Testimony and documentary evidence at hearing showed that the District, in alignment with State policy, bases its ESY eligibility on regression/recoupment data unless no data is, or would be, available. In Student's case, District deferred determining ESY eligibility when it developed Student's initial IEP in November 2013 because it had no reliable data regarding Student's regression/recoupment but it did have scheduled breaks following that IEP meeting from which data could be gathered in order to make a determination before the end of the school year. In the November 2014 IEP, District set April 16, 2014, as the date by which a determination would be made. District's decision was in accord with the federal rules and guidance, and with Oregon's ESY regulations. District's post-hearing brief cited federal case

law that supported its argument.  (District's Post-Hearing Brief, at 12-15, *citing Reinholdsen v. School Board of Independent School District No. 11,* 44 IDELR 42 (D Minn 2005), *aff'd 46 IDELR 63 (8th Cir, 2006); see also Pachl v. School Board of Independent School District No. 11,* 42 IDELR 264, 3-4, 7-8 (D Minn, 2005), *aff'd 46 IDELR 1 (8th Cir, 2006).)

In *Reinholdsen*, similar to the present case, a parent contended that contention that ESY services must be completed contemporaneously with other portions of the student's IEP.   The District Court's decision, (upheld by the 8th Circuit Court of Appeals in its unpublished decision at 46 IDELR 63 (8th Cir. 2005)) specifically found that

> It is well established, however, that neither federal nor state law requires a student's IEP to determine a student's ESY services by a particular date. The Office of Specific Education Programs addressed this specific issue when it explained:
>
>> There is no need to specify a timeline for determining whether a child should receive ESY services. Public agencies are expected to ensure that these determinations are made in a timely manner so that children with disabilities who require ESY services in order to receive FAPE can receive the necessary services. 64 Fed. Reg. 12575, 12577 (March 12, 1999).[3]

*Reinholdsen,* 44 IDELR at 61.

Parent provided no supporting authority for his argument that deferring an ESY determination, in and of itself, until a later date constituted a procedural violation which resulted in a substantive violation of Student's rights.   Parent agreed during hearing that delaying Student's ESY determination at the November 20, 2013 and March 18, 2014 IEP meetings did not create a substantive impact on Student's access to a FAPE.  Parent's argument, in substance, was based on a speculation that, at some indeterminate point, after March 18 but before April 10, 2014, (when District had scheduled an IEP meeting to determine ESY) or no later than April 16, 2014 (the deadline set out in the November 20, 2013 IEP) Student would lose access to an educational opportunity required in order for Student to receive a FAPE.  Parent did not provide evidence to support his contention.

To the contrary, District provided evidence that the decision to defer Student's ESY eligibility determination was appropriate because there was no data for Student showing regression/recoupment to support ESY.  Based on their education and experience in special education and with Student individually, District staff opined, at the hearing, that determining ESY eligibility without the required data would not have complied with District's policies and procedures or those of the state or of the federal regulations.  As also opined by District staff, determining a student's ESY eligibility based solely on past eligibility is in direct contravention of the requirement that "ESY must be provided only if the child's IEP team determines, on an

---

[3] The IDEA regulations of 2006 did not change the requirements for ESY, therefore, the Comments and Analysis in 64 Fed. Reg. 12757, 12577 (March 12, 1999) are applicable to the current ESY federal regulations.

individual basis, that the services are necessary for the provision of free appropriate public education to the child." OAR 581-015-2065(2).

In summary, Parent failed to meet his/her burden to show District violated its obligation to provide FAPE based on either 1) a procedural error in failing to comply with the rules regarding determining ESY eligibility or 2) a substantive failure to provide FAPE to Student based on District's decision to delay Student's ESY eligibility determination to no later than April 16, 2014.

*Parent's opportunity for meaningful participation*

Parent's due process complaint also alleged that District prevented him/her from meaningfully participating in Student's IEP during the November 20, 2013 IEP meeting and the March 18, 2014 IEP meeting, resulting in a substantive failure to provide FAPE to Student.

The IDEA, as implemented through Oregon's rules, provides for parent participation in, among other things, the IEP and the provision of FAPE to a child qualified for a specialized education under the Act.  OAR 581-015-2190 provides, in relevant part, that:

> (1) School districts must provide one or both parents with an opportunity to participate in meetings with respect to the identification, evaluation, IEP and educational placement of the child, and the provision of a free appropriate public education to the child.

The IEP team must include one or both of the child's parents (OAR 581-015-2210(1)(a), and Districts must take steps to ensure parents are present at each IEP or placement meeting or are afforded an opportunity to participate (OAR 581-015-2195(1), and must consider the concerns of the parents for enhancing their child's education when developing, reviewing, and revision a child's IEP.  OAR 581-015-2205.  In *Amanda J. v. Clark County School District,* 267 F. 3d 877 (9th Cir. 2000), the Court of Appeals emphasized the importance of parents' right to participate in the special education process for their child.  The Court stated that "[a]mong the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan.  Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know."  *Amanda J.,* 267 F. 3rd at 882.

Parent was correct in arguing that Parent has the right to participate in Student's special education as outlined above.  However, the evidence at hearing did not support Parent's allegations that District failed to allow Parent the opportunity to meaningful participate in the development of Student's IEP, most particularly, in the timing of the determination regarding Student's ESY eligibility.  To the contrary, overwhelming evidence showed that District sought information from Parent when preparing for the November 2013 IEP meeting and sought Parent's participation prior to and during the November 20, 2013 IEP meeting.  Meeting notes and testimony from multiple witnesses substantiated District's contention that Parent provided input throughout the IEP meeting on November 20th, that the team discussed Parent's input, and that the IEP that was developed included Parent's input.

Despite Parent's allegation in the complaint and his/her arguments post-hearing, Parent agreed at the November 20th IEP meeting and during the hearing, that it was not necessary to determine Student's ESY eligibility in November 2013.

Evidence at hearing supported Parent's allegation that he/she was not allowed further input regarding the timing of an ESY determination when the IEP team met in March 2014. District's failure to permit further input from Parent on the timing of the ESY determination resulted in a procedural violation of rules. However, Parent agreed that Student did not suffer a substantive impact regarding Student's right to an ESY determination based on a failure to determine ESY on March 18, 2014. Therefore, the procedural defect did not result in a substantive defect in the District's provision of FAPE to Student.

Parent also argued that District's failure to make a determination after March 19, 2014 (when Parent filed the due process complaint) but before April 10, 2014 (when the District convened an IEP team meeting specifically to discuss and determine Student's ESY eligibility) violated Student's right to a FAPE. As stated on the record, Parent's argument was beyond the jurisdiction of the March 19, 2104 due process complaint.

Parent's main contention that District precluded meaningful participation was based on Parent's disagreement with the IEP team's decision to defer ESY determination until after Spring break 2014. Parent participated in the ESY discussions and he agreed that the determination for ESY eligibility did not need to be made as of November 20, 2014 or as of March 18, 2014. Parent's complaint arose from his disagreement with the IEP team's decision, not from District preventing Parent participation in the discussion leading to the decision. To the extent Parent showed a procedural violation regarding Parent's right to participate in the March 18, 2014 decision to defer ESY, Parent failed to show that District failed to provide for Parent's meaningful participation in developing Student's IEP and in the timing of the ESY determination.

## ORDER

Parent failed to show that District violated its obligation to provide Student with a FAPE in its consideration of ESY services for Student when District deferred the determination for ESY eligibility to no later than April 16, 2014.

Parent did not meet his/her burden to show that District failed to meet its obligation to provide for meaningful Parent participation in the development of Student's IEP, including the consideration of ESY services for Student, at IEP team meetings in November 2013. Despite District's failure to allow Parent additional input regarding the timing of ESY determination for Student at the March 2014 IEP meeting, the procedural error did not result in a substantive denial of FAPE to Student.

Parent's due process complaint filed March 19, 2014 is therefore **DISMISSED** with prejudice.

  /s/ A. Bernadette House
A. Bernadette House

Senior Administrative Law Judge
Office of Administrative Hearings

## APPEAL PROCEDURE

**NOTICE TO ALL PARTIES**: If you are dissatisfied with this Order you may, within 90 days after the mailing date on this Order, commence a nonjury civil action in any state court of competent jurisdiction, ORS 343.175, or in the United States District Court, 20 U.S.C. § 1415(i)(2).  Failure to request review within the time allowed will result in **LOSS OF YOUR RIGHT TO APPEAL FROM THIS ORDER.**

**ENTERED** at Salem, Oregon this 6th day of June 6, 2014 with copies mailed to:

_____ Oregon Department of Education, Public Services Building, 255 Capitol Street NE, Salem, OR 97310-0203.

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing FINAL ORDER in Case No. DP 14-102 on the foregoing parties on the 6th day of June 2014 by depositing a copy of said document in a sealed envelope in the United States Mail at Salem, Oregon, with the postage thereon fully prepaid, and addressed to:

By: US Mail and via e-mail

Raymond Parenteau
Parent(s) of CP
1370 SW David Drive
Grants Pass, OR  97527

Andrea L. Hungerford
Hungerford Law Firm LLP
PO Box 3010
Oregon City, OR   97045

Rich Cohn-Lee
Hungerford Law Firm LLP
PO Box 3010
Oregon City, OR   97045

*John Higgins, Superintendent*
*Grants Pass School District*
*725 NE Dean Drive*
Grants Pass, OR   97526-1649

By: Shuttle and e-mail

Claudette Rushing, Legal Specialist
Department of Education
255 Capitol Street NE
Salem, OR  97310-0203

/s/ Carol Buntjer
Carol Buntjer
Hearings Coordinator