**Richard G. Cohn-Lee, OSB No. 952331**
E-mail:  Rich@hungerfordlaw.com
**Joel E. Hungerford, OSB No. 140940**
E-mail:  Joel@hungerfordlaw.com
THE HUNGERFORD LAW FIRM
PO Box 3010
Oregon City, Oregon 97045
Telephone:  (503) 706-7956
Facsimile:  (503) 655-1429

      Attorneys for Plaintiff–Appellant

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **GRANTS PASS SCHOOL DISTRICT**, | Civil No. 1:14-cv-01115-PA |
|     **Plaintiff-Appellant**, | |
|   v. | **DISTRICT'S OPENING BRIEF** |
| **STUDENT,** | |
|     **Defendant-Appellee**. | Individuals with Disabilities Education Act ("IDEA") |

                   Confidential/Filed Under Seal

**TABLE OF CONTENTS**

I.   INTRODUCTION……………………………………………………………………………..7

     A.  Overview and IDEIA Generally.......................................................................... 7

     B.  Procedural and Factual Background..................................................................... 8

II.  BURDEN OF PROOF.......................................................................................... 10

III. STANDARD OF REVIEW...................................................................................11

IV. ANALYSIS............................................................................................................ 12

     A.  The ALJ's Findings Of Fact Are Not Entitled To Deference Because (1) Many Of
         The Findings Of Fact Were Nothing More Than Word-For-Word Recitations Of
         The Exhibits Found In The Record, and (2) She Failed To Summarize Or Make
         Any Significant Reference To The Testimony Of Key Witnesses Whose
         Testimony Was On Point With Issues To Be Decided In This Case, and (3) The
         ALJ Disregarded Approximately Half Of The Data Collected By The
         District.............................................................................................................. 12

     B.  The ALJ's Conclusions Of Law Are Not Entitled To Deference Because (1) She
         Failed To Address On Point Legal Arguments And Case Law Establishing That
         Questions Of Educational Methodology Such As Data Collection Are Left To The
         Discretion Of The School Districts, (2) She Failed To Address On Point Case
         Law and Testimony In Regards To Matters Of Witness Deference, And (3) She
         Failed To Address On Point Case Law Regarding What The District Is Required
         To Consider During ESY Determinations........................................................... 19

         1.  The ALJ ignored overwhelming case law establishing that (1) data
             collection is a question of educational methodology, and (2) questions of
             educational methodology are reserved to the discretion of the school
             district. ............................................................................................... 21

         2.  The ALJ ignored on point case law and testimony concerning the
             amount of weight that should be given to all of the expert witnesses who
             testified.................................................................................................. 26

         3.  The ALJ held the District to standards concerning the use of
             regression/recoupment data that is inconsistent with federal law and her
             own prior rulings.................................................................................... 30

         4.  The ALJ's Order requires Student to work on goals and objectives that
             everyone, including the Parent, have agreed are no longer appropriate
             for Student............................................................................................. 33

V.  CONCLUSIONS.................................................................................................... 35

## TABLE OF AUTHORITIES

*Aetna Casualty v. Robinson*, 115 Or App 154, 158, 836 P2d 1362 (1992) ................................ 27

*A.I. ex rel. Iapalucci v. District of Columbia*, 402 F Supp 2d 152 (D DC 2005) ........................ 7

*Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 557 IDELR 315 (5th Cir. 1986) ........... 31

*Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley ("Rowley")*, 458 US 176, 198, 102 S Ct 3034, 73 L Ed 2d 690 (1982) ..................... 7, 22-23

*Bridges ex rel. F.B. v. Spartanburg School Dist. Two*, 2011 WL 3882850, *6 (D SC Sept 2, 2011) ................................................................................................................. 25

*Carlson v. San Diego Unified School Dist.*, 380 Fed Appx 595, 597 (9th Cir 2010) ............. 23-24

*Capistrano Unified Sch. Dist. v. Wartenberg*, 49 F.3d 884, 891 (9th Cir. 1995) ....................... 11

*C.C. v. Fairfax County Bd. of Educ.*, 879 F Supp 2d 512, 520-21 (ED Va 2012) ...................... 12

*Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396 (9th Cir. 1994), *superseded by statute on other grounds, as stated in M.L. v. Federal Way School Dist.*, 341 F.3d 1052 (9th Cir. 2003) ...... 11

*Cordrey v. Euckert*, 17 IDELR 104 (6th Cir.1990), *cert. denied*, 499 U.S. 938, 110 LRP 38027 (1991) ........................................................................................................... 31

*E.H. v. New York City Dept. of Educ.*, 2014 WL 1224417, *5 (SDNY March 21, 2014) .......... 25

*Forest Grove School Dist. v. Student*, 2014 WL 2592654 (D. Or. 2014) ................. 13, 19-20, 24

*Gwinnett County School Dist. v. J.B. ex rel. D.B.*, 398 F Supp 2d 1245, 1267 (ND Ga 2005) ... 12

*James M. ex rel. Sherry M. v. Hawai'i*, 803 F. Supp. 2d 1150, 1157, 1160 (D. Hawai'i 2011) ................................................................................................. 11

*Johnson v. Independent School Dist. No. 4 of Bixby, Tulsa County, Okla.*, 921 F. 2d 1022 (10 Cir. 1990) ...................................................................................................... 30

*K.S. v. Fremont Unified School District*, 545 F. Supp. 2d 995 (N. D. Cal. 2008) ............... 19, 26

*Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir 1988) ....................... 24

*Manteca Unified School District,* 50 IDELR 298 at 3-4 (SEA Ca June 27, 2008) ................... 27

Confidential/Filed Under Seal

*McQueen v. Colorado Springs Sch. Dist. No. 11*, 419 F. Supp. 2d 1303, 207 Educ. L. R. 956 (D. Colo. 2006), *rev'd*, 488 F.3d 868, 221 Educ. L. R. 535 (10th Cir. 2007) .............................. 31

*Nalu Y. ex rel. Patty Y. v. Department of Educ., Hawaii*, 858 F Supp 2d 1127, 1133 (D Hawaii 2012) ........................................................................................................ 12

*N.B.v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 236 Educ. L. R. 603 (9th Cir. 2008) ...... 31

*Ojai Unified Sch. Dist. et al v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S. Ct. 90, 130 L.Ed.2d 41 (1994). ........................................................... 11, 23

*Omey v. Senior and Disabled Services Div.*, 124 Or App 112, 115, 861 P2d 394 (1993) ......... 27

*Pachl v. School Board of Independent School District No. 11*, 42 IDELR 264, at 18 (D Minn Feb 23, 2005), *aff'd* 46 IDELR 1 (8th Cir July 14, 2006) ........................................................ 23

*Parenteau v. Prescott Unified School Dist.*, 2008 WL 5214997, *8-9 (D Ariz Dec 11, 2008) .......................................................................................................... 25, 35

*P.K. ex rel. S.K. v. New York City Dept. of Educ. (Region 4)*, 819 F Supp 2d 90, 108-09 (EDNY 2011) ....................................................................................................... 24

*Reid ex rel. Reid v. District of Columbia*, 401 F3d 516, 521 (DC Cir 2005) ...................... 12, 35

*Seattle School Dist., No. 1 v. B.S.*, 82 F 3d 1493 (9th Cir 1996) .................................. 8

*Shakopee Indep. Sch. Dist.*, 52 IDELR 210 (SEA MN 2009) ...................................... 23

*Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990) ........................... 22

*Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. den*, 513 U.S. 965, 115 S. Ct. 428, 130 L.Ed.2d 341 (1994) ............................................................... 11, 22-23

*Virginia S. ex rel. Rachael M. v. Department of Educ., Hawaii*, 2007 WL 80814, * 12 (D Haw Jan 8, 2007) ................................................................................................ 22


20 USCA §§1400(c)(1) ...................................................................................... 7

20 USCA §§1400(d)(3) ...................................................................................... 7

20 USCA §1401(26)(A) ..................................................................................... 7

OAR 581-015-2065(2) ...................................................................................... 17

HAR § 8-60-7 ................................................................................................ 17

71 Fed. Reg. 46582 (2006) ......................................................................... 30

71 Fed. Reg. 46,665 (2006) ......................................................................... 23

## I. INTRODUCTION

**A.      Overview and IDEIA Generally**

This is an appeal of an administrative law judge's ("ALJ") decision issued pursuant to the Individuals with Disabilities Education Improvement Act 2004 ("IDEIA"), 20 USCA §§1400 *et seq*, which focuses on improving educational results for children with disabilities. As stated in § 1400(c)(1): "Improving *educational* results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." *Id.*§1400(c)(1) (emphasis added). One of the primary purposes of the IDEIA is "to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities." *Id.* at §1400(d)(3). While the Act encompasses "related services," those services are provided "as may be required to assist a child with a disability to benefit from special education." 20 USCA §1401(26)(A).

The IDEIA guarantees a free, appropriate public education ("FAPE") for all students with disabilities, including the necessary supports so that students can access their education. The Individualized Education Plan ("IEP") is the means by which schools work with parents to describe the educational status and needs of the student, then design supports and specialized instruction so the particular Student receives an appropriate education.

It is important to note that an "appropriate education" does not amount to providing services designed to maximize a student's potential. *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley ("Rowley")*, 458 US 176, 198, 102 S Ct 3034, 73 L Ed 2d 690 (1982). Rather, the appropriate focus is whether the IEP is reasonably calculated to provide *some* meaningful educational benefit. *A.I. ex rel. Iapalucci v. District of Columbia*, 402

F Supp 2d 152, 163 (D DC 2005).  In other words, districts are obliged only to provide a "basic floor of opportunity" through an IEP designed to provide educational benefit to the disabled student. *Seattle School Dist., No. 1 v. B.S.*, 82 F 3d 1493, 1500 (9th Cir 1996).

While it is understandable that all parents, including the parents of disabled students, want their children to have a wide variety of educational resources and experiences, the reality is that Oregon's public school funding does not allow the maximizing of potential for any student at the current time. *See Brillon v. Klein Independent School Dist.*, 100 Fed Appx 309, 312-313 (5th Cir 2004) (rejecting parents' expert witnesses' contention that school district could have provided "better accommodations" where school districts are "not required to 'provide every conceivable supplementary aid or service to assist the child.'" (Citation omitted).

## B.    Procedural and Factual Background

This appeal concerns the Final Order issued in administrative due process 14-104 ("*CP II*" or "DP 14-104"), which addressed whether the Grants Pass School District No. 7 ("the District") improperly denied extended school year services ("ESY") to Student over the summer of 2014, resulting in a denial of FAPE. DP 14-104 Final Order at 2; DP 14-104 Prehearing Report and Order at 3; and Tr. Vol. 3, 7:19- 25. An earlier hearing involving the same parties and same ALJ ("DP 14-102" or "*CP I*") addressed the issue of whether the District properly considered and allowed Parent to participate in discussing ESY during the November 20, 2013 and March 18, 2014 IEP meetings. DP 14-102 Final Order at 2; DP 14-102 Prehearing Report and Order at 1; and Tr. Vol. 1, 6:14-7:11. Essentially, *CP I* addressed whether the District made an ESY determination in a timely manner and allowed the Parent to participate in that decision, and *CP II* addressed whether the District denied Student FAPE by making the substantive determination that ESY was not appropriate for Student.

The testimony, evidence, and Findings and Conclusions from *CP I* were submitted into the evidence and record of *CP II*. DP 14-104 Notice of Hearing and Rights at 2.

The Student in this matter is eligible for special education services under the IDEA under the category of Autism Spectrum Disorder. Ex. D3 at 1 and Tr. Vol. 1 at 159. Student arrived in the District in July 2013, having previously attended school in Hawaii. Ex. S11 and Tr. Vol. 1, 159:25-160:6. Based on the goals and objectives in Student's previous out-of-state IEP and its determination by that school district that Student required ESY services for the summer of 2013, the District provided ESY services to Student during Summer 2013. Tr. Vol. 1, 160:12-21.

On November 20, 2013, the District convened an IEP meeting to review Student's IEP. Ex. D2. Student's Parent attended and participated in this meeting, which was facilitated by a mediator appointed by the Oregon Department of Education ("ODE") to assist the parties in following appropriate procedure for the meeting. Ex. D4 and Tr. Vol. 1, 107:17-108:4. As a result of this meeting, Student's IEP was substantially revised. Ex. D3.

The District began gathering recoupment and regression data after the development of the November 20, 2013 IEP, but this IEP was in place for only a very short period before winter break. Tr. Vol. 2, 36:10-40:1. Factoring in the Thanksgiving holiday and unanticipated snow days, there were only 16.5 days before the start of the winter holiday. Tr. Vol. 2, 35:25-40:1. Moreover, Student's new IEP involved a significant shift in the type of objectives (including a shift from academic to more functional goals), methodology, and curriculum compared to what Student had received under prior IEPs. Tr. Vol. 2, 40:8-23. Based on the lack of adequate baseline data before the winter break, District staff felt that they could not make an ESY determination shortly after the winter break. Tr. Vol. 2, 39:20-40:1; Tr. Vol. 2, 63:23- 64:3; Tr.

Confidential/Filed Under Seal

Vol. 2, 40:2-5. However, had the IEP team made a decision at this point in time, it would have been that the Student did not qualify for ESY. Ex. D10; Tr. Vol. 2, 63:7-14.

Because the District was not entirely confident in the data collected over winter break, the IEP team decided to wait to make an ESY determination after spring break so that the District would have another break over which to regression/recoupment gather data. Tr. Vol. 2, 39:20-40:1; Tr. Vol. 2, 63:23-64:3; and Tr. Vol. 2, 63:7-14.

On March 18, 2014 (before spring break began on March 21, 2014) the District convened another IEP meeting to discuss other IEP matters. Ex. D5. The Parent requested that the topic of ESY be added to the agenda for this meeting and the District honored the Parent's request. Ex. D5 at 1; Ex. D6. The team discussed the issue of ESY, but District staff explained that as of that day, spring break had not yet occurred, so it would not yet be possible to compare the pre- and post-spring break recoupment/regression data to make an ESY determination. Ex. D5 at 8; Ex. D6; Tr. Vol. 2, 116:24-117:16.

On April 10, 2014, Student's IEP team met to determine Student's eligibility for ESY. Tr. Vol. 3 at 19 and Ex. D9. Student's Parent has never taken issue with who was or was not present at the meeting. Tr. Vol. 3, 24:21-23. At this meeting the members of the IEP team from the District all agreed that Student did not qualify for ESY in any category. Tr. Vol. 3, 25:12-23 and Ex. D11. The Parent agreed that Student did not need ESY in the area of writing goals, but disagreed about the other areas. Ex. D11.

## II.    BURDEN OF PROOF

In the proceeding below, the Student bore the burden of proving that the District failed to meet the requirements of the IDEIA in various respects, and the ALJ erroneously concluded that Student met this burden of proof with regard to the majority of the Student's allegations. On

appeal, the District has the burden of proof with regard to those portions of the ALJ's order that it has appealed. *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396, 1399 (9th Cir. 1994).

## III.   STANDARD OF REVIEW

This court reviews the ALJ's factual determinations for clear error, but reviews *de novo* the ALJ's ultimate determination of the appropriateness of the educational program. *Capistrano Unified Sch. Dist. v. Wartenberg*, 49 F.3d 884, 891 (9th Cir. 1995) [citations omitted]. The court must give "due weight" and "accord deference" to the policy decisions of the District, as "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. den*, 513 U.S. 965, 115 S. Ct. 428, 130 L.Ed.2d 341 (1994) [citations omitted]; *Ojai Unified Sch. Dist. et al v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S. Ct. 90, 130 L.Ed.2d 41 (1994).

Although the court must consider the ALJ's findings, the Ninth Circuit has held that it is within the court's discretion to "reject them in part or in whole." *Ojai* at 1473-74. Further, the amount of deference that the court gives to the hearing officer's findings is discretionary, and increases only "where [the ALJ's findings] are thorough and careful." *Capistrano* at 891. As in this case, a factor weighing against such deference is where an ALJ fails to cite, recognize or even discuss substantial portions of the testimony of relevant witnesses and documents or fails to provide a well-reasoned analysis of her findings and conclusions; instead what is required is a written decision that "evinces his careful, impartial consideration of *all* the evidence and demonstrates his sensitivity to the complexity of the issues presented." *James M. ex rel. Sherry M. v. Hawai'i,* 803 F. Supp. 2d 1150, 1157, 1160 (D. Hawai'i 2011) (emphasis added) (deference appropriate where ALJ summarized testimony of teachers, administrators, therapists,

Confidential/Filed Under Seal

and consultants involved in the process, and created detailed decision explaining her factual findings and legal conclusions); *see also Nalu Y. ex rel. Patty Y. v. Department of Educ., Hawaii*, 858 F Supp 2d 1127, 1133 (D Hawaii 2012) (hearings officer's ruling neither careful nor thorough where it completely "ignored critical testimony" and in fact disregarded such testimony in favor of weaker, contrary evidence); *C.C. v. Fairfax County Bd. of Educ.*, 879 F Supp 2d 512, 520-21 (ED Va 2012) (summarizing relevant case law regarding review of hearings officer decisions and noting that such cases held that, while hearings officer was not necessarily required to present detailed findings regarding credibility or the weight given to one side's witnesses  or the other's, such cases at a minimum involved the hearings officer discussing or summarizing both parties' evidence and witnesses, even if the hearings officer ultimately disagreed with or gave less weight to one side's evidence or witnesses); *Gwinnett County School Dist. v. J.B. ex rel. D.B.*, 398 F Supp 2d 1245, 1267 (ND Ga 2005) (federal district court, after conducting it's own review of the transcripts and exhibits, holding that there was insufficient evidence to support hearings officer's conclusion of school district liability and that hearings officer's decision not entitled to deference where "where crucial evidence is missing."); *Reid ex rel. Reid v. District of Columbia*, 401 F3d 516, 521 (DC Cir 2005) (holding that hearings officer decision entitled to "little deference" where it lacked reasoned and specific findings and required district court to further explore administrative record for evidence on the issue).

    As discussed below, in this case the ALJ's Findings of Fact and Conclusions of Law lack any of the indicia above and are therefore neither careful nor thorough; as a result, the court should afford them little deference.

/// /// ///

/// /// ///

# IV. ANALYSIS

**A.**    **The ALJ's Findings Of Fact Are Not Entitled To Deference Because (1) Many Of The Findings Of Fact Were Nothing More Than Word-For-Word Recitations Of The Exhibits Found In The Record, (2) She Failed To Summarize Or Make Any Significant Reference To The Testimony Of Key Witnesses Whose Testimony Was On Point With Issues To Be Decided In This Case, and (3) The ALJ Disregarded Approximately Half Of The Data Collected By The District**

The ALJ's Finding of Fact consists largely of word-for-word excerpts from documents in the record or statutes or administrative rules. Final Order 3-18. Additionally, the ALJ's Findings of Fact also omit key, on-point testimony that contradicted her conclusions. As noted recently in *Forest Grove School Dist. v. Student*, 2014 WL 2592654 (D. Or. 2014), such Findings of Fact are not careful and thorough and are, therefore, due little deference.

In *Forest Grove* the court specifically found that,

> "Although the ALJ's sixty-eight page single spaced opinion is lengthy, it is not careful and thorough, and the court affords it little deference. The ALJ describes in detail many of the exhibits on record. She includes large block quotes of each IEP, and describes each IEP meeting as described in the IEP meeting notes. However, the ALJ makes little to no mention of witness testimony taken over multiple days of administrative hearing. Most importantly, the ALJ does not discuss the hearing testimony of the parties experts, which sheds significant light on the issues presently before the court and often contradict the ALJ's conclusions of fact and law." *Id.* at *12.

Here, like in *Forest Grove*, the ALJ's Findings of Fact consist largely of word-for-word recitations of the documents found in the exhibits. *See, e.g.,* Finding of Fact 3 (word-for-word recitation of the District's policies and procedures for determining ESY found in Ex. D1) and Findings of Fact 26-29 (word-for-word recitation of measurable goals and objectives from Student's IEP found in Ex. D9).

Next, just like in *Forest Grove* the ALJ in this case ignored or disregarded highly relevant testimony speaking to the matters at issue. Specifically, although the ALJ quoted the Parent's

Confidential/Filed Under Seal

expert testimony extensively in her Findings of Fact, she ignored contradictory testimony from both the District's expert witnesses and even the Parent's expert witnesses themselves.

For instance, the ALJ relied heavily on the testimony of Dr. Gentry and Dr. Sutton to support the finding that the District's data collection lacked fidelity, and therefore many of the Findings of Fact dealt with the testimony of these two witnesses. In fact, approximately three single-space pages of the Findings of Fact (i.e., over one dozen Findings of Fact) were devoted to the credentials of Dr. Gentry and his testimony concerning the fidelity of the District's data collection process. DP 14-104 Final Order (Findings of Fact 46 and 53-65). However, the ALJ made no mention of the testimony from Dr. Gentry himself that it was "almost impossible" for him to judge the fidelity of the District's data collection and without more information available he "can't say whether or not [the] data [the District collected] meets the standards of fidelity or not." Tr. Vol. 3, 24:14-25:8 ("In a case like this where I have only the raw data in front of me, it is almost impossible to judge fidelity just because, as a consultant, I would be training and sitting in with the data collector to make sure they're collecting data correctly when they collect it [...] So without those things, I can't say whether or not this data meets the standards of fidelity or not."). The ALJ made no mention of this relevant testimony that went to the central matter of Dr. Gentry's testimony, despite having spent a significant amount of time outlining the testimony of this witness.

Similarly, the ALJ relied greatly on the testimony of Dr. Sutton to establish that Student needs ESY for the summer of 2014. As with Dr. Gentry, the ALJ devoted at least one dozen Findings of Fact (i.e., approximately two single-space pages) to the qualifications and testimony of Dr. Sutton. However, the ALJ made no reference to the fact that when Dr. Sutton was asked

Confidential/Filed Under Seal

directly by the ALJ whether student needed ESY for the summer of 2014 Dr. Sutton testified that she was not in a position to make that determination. Tr. Vol. 4.110:3-22.

Not only did the ALJ ignore highly relevant testimony that went to the matter at hand, she also dismissed equally relevant documentary evidence, including evidence she had stated was relevant in her *CP I* Order. As a result, the ALJ's Final Order in *CP II* contradicts the Final Order in *CP I*, a ruling that neither party appealed.

As established in *CP I,* the District was reasonable in waiting until after spring break in order to gather ESY regression/recoupment data given the District's concerns about the strength of the regression/recoupment data it gathered over winter break. DP 14-102 Final Order at 18. Specifically, the ALJ concluded,

> "[The] District provided evidence that the decision to defer Student's ESY eligibility determination was appropriate because there was no data for Student showing regression/recoupment to support ESY. Based on their education and experience in special education and with Student individually, District staff opined, at the hearing, that determining ESY eligibility without the required data would not have complied with District's policies and procedures or those of the state or of the federal regulations." DP 14-102 Final Order at 18.

Although the ALJ agreed in *CP I* that the District needed to wait until after spring break to make an ESY determination so that it could supplement the data it collected over winter break, the ALJ now dismisses all of the data collected over spring break in a single footnote. DP 14-104 Final Order at 25 (Footnote 6). In *CP II* the ALJ stated that because spring break consisted only of five school days and because the Parent and the Parent's witnesses were only concerned about breaks in education lasting 10 days or more, the data collected over spring break was not "relevant." *Id.*[1] As noted previously by this court, such a finding runs counter to the ALJ's Order

---

[1] The footnote reads, in its entirety, "Only evidence on data concerning Student's performance before and after the winter break is discussed in the Opinion. Spring break created a break of five school days. As noted by Parent and by Parent's experts, Student suffers significant regression-

in DP 14-102, which found that the District reasonably delayed making a regression/recoupment determination precisely so that it could collect the spring break data. Order Granting of Remedies at 6.

Not only is this ALJ's ruling in DP 14-104 contradictory to her ruling in DP 14-102, but it is also legally inappropriate. When dismissing the spring break data the ALJ relied heavily on the assertion that Student regressed only for breaks of 10 or more school days. DP 14-104 Final Order at 13 (Finding of Fact 48), 25 (Footnote 6), and 27. However, this conclusion was arrived at because these were the breaks when ESY was provided to Student on previous IEPs. Tr. Vol. 4 at 130-132; DP 14-104 Final Order at 18 (Finding of Fact 78). Despite numerous attempts by the District to obtain actual data supporting this conclusion from the Student's prior Hawaii School District, the Hawaii Department of Education and even the Parent himself, the District has never received that information. Tr. Vol. 2, 239:25-240:3. In fact, the District even asked Dr. Sutton from Student's previous district on the record during the hearing, to provide that data to the District. Tr. Vol. 4, 133:4-135:8. Again, however, to his day (even after asking Dr. Sutton for it at hearing) this data has never been shared with the District. The only documentation that the District has received about Student's ESY in Hawaii is the Hawaii IEP itself, which states that Student is to receive ESY, but does not include any information or reasoning to explain why. Ex. S11 and Tr. Vol. 2, 191:19-23 (Parent admitting IEP from Hawaii includes no information as to why Student was provided ESY in Hawaii).

Moreover, even if the District did have the underlying data from those previous ESY determinations that still would not be determinative: The District would still be required to conduct a full ESY determination based on the *current* abilities and needs of a student, not

---

recoupment problems after a break of 10 days or more. Data collected for Spring break, which

simply historical assertions about ESY eligibility, especially in the absence of supporting data. As noted by the ALJ herself in DP 14-102, "determining a student's ESY eligibility based solely on past eligibility is in direct contradiction of the requirement that "ESY must be provided only if the child's IEP team determines, on an individual basis, that the services are necessary for the provision of free appropriate public education to the child." OAR 581-015-2065(2)." DP 14-102 Final Order at 18-19. Relatedly, the evidence at hearing was that the Student's Oregon IEP was substantially different from his previous IEPs, including those from Hawaii. Tr. Vol. 2, 39:3-20 and Tr. Vol. 1, 153:11-13. Therefore, the District would still need to consider how the Student was doing in his current setting, working on his current IEP goals and short-term objectives.

Also, as noted in the District's Posthearing Brief in DP 14-102, the Hawaii regulations[2] regarding ESY are different from those in Oregon. DP 14-102 District's Posthearing Brief at 24. For instance, the notes and guidance accompanying the Hawaii regulations have Hawaii schools consider factors in making ESY determinations that schools in Oregon do not consider. *See, generally,* HAR § 8-60-7.

Additionally, the testimony relied on by the ALJ (i.e., that of Dr. Sutton's) regarding the length of breaks for when ESY was appropriate was that the length of break varied over time – that is, Student had received ESY for breaks other than just those of 10 or more days in length. Tr. Vol. 4 at 130:24-132:6. In fact, Sutton testified, "And every time we had more data after a break, we revisited it [the ESY determination]. So I believe it [ESY] got reduced to 10 [day breaks] versus the other way around." *Id.* (brackets added). This was *precisely* what the District was trying to do with the spring break data – revisit the issue of ESY once it had more data to

---

consists of only five school days, is not relevant to that issue."

[2] Student entered the District from a district in Hawaii and, thus, the IEP before the District's November 2013 IEP was created in Hawaii.

determine when Student may or may not need ESY for a period of time different from what he had displayed in the past.

Further, the District would be in violation of state and federal law if it were to adopt the strategy set forth by the ALJ (i.e., disregarding the spring break data). If the District collected and analyzed only regression/recoupment data that aligned with what a student received in the past, the Student would never be able to qualify for ESY for a shorter break. For example, if the District never considered regression/recoupment for breaks of five days (like it attempted to do here) because that was (1) not what the Student had qualified for in the past, and (2) not what the Parent contended Student needed, then Student would never be able to get ESY for breaks of that length, even if he actually needed it. But that is the precise result of the ALJ's Order in *CP II*. Instead of following the applicable regulations and her own analytical framework established in *CP* I, the ALJ instead relied solely on the assertion of the Parent that ESY data collected for spring break should be disregarded.

In contrast, the evidence at hearing was unanimous and uncontested that the spring break data did not support a finding of ESY. Ex. D10 at 1-5 and Tr. Vol. 3, 116:4-125:21. The Parent did not once challenge the validity of the collection process or conclusions of that spring break data at any point in time. *Id.*

However, even though the spring break data was collected for the sole purpose of assisting the IEP team in making an ESY determination, and even though the District gathered it because the District shared the Parent's concerns about the data collected over winter break, the ALJ dismissed all of the data collected over spring break as irrelevant. DP 14-104 Final Order at 25 (Footnote 6). Essentially, the ALJ penalized the District for what she perceived as flaws in the District's winter break data, but when the District shared the same concerns and took action to

Confidential/Filed Under Seal

supplement the winter break data with data collected over spring break, she dismissed any

additional data as irrelevant.

Because the ALJ's Findings of Fact were overly selective, and because many of her

Findings of Fact were simply recitations of the exhibits found in the record, her Findings of Fact

are due little deference.

**B.    The ALJ's Conclusions Of Law Are Not Entitled To Deference Because (1) She Failed To Address On Point Legal Arguments And Case Law Establishing That Questions Of Educational Methodology Such As Data Collection Are Left To The Discretion Of The School Districts, (2) She Failed To Address On Point Case Law And Testimony In Regards To Matters of Witness Deference, And (3) She Failed To Address On Point Case Law Regarding What The District Is Required To Consider During ESY Determinations**

Not only did the ALJ ignore contrary testimony and evidence, she also ignored relevant

case law and even entire lines of legal argument without any explanation or analysis. When an

ALJ does not support her Conclusions of Law with adequate case law those conclusions are

afforded little deference. *Forest Grove School Dist*, 2014 WL 2592654 at *12. The court in

*Forest Grove*, found that

> "The ALJ's conclusions of law are also entitled to little deference. In her analysis of the issues, the ALJ fails to adequately support her conclusions with caselaw [sic]. Instead, she applies an arbitrarily high standard which bears little resemblance to the legal standards established by decades of court interpretation of the IDEA […] Because the ALJ's opinion is factually selective to the detriment of an accurate factual record and inadequately develops the applicable legal standards, the court affords the ALJ's opinion little deference." *Id.*

When the ALJ did cite case law to support her conclusions it was minimal. For example,

the ALJ cited *K.S. v. Fremont Unified School District*, 545 F. Supp. 2d 995 (N. D. Cal. 2008) to

establish that deference should be granted to ALJ's in allocating weight given to expert opinions.

DP 14-104 Final Order at 24. She then gave greater weight to the Parent's expert witnesses,

concluding that, "their [the Parent's witnesses'] observations regarding the flaws in District's

data collection established that the District's decision was not based upon valid criteria." *Id.* at 26. However, the ALJ did not provide any case law establishing that the standards set forth by the Parent's witnesses align the requirements required as a matter of law. In fact, the testimony from the Parent's witnesses was often concerning what they would "prefer" to see or what they thought was "best". *See, e.g,* Tr. Vol. 4, 38:23-39:7 (Gentry testifying that 10 or more trials is "preferable"); Tr. Vol. 4, 49:25-50:11 (Gentry testifying that more data points create "a better average."); Tr. Vol. 4, 31:6-11 (Gentry testifying that "the more data points you can use to create an average the better * * *"); and Tr. Vol. 4, 58:21-22 (Gentry testifying to what he thinks would provide "a better baseline".). The ALJ echoed this testimony in her Conclusions of Law, such as when she noted that Dr. Gentry opined that the District should have collected regression/recoupment data on consecutive days. DP 14-104 Final Order at 26. However, the ALJ cited no legal authority via case law or statute/regulation that the District is required to meet this type of standard (i.e., there is no legal requirement that school districts collect ESY data on consecutive days). This is precisely the type of "arbitrarily high standard" mentioned by the court in *Forest Grove*.

In fact not only did the ALJ not cite any legal authority requiring the District to meet the standards set forth by the Parent's witnesses, she did not address or even attempt to distinguish the substantial case law cited by the District that establishes that districts are not required to use the "best" methodology available, including methodology relating to data collection. *See, e.g., Forest Grove School District v. Student*, 2014 WL 2592654 at *25 (finding no legal support for argument that school district staff must use educational methodology "which works best for that student.").

20 -- DISTRICT'S OPENING BRIEF                                    Confidential/Filed Under Seal

Although the testimony of the Parent's witnesses may establish that the District did not follow what the Parent's witnesses believed were best practice, neither they nor the ALJ provided any legal citation that the District's data collection fell below the standards set forth by federal law, state law, or even the District's own policies and procedures. Basically, the ALJ held the District to the standards of the Parent and his witnesses, not the standards of the law.

1.     **The ALJ ignored overwhelming case law establishing that (1) data collection is a question of educational methodology, and (2) questions of educational methodology are reserved to the discretion of the school district**

The District's Posthearing Brief cited and analyzed substantial case law that established (1) the collection of data for determining ESY is a question of educational methodology, and (2) questions of educational methodology are outside the scope of what courts should second-guess and are, therefore, left to the discretion of school districts. However, the ALJ made no reference at all to this argument in her Final Order: She did not state that she disagreed with this argument, she did not state that the current case was distinguishable from the cases cited in briefing, nor did she cite contrary case law establishing that such an argument was not appropriate. Instead, the ALJ merely ignored that argument and legal standard altogether, making no reference to it at all in the *CP II* Final Order.

The evidence at hearing was that Parent disagreed with the method the District used to collect data to determined ESY. *See, for example,* Ex. D11 at 4 (April 10 meeting notes reading, "To summarize the discussion [Kirk Kolb] explained that the way [Parent] came up with the data and the way the district came up with the data are two different methods, so the data will not match. [Parent] indicated he understood that now." *See also* Ex. D11 at 7 ("[Parent's] data explanation involved his methodology for determining ESY, which included a longer period of time to determine the averages using highest scores for both pre- and post-break data. Discussion

was held regarding both methods of determining the data to use for determining ESY.").
However, courts have routinely rejected attempts to second-guess the methodological choices
and professional judgment of educators, including in the area of progress reporting and data
collection.

The Supreme Court has cautioned that "[i]n assuring that the requirements of the Act
have been met, courts must be careful to avoid imposing their view of preferable educational
methods upon the States. The primary responsibility for formulating the education to be accorded
a handicapped child, and for choosing the educational method most suitable to the child's needs,
was left by the Act to state and local educational agencies in cooperation with the parents or
guardian of the child." *Rowley,* 458 U.S. at 207 (footnote omitted). "The 'preponderance of the
evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their
own notions of sound educational policy for those of the school authorities which they review.'"
*Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990) (quoting *Rowley,* 458 U.S.
at 206).

In particular, federal case law from within the Ninth Circuit has held that questions of
ESY eligibility criteria and methodology are "classic examples of technical questions of
educational policy." *Virginia S. ex rel. Rachael M. v. Department of Educ., Hawaii*, 2007 WL
80814, * 12 (D Haw Jan 8, 2007) (noting that reviewing courts lack the expertise necessary to
resolve persistent and difficult questions of educational policy and that they should likewise not
"second-guess" conclusions regarding ESY determinations absent contrary evidence) (citations
omitted).

The court must give "due weight" and "accord deference" to the policy decisions of the
District, as "courts should not substitute their own notions of sound educational policy for those

Confidential/Filed Under Seal

of the school authorities which they review." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. den*, 513 U.S. 965, 115 S. Ct. 428, 130 L.Ed.2d 341 (1994) [citations omitted]; *Ojai Unified Sch. Dist. et al v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S. Ct. 90, 130 L.Ed.2d 41 (1994); *Pachl v. School Board of Independent School District No. 11*, 2005 WL 428587, *20 (D Minn Feb 23, 2005), *aff'd* 46 IDELR 1 (8th Cir July 14, 2006) (rejecting distinction by parents between ESY and other areas of IEP and placement development where school district personnel are afforded deference based on their educational expertise).

The Parent presented two expert witnesses to argue that the District's "raw data" sheets lacked fidelity or that different methodologies should have been employed in analyzing that data. For example, Dr. Gentry asserted that the District should have used three data points instead of two data points when collecting pre- and post-break data averages. Tr. Vol. 4, 31:1-11.

However, the IDEA does not require that the IEP identify the specific methodology that the district will use. The U.S. Department of Education has specifically addressed this issue, stating, "there is nothing in the [IDEA] that requires an IEP to include specific instructional methodologies." 71 Fed. Reg. 46,665 (2006) (bracketed language added). *See also* 34 CFR § 300.320(d)(1); *Shakopee Indep. Sch. Dist.*, 52 IDELR 210 (SEA MN 2009) (finding that neither the IDEIA nor its implementing regulations require an IEP to include a specific methodology or one that would maximize the student's abilities); *See also Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 US 176, 178, 102 S Ct 3034, 73 L Ed 2d 690 (1982) (holding that once it has been determined that the general requirements of IDEA have been met, "questions of methodology are for resolution by the States."); *Carlson v. San*

*Diego Unified School Dist.*, 380 Fed Appx 595, 597 (9th Cir 2010) (unpublished opinion) (holding same).

In the recent decision of *Forest Grove School District*, 2014 WL 2592654 at *25, in substantially reversing an Oregon ALJ, the Oregon federal district court reiterated that "'parents, no matter how well-motivated, do not have the right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child.'" (citing *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir 1988)). The district court also emphasized "it is not the prerogative of outside actors to usurp the authority of school districts by substituting their own ideas about sounds educational policy for that of the schools." *Id.*

In stark contrast, the ALJ did not provide *any* legal authority as to why the District should have used the methodologies endorsed by the Parent's witnesses.

Relatedly, multiple courts including those within the Ninth Circuit have held that the same deference with regard to methodology applies with equal force when it comes to arguments that a school district did not employ the "correct" or optimal approach to data collection. *See, e.g., P.K. ex rel. S.K. v. New York City Dept. of Educ. (Region 4)*, 819 F Supp 2d 90, 108-09 (EDNY 2011) (affirming ALJ's conclusion that while school district did not establish that methodology used for tracking progress on IEP goals and objectives accurately measured progress and did not specify a method of measuring progress, these deficiencies did not impede student's right to FAPE where testimony of teacher providing services was that progress was based not only on data sheets but also on informal assessments of progress including observations of student by teacher and summarizing extensive case law holding that courts have been skeptical of finding a denial of FAPE based on the methods of measuring progress and that

Confidential/Filed Under Seal

such decisions are "precisely the type of issue upon which the IDEA requires deference * * *")
(citations omitted); *Bridges ex rel. F.B. v. Spartanburg School Dist. Two*, 2011 WL 3882850, *6
(D SC Sept 2, 2011) (even where methods of progress measurement were not aligned with the
method that parents viewed as being optimal, where student's progress was expressed in terms of
percentages and were sufficiently measureable to reasonably gauge progress, school district did
not violate IDEA and, even if it had, such a technical deficiency would not mount to denial of
FAPE where it was not shown that the deficiency had deprived student of educational
opportunity necessary for provision of FAPE); *E.H. v. New York City Dept. of Educ.*, 2014 WL
1224417, *5 (SDNY March 21, 2014) (school district's reliance on progress report that aligned
with previous goals and a specific methodology that would not be implemented at school
district's new proposed placement was not unreasonable where reality was that in addition to
data in report, student had been observed by school staff daily and thus use of progress report by
school district did not violate requirements of IDEA); *Parenteau v. Prescott Unified School
Dist.*, 2008 WL 5214997, *8-9 (D Ariz Dec 11, 2008) (federal district court rejecting claims by
same parent in instant case against prior school district that district had failed to provide
"quantitatively measureable" methods of measuring progress towards IEP goals and that IEP
failed to provide services pursuant to parent's desired methodology and accompanying
"intensive, quantitative data collection" where court noted that school district was not compelled
to rely on numerically precise quantitative data, but could also rely on qualitative information to
measure progress and, at any rate, IDEA does not require that districts utilize specific
methodologies or strategies; rather, district reasonably relied on "qualified educators who make
professional judgments regarding the most appropriate teaching methods [and] strategies * * *.")

All of these cases were provided to the ALJ in the District's Posthearing Brief. However, the ALJ did not address any of these issues (e.g., questions of educational methodology are reserved to the discretion of the school districts). Instead, the ALJ went about doing precisely what was proscribed by these cases: second-guessing the methodology used by the District when collecting ESY regression/recoupment data. For instance, she concluded that the District should have used at least three data points instead of two, as recommended by Dr. Gentry. DP 14-104 Final Order at 26 (Conclusion of Law). This is precisely the type of Monday morning quarterbacking courts should avoid. Nevertheless, the ALJ did just that without providing any case law establishing why that was appropriate, or why the District should be held to the standards set forth by the Parent's witnesses.

In summary, the ALJ not only failed to provide any case law justifying the second-guessing of data collection methodology used by the District, she also failed to address significant case law to the contrary.

> 2.      **The ALJ ignored on point case law and testimony concerning the amount of weight that should be given to all of the expert witnesses who testified**

The ALJ gave significantly more deference to the testimony of the Parent's expert witnesses than to the District's expert witnesses. The ALJ, however, ignored and refused to address or distinguish significant case law provided by the District undermining such deference.

The ALJ cited *K.S. v. Fremont Unified School District*, 545 F. Supp. 2d 995 (N. D. Cal. 2008) to establish that conclusion that ALJs should be granted deference when making determinations regarding the weight granted to expert witnesses. DP 14-104 Final Order at 24-25. The ALJ contends that this case gives her broad discretion to make sweeping statements discounting the testimony from the District's expert witnesses. *See, e.g.,* DP 14-104 Final Order

Confidential/Filed Under Seal

at 26 (ALJ concluding, "District's analysis was not persuasive.") and *Id.* at 25 (ALJ concluding,

"Counsel's attempt to rehabilitate Ms. Jewell on cross-examination was not persuasive.")

However, the ALJ did not distinguish or even mention significant case law cited by the

District contradicting the deference afforded by the ALJ. For instance, the ALJ made no

reference to *Manteca Unified School District,* 50 IDELR 298 at 3-4 (SEA Ca June 27, 2008),

which establishes that experts who have actually met, assessed, or worked with child are entitled

to greater weight than an expert who has not, despite the testimony at hearing that Dr. Sutton has

never provided a direct, formal evaluation or observation of Student for purposes of educational

programming. Tr. Vol. 4, 4-10. Conversely, all of the District's experts have worked with

Student directly. Tr. Vol. 2, 11:9-11; Tr. Vol. 2, 123:24-124:5; and Tr. Vol. 1, 159:14-20 (Kolb

testifying he used to see Student on a daily basis).

Similarly, the ALJ did not distinguish or even mention *Omey v. Senior and Disabled*

*Services Div.*, 124 Or App 112, 115, 861 P2d 394 (1993), which establishes that greater weight

should be given to witness who had more recently treated the individual at issue, despite the fact

that Dr. Gentry has not had any contact with Student since February of 2010, over four years ago

and that he testified that he doesn't "know [Student] now like [he] knew [Student] years ago."

Tr. Vol. 4, 43:2-3 and Tr. Vol. 4, 75:2-77:21. Not only did the ALJ not mention that case law,

she ignored and made no mention of that testimony.

The ALJ also did not distinguish or mention *Aetna Casualty v. Robinson*, 115 Or App

154, 158, 836 P2d 1362 (1992), which establishes that the fact that a witness lacks current

licensure should impact the weight given opinion to that witness's opinion. The ALJ made no

mention of this case even though the testimony at hearing was that Dr. Sutton has not held a

teaching license in any state since well before the Student even entered her district (i.e., she has

not held a teaching license in any state since 2009 or earlier). Tr. Vol. 4, 114:17-115:14.
Similarly, Dr. Gentry testified that he is neither certified as a school psychologist in Oregon, nor
is he licensed as a board psychologist in Oregon. Tr. Vol. 4, 63:17-24. And, neither of Parent's
witnesses were familiar with the ESY data collection and determination requirements in the state
of Oregon. In contrast, all of the District's experts were designated as experts not just in special
education, but specifically ESY procedures in Oregon, and all had served Student directly during
the IEP school year at issue. Tr. Vol. 2, 122:24-124:5; Tr. Vol. 2, 9:24-11:11; Vol. 1, 157:21-
160:20.

    Again, all of these cases were provided to the ALJ in posthearing briefing, yet none of
them were addressed or even mentioned. Rather, the ALJ simply stated, "I give greater weight to
those who testified that District's data was not reliable. The testimony of Gentry and Sutton was
more persuasive, logical, and based on a long history of working with Student." DP 14-104 Final
Order at 26.

    Although she granted the Parent's witnesses great deference because of their "long
history" with Student, the ALJ failed to mention testimony to the opposite. For instance, as stated
above the ALJ never mentioned Dr. Gentry's concession early in his testimony that he could not
make any judgments about the fidelity of the District's data collection process or Dr. Sutton's
testimony that she could not say whether the Student would be harmed by a break in education.
Tr. Vol. 3, 24:14-25:8 and Tr. Vol. 4.110:3-22.

    Next, although the ALJ concluded that the Parent's experts' analysis of the data was
more logical and persuasive, the ALJ made no reference to the testimony at hearing that neither
one of the Parent's witnesses *ever* consulted with District staff regarding the meaning of the raw
data or whether additional interpretation, data and data analysis had occurred after the raw data

Confidential/Filed Under Seal

sheets were generated. Tr. Vol. 3, 74:10-18 and Vol. 3, 114:12-16. Rather, the testimony of

Parent's expert witnesses was based solely on assumptions about what they saw on the raw data

sheets provided to them; Tr. Vol. 3, 35:15-23 (in regards to the number of trials used, Gentry

testifying "I would assume if its not written [...] So I'm assuming that if it doesn't say less than

10, that it was 10." Tr. Vol. 3, 42:25-43:12 (Gentry testifying to his understand of Student's IEP,

stating, "I mean, so I have to assume that the IEP team chose these IEP goals for – and I don't

know – I don't know [Student] now like I knew [Student] years ago [...] "I would assume that the

IEP team created an IEP and chose goals that were a significant need for [Student] * * * " and

"you have to assume that these goals are the five or four goals that are really important to

increasing or decreasing problematic social behavior."); Tr. Vol. 3, 88:18-89:1 (Gentry having to

assume how the District collects data, "I'm assuming the 12/12, 12/13 are the dates [...] I'm

assuming, because it's a goal, that that's their form of data collection."); Tr. Vol. 3, 100:13-22

(Sutton testifying that she had to assume why the District chose to collect certain data after

Parent directly asked her about the fidelity of the raw data – "And it looks like somebody

decided to change it. And I don't know the reason why. But I'm assuming there was a reason for

it. I don't know.")

Similarly, neither of Parent's experts ever interviewed, communicated with, or requested

additional documents from the District in order to assist in the formation of their opinions – this

was the first time the District had heard from either of these individuals. Tr. Vol. 4, 64:16-19; Tr.

Vol. 4, 74:7-75:1; Tr. Vol. 4, 113:11-20; Tr. Vol. 4, 114:12-16; Tr. Vol. 4, 120:11-123:3.

Moreover, the testimony at hearing was that the raw data sheets that Student's Parent had

his experts review (and which the ALJ relied upon so heavily in her determination that Student

qualified for ESY) was subject to filtering, correction and interpretation via Dorothy Jewell's

Confidential/Filed Under Seal

professional knowledge of Student. Tr. Vol. 3, 106:25-107:9. However, neither of Parent's

experts talked to Dorothy Jewell about how she collected the raw data or how she interpreted it.

Essentially, the expert witnesses based their opinions off of what amounted to Ms. Jewel's notes,

without knowing how she collected that information or what she did with it after collecting it.

> 3. **The ALJ held the District to standards concerning the use of regression/recoupment data that is inconsistent with federal law and her own prior rulings**

The ALJ concluded that the District relied too heavily on its regression/recoupment

analysis in determining whether Student qualified for ESY. DP 14-104 Final Order at 25 ("Ms.

Jewell's application of a single standard, requiring regression-recoupment data as the sole basis

for ESY eligibility is not in accord with federal or state law* * *"). The ALJ relied heavily on the

case, *Johnson v. Independent School Dist. No. 4 of Bixby, Tulsa County, Okla.*, 921 F. 2d 1022

(10 Cir. 1990), to support the conclusion that districts must consider more than just

regression/recoupment data when making ESY determinations. *Id.* at 23-24. The ALJ did not cite

any legal authority within the Ninth Circuit supporting this.

However, the U.S. Department of Education ("the ED") has explicitly stated, sixteen

years after *Johnson* was decided, that states *are* allowed to use regression/recoupment as the *sole*

criteria for determining ESY. 71 Fed. Reg. 46582 (2006) ("States may use recoupment and

retention as their sole criteria but they are not limited to these standards and have considerable

flexibility in determining eligibility for ESY services and establishing State standards for making

ESY determinations."[3]). This was something the District included in its Posthearing Brief for *CP

I* and, in fact, the ALJ quoted in her first *CP I* Final Order. DP 14-102 Final Order at 17. Again,

the ALJ utterly disregarded her own legal analysis from *CP I* in the *CP II* Final Order without

Confidential/Filed Under Seal

any justification or explanation. Similarly, the ALJ did not address or distinguish numerous cases briefed during *CP I* (and, therefore, in the *CP II* record), including those from the Ninth Circuit that established regression/recoupment analyses as the appropriate standard for ESY determination. *See, e.g., N.B.v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1210-11 (9th Cir. 2008) (holding that district court did not err in applying a regression/recoupment standard in determining child entitled to ESY services); *Cordrey v. Euckert*, 17 IDELR 104 (6th Cir.1990), *cert. denied*, 499 U.S. 938, 110 LRP 38027 (1991); *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 557 IDELR 315 (5th Cir. 1986); *McQueen v. Colorado Springs Sch. Dist. No. 11*, 419 F. Supp. 2d 1303, 1307-09 (D. Colo. 2006), *rev'd on other grounds*, 488 F.3d 868 (10th Cir. 2007) (finding that district court should have dismissed parents' case before even considering merits due to parents' failure to exhaust administrative remedies).

    Additionally, the ALJ's ruling in *CP II* that the District erred by relying on a regression/recoupment standard is inconsistent with this same ALJ's ruling in *CP I*. In *CP I* the ALJ ruled that the District's policy and procedure of using regression/recoupment data to make ESY determinations was in line with state and federal law. DP 14-102 Final Order at 17 (ALJ concluding, "Testimony and documentary evidence at hearing showed that the District, in alignment with State policy, bases its ESY eligibility on regression/recoupment data unless no data is, or would be, available.") However, in *CP II*, she now finds the District's reliance on regression/recoupment data inappropriate. DP 14-104 Final Order at 23 ("Under federal law, regression-recoupment is not the standard for availability of ESY services.") She does not clarify this discrepancy other than by stating, patly:

---

[3] ED declining to add language to § 300.106 to make it so that "regression and retention" data could not be the sole criteria for determining a child's eligibility for ESY.

> "As argued by District previously in case number DP 14-102, a district may rely on regression-recoupment data to determine ESY eligibility a child's eligibility. However, a child's eligibility determination must account for "the individual needs of the child and [a denial of ESY] results in denial of FAPE when the child has unique needs and requires special education and related services in excess of the academic year. * * *" *Id.*

The ALJ, however, provided no citation to any evidence in the record supporting that the District's method of determining ESY eligibility failed to align with the specific needs of the Student. In yet another example of internal inconsistency, in her ruling in *CP I* the ALJ specifically noted and concurred with the District's approach of using a student's IEP goals and objectives – which by definition are aligned with the unique educational needs of a student – as the measures for ESY recoupment/regression data. DP 14-102 Final Order at 17-18. The District's ESY guidelines, which the ALJ held align with comport federal and state law, read, "ESY is intended to maintain a skill or behavior directly related to one or more IEP goals," as well as "ESY services are determined by the IEP team specifically for the student's specific needs: only those needs that relate directly to one or more IEP goals." *Id.* at 5-6.

Lastly, even if the District did need to consider criteria outside of regression/recoupment data, the testimony at hearing was that members of the IEP team *did* consider such criteria. For example, the District's Autism specialist, Kirby Erickson, who provided ESY to Student over the summer of 2013 testified that it was her professional opinion that Student would be more benefited by a break in direct education than ESY services because he appeared to be getting worn out by school. Tr. Vol. 4, 146:21-147:13 (opining that, based on personal observation, Student would have benefited by having a break from instruction rather than ESY services during the summer of 2013).

Confidential/Filed Under Seal

In summary, the ALJ selectively chose what legal authorities she believed were applicable concerning what needs to be considered during ESY determinations, as well as ignored relevant testimony conflicting with her Conclusions.

**4.    The ALJ's Order requires Student to work on goals and objectives everyone, including the Parent, have agreed are no longer appropriate for Student**

Finally, as noted in the District's Motion for a Temporary Restraining Order ("TRO") even if it were found that the District denied Student FAPE, the Remedies ordered by the ALJ would still be inappropriate. District's Motion for TRO at 10-12, 13.

As noted by the ALJ in the *CP I* Final Order, and as required by the District policies and procedures (which the ALJ concluded was in line with state and federal law), "ESY is intended to maintain a skill or behavior directly related to one or more IEP goals." DP 14-102 Final Order at 5. The Remedy set forth in the ALJ's *CP II* Final Order requires the District to provide ESY "with regard to Student's Annual Goals and Short Term Objectives as set forth in the May 23, 2013 IEP." DP 14-104 at 28. However, as this court has noted on previous occasions, the record reflects that many of the goals and objectives of the May 2013 IEP were discarded or superseded by the subsequent IEP meetings. Order Granting TRO at 5-6 and Order Granting Stay of Remedies at 6. As such, the ALJ's Final Order requires the District to provide ESY that is not connected to any of Student's current IEP goals. The evidence at hearing was that the May 2013 IEP was written over a year ago by a school district in Hawaii, and since then the District in Oregon has met with the Parent on multiple occasions to write and rework a new IEP. For instance, when the Parent and the District implemented a new IEP for Student in November 2013, both parties decided that the old goals and objectives were no longer appropriate for Student and that there needed to be a substantial shift in the educational curriculum and methodologies that would be used with Student. Tr. Vol. 2, 30:19-21 (testimony that the

"objectives [on the new IEP] differed greatly" from the Hawaii IEP); Tr. Vol. 2, 40:8-23

(testimony that there were changes in the instructional approach and methodology in the new

IEP). Moreover, the testimony at hearing was that Parent was involved in determining these new

goals and objectives. Tr. Vol. 2, 23:17-21.

Second, the ALJ's Final Order required the District to provide ESY to Student in all

educational areas even though the testimony at hearing and in the record was that the Parent

agreed that it was not appropriate to provide Student ESY in the area of writing. Tr. Vol. 3,

38:17-39:2; Ex. D11 at 5.

Thus, the ALJ is requiring the District to provide ESY in areas that everyone, including

the Parent, agrees are not appropriate and for goals and objectives that everyone, including the

Parent, agrees are no longer appropriate.

The Student's Parent has forth an explanation for the Ordered Remedy, stating, "If the

order had been laid out in any other format, or a comma had been inserted after the phrase "short

term objectives", the Plaintiff's motion would have been significantly shorter and this Court

would not have found reason to be concerned with the ALJ's order." Answer to District's Motion

for TRO at 2-3. As stated by this court, such an explanation, "although plausible, is at odds with

the plain language of the ALJ's Order." Order Granting Stay of Remedies at 6. Even if this court

were to assume that the ALJ was attempting to do what the Parent suggests[4], such a remedy

would still be problematic. First, assuming that the ALJ meant something other than what the

plan language of her Final Order meant, such an interpretation speaks to the level of care and

thoroughness with which she composed the Final Order; secondly, and more importantly, such a

remedy would still be contradictory to relevant caselaw.

                                    Confidential/Filed Under Seal

Even when a parent proves that a school fails to offer FAPE, the parent must still present evidence regarding the appropriate scope of services or remedy he is seeking. *Parenteau v. Prescott Unified School Dist.*, 2008 WL 5214997, *10 (D Ariz Dec 11, 2008) (noting that even if parent had proven that prior school district had failed to offer a FAPE, fact that parent failed to put on any evidence regarding the appropriate scope of services or any specifics about the specific remedy he was seeking resulted in parent not being entitled to any remedy).

Other courts have also held that an award of ESY based on a prior IEP is not entitled to deference where there was little to no evidence at hearing regarding the appropriateness of this remedy or how it would address any failures by District to provide FAPE. *Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 521 (D.C.Cir.2005) ("[T]he district court, obligated by IDEA to ensure that relief set forth in the administrative award was 'appropriate,' could not simply rely on the hearing officer's exercise of discretion.").

In this case, the Parent presented no evidence or testimony at hearing regarding what an appropriate remedy would be. Instead, the Parent merely stated in his posthearing brief that, "The details of requested ESY compensatory education are outlined and enumerated in the Hawaii IEP which was in effect prior to the current IEP." The Parent presented no testimony or evidence as to why this remedy would be appropriate and the District never had the opportunity to cross-examine the Parent on the issue of why he believes that this remedy is appropriate.

## V. CONCLUSION

Because the ALJ has blatantly ignored critical evidence and case law and failed to explain her reasoning for doing so, and has on multiple occasional applied an incorrect and

---

[4] The District is not conceding this point, but believes it would be beneficial to continue making arguments under that assumption.

strained interpretation of the requirements of the IDEA, the court should reverse the ALJ's Final

Order with regard to the issues identified above.


Dated: November 28, 2014.


THE HUNGERFORD LAW FIRM


/s/ Richard Cohn-Lee_____
Richard G. Cohn-Lee, OSB No. 952331
E-mail:  Rich@hungerfordlaw.com
Joel E. Hungerford, OSB No. 140940
E-mail: Joel@hungerfordlaw.com
Telephone:  (503) 706-7956
Facsimile:  (503) 655-1429


Of Attorneys for Plaintiff–Appellant

Confidential/Filed Under Seal

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DISTRICT'S OPENING BRIEF** on the

following named person on the date indicated below by:

[　] 　mailing with postage prepaid;

[　] 　hand delivery;

[ x ] 　electronic delivery;

[　] 　overnight delivery

to said person a true copy thereof at their last-known address indicated below:

Ray Parenteau
1370 SW David Drive
Grants Pass, OR 97527

   For Defendant-Appellee

DATED: November 28, 2014.


THE HUNGERFORD LAW FIRM


/s/ Richard Cohn-Lee_____
Richard G. Cohn-Lee, OSB No. 952331
E-mail:  Rich@hungerfordlaw.com
Joel E. Hungerford, OSB No. 140940
E-mail: Joel@hungerfordlaw.com
Telephone:  (503) 706-7956
Facsimile:  (503) 655-1429

     Of Attorneys for Plaintiff–Appellant


Confidential/Filed Under Seal

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,519 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: November 28, 2014.

THE HUNGERFORD LAW FIRM

/s/ Richard Cohn-Lee_____
Richard G. Cohn-Lee, OSB No. 952331
E-mail:  Rich@hungerfordlaw.com
Joel E. Hungerford, OSB No. 140940
E-mail: Joel@hungerfordlaw.com
Telephone:  (503) 706-7956
Facsimile:  (503) 655-1429

Of Attorneys for Plaintiff–Appellant