IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

GRANTS PASS SCHOOL DISTRICT,          No. 1:14-cv-01115-PA

      Plaintiff-Appellant,          **OPINION & ORDER**

    v.

STUDENT,

      Defendant-Appellee.

**PANNER, J.**

Plaintiff-Appellant Grants Pass School District ("the District") seeks review of the Final Order by Administrative Law Judge A. Bernadette House ("the ALJ") finding the District in violation of the Individuals with Disabilities Education Act ("IDEA"). I held a hearing on this appeal at which Defendant-Appellee Student ("Student") was represented by his father ("Parent") appearing *pro se*. After careful consideration of the party's briefing, as well as the administrative record, I REVERSE the decision of the ALJ.

1 - ORDER

## Legal Standard

### I. Statutory Framework

The IDEA's central purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). A "free appropriate public education" ("FAPE") includes "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

Oregon has implemented the substantive and procedural requirements of the IDEA by statute and through regulations issued by the Oregon Department of Education ("ODE"). See ORS 343.146 – 343.193; OAR 581-015-2000 et seq. State standards that are not inconsistent with federal standards are enforceable in federal court. W.G. v. Bd. of Tr. Of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1483 (9th Cir. 1992), superseded by statute on other grounds.

One of the most important components of the IDEA is the "individualized education program" ("IEP"), a comprehensive written plan developed by an "IEP team" consisting of the student's parents, teachers, and representatives of the local

educational agency ("LEA").  20 U.S.C. § 1414(d).  "The IEP's ultimate purpose is to tailor the educational services the LEA provides to meet the special needs created by the student's disability and ensure that the student receives the benefit of a FAPE." West-Linn Wilsonville Sch. Dist. v. Student ("West-Linn"), No. 3:12-cv-2364, 2014 WL 3778571, at *2 (D. Or. July 30, 2014).  The IDEA requires that the IEP describe the student's present levels of performance, annual goals, short-term objectives, and the specific educational services to be provided. 20 U.S.C. § 1414(d)(1)(A)(i).

The IDEA permits a parent or LEA to file a complaint with respect to any matter relating to the provision of FAPE, which may be heard by an impartial administrative law judge ("ALJ"). 20 U.S.C. § 1415(b)(6),(f).

## II. Standard of Review

Under the IDEA, any party aggrieved by the decision of an ALJ may file an administrative appeal in a U.S. District Court. 20 U.S.C. § 1415(i)(2)(A).  The party challenging the administrative decision bears the burden of persuasion.  Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007).

Judicial review in IDEA cases "differs substantially" from judicial review of other agency actions.  Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993).  The court reviews the full administrative record, as well as any additional evidence introduced by either party.  20 U.S.C. § 1415(i)(2)(C). The court may "grant such relief as the court determines is appropriate" based on the preponderance of the evidence.  Id. This standard of review has been characterized as "modified *de*

3 - ORDER

*novo* review." <u>Ashland Sch. Dist. v. Parents of Student R.J.</u>, 585
F. Supp. 2d 1208, 1212 (D. Or. 2008); <u>West-Linn</u>, 2014 WL 3778571,
at *2.

The preponderance of the evidence standard is "by no means
an invitation to the courts to substitute their own notions of
sound educational policy for those of the school authorities
which they review." <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206
(1982).  "The very importance which Congress has attached to
compliance with certain procedures in the preparation of an IEP
would be frustrated if a court were permitted simply to set state
decisions at nought." <u>Id.</u>  The reviewing court's inquiry is
twofold:

> First, has the State complied with the procedures set
> forth in the Act? And second, is the individualized
> education program developed through the Act's
> procedures reasonably calculated to enable the child to
> receive educational benefits?  If these requirements
> are met, the State has complied with the obligations
> imposed by Congress and the courts can require no more.

<u>Id.</u> at 206-07.

A challenge may be procedural or substantive.  <u>J.W. v.
Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 432-33 (9th Cir. 2010).
A procedural violation occurs when a state violates the IDEA's
statutory or regulatory procedures in creating an IEP.  A
substantive violation occurs when a state offers an IEP that is
not reasonably calculated to enable the child to receive a
meaningful educational benefit.  <u>Id.</u>

Courts review the ultimate determination of the
appropriateness of the educational program *de novo*.  <u>Gregory K.
v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1310 (9th Cir. 1987);
<u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 891

4 - ORDER

(9th Cir. 1995).  "In the Ninth Circuit, the sufficiency of a school district's actions, including evaluation decisions and decisions regarding the student's substantive educational curriculum are judged by the 'snapshot rule.'"  Forest Grove Sch. Dist. v. Student ("Forest Grove"), No. 3:12-cv-01837-AC, 2014 WL 2592654 at *20 (D. Or. June 9, 2014)(citing Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999)).  In applying the "snapshot rule," a court must determine whether the school district's actions were reasonable considering the facts known when the decision was made.  Adams, 195 F.3d at 1149.

Nevertheless, reviewing courts must give "due weight" to the state administrative proceedings.  Rowley, 458 U.S. at 206.  The degree of deference due to the ALJ "is a matter for the discretion of the courts."  Capistrano, 59 F.3d at 891 (citation and quotation marks omitted).  "The amount of deference accorded the hearing officer's findings increases where they are thorough and careful."  Id.  Reviewing courts are directed to consider the ALJ's findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue."  Id.  The court remains free, however, "to accept or reject the findings in part or in whole."  Id.

## Background

### I. Factual Background

Student in this case has been diagnosed with autism spectrum disorder.  At the time of the relevant IEP, Student's chronological age was fifteen years and his cognitive functioning was equivalent to that of a neurotypical child of five years and five months.  The record indicates that Student experiences

5 - ORDER

difficulty with transitions, such as changing schools or staff.
When experiencing change or transition, Student displays
behaviors which interfere with his ability to access his
education, such as running away, flopping on the floor, or
aggression towards educational staff ("behaviors").

All parties agree that Student is entitled to special
education services under the IDEA.  Historically, Student's
special education services have included extended school year
services ("ESY"), which provided Student with instruction during
breaks and interruptions of the school year.

Student moved to Oregon during the summer of 2013.  Before
his relocation, Student lived in Hawaii.  On May 23, 2013,
Student's Hawaiian school district prepared an IEP for Student
("the Hawaii IEP").  The Hawaii IEP included a provision to
provide Student with ESY during breaks in the 2012-13 school year
lasting longer than ten days.  The District received a copy of
the Hawaii IEP before Student's relocation, but was unable to
acquire Student's other educational records, despite multiple
requests directed to both Parent and the Hawaiian educational
authorities.  Consistent with the Hawaii IEP, the District made
arrangements to provide Student with ESY during the summer of
2013.

The District adopted a policy entitled "Extended School Year
Guidance" to guide staff in making ESY eligibility
determinations.  The District copied their policy from the
information provided on the Oregon Department of Education
website.  In order to be eligible for ESY under the District's
policy, a student needed to demonstrate "undue" regression and

6 - ORDER

recoupment of a skill or behavior directly related to an IEP goal. The policy required that an ESY determination be based on measurable data, but provided that, in the absence of documented evidence, the determination could be made based on predictions according to the professional judgment of the IEP team.

On November 20, 2013, the District convened a meeting of an IEP team to prepare a new IEP for Student. The IEP team included Parent, as well as Student's special education teacher and other representatives of the District. The IEP team prepared a new IEP for Student ("the Oregon IEP"), which substantially revised Student's goals and objectives. When Parent raised the issue of ESY, the IEP team determined that it would wait to determine Student's eligibility for ESY until it had an opportunity to gather and analyze data about Student's performance before and after the upcoming school breaks. Specifically, the District wanted to gather information about whether Student experienced regression over break periods and, if so, how long it took Student to recoup that lost progress ("regression/recoupment data"). Over Parent's objections, the IEP team resolved to make a decision on Student's ESY eligibility by April 16, 2014.

Due to a number of factors including illness and inclement weather, the District only had 16.5 school days to gather baseline regression/recoupment data between the November 20, 2013 IEP meeting and the onset of the 2013-14 winter break. Student's special education teachers gathered the data by selecting and averaging two data points in each relevant area before the break to create a "pre-break" average. The teachers repeated the process after the break to create a "post-break" average. The

7 - ORDER

pre-break average would then be compared to the post-break
average to determine if Student regressed over the break.
Student's special education teacher Dorothy Jewell ("Jewell") was
primarily responsible for collecting and analyzing the
regression/recoupment data.  Jewell also separately tracked
Student's behavioral issues on a daily basis, although that data
was intended for use in refining Student's subsequent IEPs,
rather than for determining Student's ESY eligibility.

On March 18, 2014, the IEP team met for a second time.  At
Parent's request, ESY was added to the meeting's agenda.  At the
March 2014 IEP meeting, Jewell expressed reservations about using
the pre-winter break data as a reliable baseline, due to the
short, interrupted, and chaotic pre-break environment.  Over
Parent's objection, the IEP team resolved to wait until after the
2014 spring break to make a determination about ESY eligibility.
The District anticipated that the IEP team would use the
regression/recoupment data collected over the spring break tp
determine whether to provide Student with ESY over the summer of
2014.

Parent submitted a due process complaint to the Oregon
Department of Education ("ODE"), alleging that the District's
failure to make an ESY determination at the March IEP meeting
violated the IDEA.  A hearing was held before an ALJ from the
Oregon Office of Administrative Hearings.

On April 10, 2014, after spring break, the District convened
a third IEP meeting.  At that meeting, Jewell presented the IEP
team with her data and analysis regarding Student's regression
and recoupment over the winter and spring breaks.  With the

8 - ORDER

exception of Parent, the IEP team members concluded that Student
did not qualify for ESY in any area.  Parent agreed that Student
did not need ESY in writing, but felt that Student needed ESY in
all other areas.  Parent objected to the District's data
collection methodology and the District's analysis of the data.
Over Parent's objections, the District accepted the determination
of the rest of the IEP team and determined that Student would not
receive ESY for the summer of 2014.

Following the April 2014 IEP meeting, Parent filed a second
due process complaint with the ODE, alleging that the District's
decision to deny ESY constituted a denial of FAPE in violation of
the IDEA.  A second hearing was held before the same ALJ.

## II. Procedural Background

As noted, the question of Student's entitlement to ESY over
the summer of 2014 gave rise to two administrative due process
hearings.  The ALJ issued her Final Order in the first case, ODE
Case No. DP 14-102 ("*CP-1*"), on June 6, 2014.  The Final Order in
the second case, ODE Case No. DP 14-104 ("*CP-2*"), was issued on
July 1, 2014.

### A. *CP-1*

Parent, on behalf of Student, filed his first due process
complaint with the ODE on March 19, 2014.  Parent alleged that
the District improperly failed to consider the issue of Student's
ESY eligibility at the November 20, 2013 and March 18, 2014 IEP
meetings.  Parent also alleged that the District had prohibited
discussion of ESY at the November 2013 and March 2014 IEP
meetings and that doing violated Parent's right to participate in
the development of Student's IEP.  Parent alleged that these

9 - ORDER

actions resulted in a substantive violation of Student's rights under the IDEA. A two-day hearing was held before an ALJ on May 12 and 13, 2014.

The ALJ issued the Final Order in *CP-1* on June 6, 2014. The ALJ found for the District on substantially all of Parent's claims. The ALJ ruled that the District had lacked the necessary data to make an ESY determination on November 20, 2013, and that the District had appropriately delayed making a determination until after the winter and spring breaks to collect the necessary data. In addition, the ALJ determined that the District's ESY policy, which determines ESY eligibility based solely on regression and recoupment, conforms with the state policy on ESY eligibility and did not violate federal rules or regulations.

Parent did not appeal the ALJ's decision in *CP-1*.

## B. *CP-2*

On April 18, 2014, Parent, on behalf of Student, filed his second due process complaint with the ODE. Student alleged that the District's decision to deny ESY constituted a denial of FAPE in violation of the IDEA, as well as state and federal regulations.

A two-day hearing was held on June 16 and 17, 2014. The record of *CP-1* was incorporated into the record of *CP-2*. The ALJ heard testimony from Parent, as well as expert witnesses from both Student and the District. Student's expert witnesses were Joseph Gentry, Ph.D., a psychologist who had worked with Student as a consultant for Student's previous school district in Arizona, and Aletha Sutton, Ph.D., a special education administrator from Student's previous school district in Hawaii.

10 - ORDER

The District's expert witnesses were Kirk Kolb, Director of Special Education Services with the District; Dorothy Jewell, Student's special education teacher; and Kirby Erickson, regional autism consultant for Southern Oregon Education Services District.

On July 1, 2014, the ALJ issued a Final Order finding that the District's decision to deny ESY was a denial of FAPE and ordering that the District provide 360 minutes of ESY per day consistent with the goals and objectives of the Hawaii IEP.

On July 14, 2014, the District filed a complaint in this Court seeking review of *CP-2* (#1). Contemporaneously, the District moved for an injunction against the enforcement of the ALJ's Final Order in *CP-2* (#2). On July 18, 2014, I granted the District's request for a temporary restraining order (#6) and on July 29, 2014, I issued a preliminary injunction in favor of the District (#17).

## Discussion

The ALJ determined that the District's decision to deny ESY violated Student's substantive rights under the IDEA. The District urges the Court to reverse the decision of the ALJ.

### I. Deference to the ALJ

As a preliminary matter, I conclude that although the ALJ's opinion is lengthy, it is not careful and thorough and I give it little deference.

The ALJ ignored contradictory evidence and testimony. For example, in her Final Order in *CP-1*, the ALJ determined that the District had appropriately delayed making an ESY determination until it had collected and analyzed regression/recoupment data

11 - ORDER

over the winter and spring breaks. DP 14-102 at 18. The spring break data indicates that Student did not experience marked regression. Ex. D10 at 1-15; Tr. Vol. 3, at 116:4-125:21. In *CP-2*, the ALJ dismissed the spring break data in a footnote and focused entirely on the winter break data. DP 14-104 at 25, n.6.

With regard to Student's experts, the ALJ credited Dr. Gentry's testimony about deficiencies in the District's data collection methodology. DP 14-104 at 26. But the ALJ ignored Dr. Gentry's testimony that he could not speak to the fidelity of the District's methods because he had not been there to observe the collection process.[1] Tr. Vol. 4, at 24:14-25:8. Similarly, the ALJ relied on the testimony of Drs. Gentry and Sutton in holding that, if the data had been properly collected and analyzed, it would support Student's eligibility for ESY. DP 14-104 at 26. This conclusion is directly contradicted by Dr. Sutton's testimony that she was not in a position to make any determination on Student's ultimate eligibility for ESY. Tr. Vol. 4, at 110:3-25. The ALJ makes no reference to the contradictory testimony of Dr. Sutton.

---

[1] Q. All right. When you look at the raw data that you have before you now, in general how would you normally determine fidelity of the data if you were not privy to the collection process?

A. In a case like this, where I have only the raw data in front of me, it is almost impossible to judge fidelity just because, as a consultant, I would be training and sitting in with the data collector to make sure they're collecting data correctly when they collect it . . . . So without those kinds of things, I can't say whether or not this data meets the standards of fidelity or not. So it's difficult as far as fidelity goes.

Tr. Vol. 4, at 24:14-25:8.

The ALJ also cited Student's experts "considerable experience with Student" and their "long history of working with Student" in support of the weight given to their testimony.  DP. 14-104, at 26-27.  In making this determination, the ALJ ignored Dr. Gentry's testimony that he had not worked with Student for more than four years before the hearing and that he didn't "know [Student] now like I knew [Student] years ago."  Tr. Vol. 4, at 43:2-3, 75:2-77:21.  The ALJ also ignored Dr. Sutton's testimony that, although she had worked with Student's special education team in Hawaii, she had never directly provided services to Student or formally observed him.  Tr. Vol. 4, at 118:11-120:10.

The ALJ also made inconsistent determinations in *CP-1* and *CP-2*, but does not acknowledge the inconsistencies or attempt to reconcile them.  The issue of the spring break data has already been noted.  Additionally, in *CP-1*, the ALJ determined that the District's ESY eligibility standards were appropriate and conformed to state and federal requirements.  DP 14-102, at 16-17. The ALJ made the opposite determination on the same issue in *CP-2*, holding that the use of regression and recoupment as the sole criterion was a violation of federal standards. DP 14-102, at 23-24.

The remedy ordered by the ALJ also raises concerns about the care and thoroughness of the ALJ's opinion.  The District was ordered to provide Student with 360 minutes of ESY per day "sufficient to maintain student's skills and behavior with regard to Student's Annual Goals and Short Term Objectives as set forth in the May 23, 2013 IEP."  DP 14-104, at 28.  As noted, the Hawaii IEP was superseded by the Oregon IEP, which revised many

13 - ORDER

of Student's annual goals and short term objectives.  Neither
party put on evidence at the administrative level about the
appropriate amount of ESY needed to meet Student's goals and
objectives under the Oregon IEP and the ALJ provided no
justification for the amount of ESY ordered.[2]  Furthermore, the
only issue before the ALJ in *CP-2* was the District's decision to
deny ESY.  Student did not contend the Oregon IEP was
otherwise defective and the parties agree that it superseded the
Hawaii IEP.  The ALJ's decision to require the District to
provide ESY consistent with the goals and objectives of a
superseded IEP raises concerns about the care and thoroughness of
the administrative decision.[3]

## II. ESY

### A. Standard for ESY Eligibility

The IDEA does not explicitly address ESY.  Federal
regulations require each public agency to "ensure that extended
school year services are available as necessary to provide FAPE."
34 C.F.R. § 300.106(a)(1).  "Extended school year services must
be provided only if a child's IEP Team determines, on an
individual basis, . . . that the services are necessary for the

---

[2]At the April 10, 2014 IEP meeting Parent agreed that Student
did not need ESY for writing.  Ex. D11, at 5.  The Final Order
does not account for the IEP team's complete consensus on the
issue of Student's writing goals.

[3]Student previously argued that ALJ's ordered remedy amounts to
a typographical error and that it should be properly read to
require 360 minutes of ESY per day consistent with the Hawaii IEP
in order to meet the goals and objectives of the Oregon IEP
(#15).  While Student's suggestion would constitute a more
reasonable remedy, it is not what the plain language of the Final
Order requires of the District.  Nor would such an egregious typo
rehabilitate the ALJ's opinion as careful and thorough.

provision of FAPE to the child."  34 C.F.R. § 300.106(a)(2).  The federal regulation does not specify the factors to be considered in determining ESY eligibility.  N.B. v. Hellgate Elementary Sch. Dist. ("Hellgate"), 541 F.3d 1202, 1210 (9th Cir. 2008).

"A claimant seeking an ESY must satisfy an even stricter test because providing an ESY is the exception and not the rule under the regulatory scheme."  Id. at 1211 (citation and quotation marks omitted).  "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." Id. (citation and quotation marks omitted).  A claimant must show that ESY is "necessary to permit the child to benefit from his instruction."  Id. at 1212 (citation and quotation marks omitted).  Claimants may rely on expert opinion testimony to make this showing and need not present empirical proof of actual prior regression.  Id.

Oregon regulations provide that the purpose of ESY "is the maintenance of the child's learning skills or behavior, not the teaching of new skills or behaviors."  OAR 581-015-2065(4). Oregon school districts "must develop criteria for determining the need for extended school year services."  OAR 581-015-2065(5).  "Criteria must include regression and recoupment time based on documented evidence or, if no documented evidence, on predictions according to the professional judgment of the [IEP] team."  Id.  "Regression" is defined as "significant loss of skills or behaviors in any area specified on the IEP as a result of an interruption in education services."  OAR 581-015-

15 - ORDER

2065(6)(a).  "Recoupment" is "the recovery of skills or behaviors
specified on the IEP to a level demonstrated before the
interruption of services."  OAR 581-015-2065(6)(b).

The District's ESY policy tracks the language and
requirements of the Oregon regulations closely.  To be eligible
for ESY under the District's ESY policy, a student "must
demonstrate 'undue' regression and recoupment of a skill or
behavior directly related to an IEP goal."  Ex. D1, at 1.  For a
student to experience "undue" regression, the student must not
recoup to his or her pre-interruption baseline within a certain
time period after the break.[4]  Id.

In this case, the ALJ held that the District erred by
applying a regression/recoupment standard for gauging ESY
eligibility.  The ALJ based this decision on Johnson v.
Independent Sch. Dist. No. 4, 921 F.2d 1022 (10th Cir. 1990).[5]
In Johnson, the Tenth Circuit rejected the use of
regression/recoupment as the sole criterion for determining ESY
eligibility and instead required a multi-faceted inquiry.
Johnson, 921 F.2d at 1027.

The Ninth Circuit has not explicitly adopted the Johnson
standard, however.  See, Hellgate 541 F.3d at 1211 (acknowledging

---

[4]The recoupment period varies according to the length of the
interruption.  "Undue" regression occurs if the student does not
recoup to the baseline within 8 weeks after summer break, 2-3
weeks after winter break, and 1-2 weeks after the spring break.
Ex. D 1, at 1.

[5]The ALJ also cited Moser v. Bret Hart Union High Sch. Dist.,
366 F. Supp. 2d 994, 972 (E.D. Cal. 2005), which relied on
Johnson.  Moser predates the Ninth Circuit's Hellgate decision,
as well as the 2006 USDE notice and comment period.

16 - ORDER

that, as of 2008, "[t]his circuit has not yet developed a standard for determining when ESY services are appropriate under the IDEA.")  To the contrary, in Hellgate, the Ninth Circuit held that a lower court did not err in applying a regression/recoupment standard.[6]  Hellgate, 541 F.3d at 1210. The Ninth Circuit's holding in Hellgate is consistent with the federal regulations.  In 2006, the United States Department of Education ("USDE") engaged in a rulemaking comment period. During that comment period, the USDE considered suggested modifications to the ESY regulations.  Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46540 (proposed Aug. 14, 2006).  The USDE explicitly rejected a comment suggesting that the regulations be amended to forbid the use of regression/recoupment as the sole criterion for ESY eligibility. The USDE's response affirmed that the establishment of specific ESY eligibility criteria was a question for the states and that the states remained free to use regression/recoupment as the sole criterion in making an ESY determination, provided that the state standard is consistent with the individually-oriented requirements of the IDEA.  Id. at 46582-83.

The Oregon regulations require that regression and recoupment be considered in making an ESY determination.  No other factor is expressly required.  In formulating its policies,

---

[6]"[Appellants] assert that the district court erred in employing a 'regression/recoupment' standard in determining that C.B. was not entitled to ESY services, as opposed to a multi-faceted inquiry, as purportedly required by state law . . . . We disagree."  Hellgate, 541 F.3d 1210.

17 - ORDER

which use regression/recoupment as the sole criterion for ESY
eligibility, the District relied on guidance from the Oregon
Department of Education's website. I conclude, therefore, that
the State of Oregon has determined that regression/recoupment is
the standard for ESY eligibility in this state. Both the state
regulations and the District policy require that the
regression/recoupment data be analyzed in the context of a
student's IEP goals and objectives, which are carefully tailored
to meet the needs of the individual student. Use of that
standard is appropriate under Hellgate and the federal
regulations.

I conclude that the District's ESY policy conforms with
state and federal regulations. It was permissible, therefore,
for the District to base its ESY determination on documented
evidence of Student's regression and recoupment of skills and
behaviors related to his IEP.

### B. Student's ESY Eligibility

As noted, school districts must provide ESY if the IEP team
determines that ESY is necessary for FAPE. 34 C.F.R. §
300.106(a)(2). An IEP adequately provides a FAPE if it is
reasonably calculated to provide a child with a meaningful
educational benefit at the time it was developed. J.W., 626 F.3d
at 432.

### 1. The 2013-2014 Winter Break Data

Based on the testimony of Drs. Gentry and Sutton, the ALJ
found fault with the District's collection and analysis of the
winter break regression/recoupment data. Dr. Gentry asserted
that the use of two data points created a very weak pre-break

18 - ORDER

average, and that the data's reliability was further undermined by inconsistent collection methodology on non-consecutive days. Dr. Sutton opined that Student's daily behavior tracking provided a better measure of Student's progress.  The ALJ concluded, based on the testimony of Drs. Gentry and Sutton, that Student experienced undue regression and recoupment problems over the winter break.  The District contends that the ALJ improperly held it to an arbitrarily high standard.

"An 'appropriate' public education does not mean the absolute best or 'potential-maximizing' education for the individual child."  Gregory K., 811 F.2d at 1314.  Rather, states must provide a "basic floor of opportunity" that is "individually designed to provide educational benefit to the handicapped child."  Rowley, 458 U.S. at 201.  "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational authorities in cooperation with the parents or guardians of the child."  Id. at 207  "[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."  Id. at 208; see also J.W., 626 F.3d at 450 ("This vagueness [in the IDEA mandate] reflects Congress' clear intent to leave educational policy making to state and local education officials.").  Collection and analysis of educational data, such as regression/recoupment data, is a matter of educational policy and methodology.  See Virginia S. v. Dep't of Educ. of Hawaii, Civil No. 06-00128 JMS/LEK, 2007 WL 80814, at *12 (D. Hawaii Jan. 8, 2007)("Questions of ESY

19 - ORDER

eligibility criteria and methodology are classic examples of technical questions of educational policy.").

In this case, the ALJ relied on the testimony of Drs. Gentry and Sutton about how the regression/recoupment data might have been better collected and analyzed in holding that the District's denial of ESY was a denial of FAPE.[7]   In doing so, the ALJ held the District to an arbitrarily high standard.  While the data collection and analysis methods proposed by Student's experts might be "better" than those employed by the District, the ALJ provides no legal authority requiring that the District employ those methods.  Nor is there any indication that the methods used by the District fell below any standard established by the IDEA or the state and federal regulations.  To the contrary, it is well established that school districts are not required to provide the "best" educational program.  Rowley 458 U.S. at 201; Gregory K., 811 F.2d at 1314; see also Virginia S., 2007 WL 80814, at *13 ("[A]n IEP need not conform to a parent's wishes in order to be sufficient or appropriate.").  "[P]arents, no matter how well motivated, do not have a right under the IDEA to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child."  Forest Grove, 2014 WL 2592654 at *25 (citation and quotation marks omitted).

---

[7]The ALJ properly recognized Dr. Gentry as an expert in the collection and analysis of educational data.  As noted, however, Dr. Gentry was not present for the collection of the data and testified that he could not speak to its collection methods or fidelity.  Nor did Dr. Gentry communicate with the District to determine how the data was collected or analyzed.  Tr. Vol. 4, 74:10-75:1.  Dr. Gentry's testimony was based instead on his assumptions after reviewing the District's raw data.

I conclude, therefore, that the ALJ erred in holding the District's data collection methodology to the standards preferred by Parent and Student's experts.  On the issue of the final analysis of the winter break regression/recoupment data, the record reflects a divergence of opinion on whether the data shows undue regression/recoupment problems.  I note, however, that the District shared many of Parent's concerns about the reliability of the winter break baseline data.  As discussed below, the District's reservations prompted them to delay making a determination until they had collected regression/recoupment data over the spring break.  I conclude that IEP team properly evaluated the winter break data in light of the District's own reservations about the data's reliability.

### 2. **The 2014 Spring Break Data**

In addition to the 2013-14 winter break data, the District also collected regression/recoupment data over the 2014 spring break.  The spring break data did not support Student's eligibility for ESY.  Ex. D10, at 1-15; Tr. Vol. 3, at 116:4-125:21.

In her Final Order in *CP-2*, the ALJ dismissed the regression/regression recoupment data collected over the 2014 spring break as irrelevant.[8]  The ALJ based this determination on

---

[8]The ALJ's discussion of the spring break data is confined to a single footnote: "Only evidence on data concerning Student's performance before and after winter break is discussed in the Opinion.  Spring break created a break of five school days.  As noted by Parent and by Parent's experts, Student suffers significant regression-recoupment problems after a break of 10 days or more.  Data collected for Spring break, which consists of only five school days, is not relevant to that issue."  DP 14-104, at 25, n.6.

21 - ORDER

the testimony of Parent and Dr. Sutton. DP 14-140, at 27. At
the administrative hearing, Dr. Sutton testified that Student's
Hawaiian school district had collected "copious amounts of data"
showing that Student only experienced regression over breaks
lasting more than ten days. Tr. Vol. 5, at 105:2-4. This is
reflected in the ESY provisions of the Hawaii IEP. Ex. S11, at
16.

The ALJ's decision to dismiss the spring break data was in
error. The Oregon regulations and the District's ESY policy
required the District to base its ESY determination on
"measurable data" and "documented evidence" unless no data was
available. OAR 581-015-2065; Ex. D1, at 1. When Student moved
to Oregon the District received a copy of the Hawaii IEP, but
none of the supporting data. Ex. S11, at 16; Tr. Vol. 2, 191:19-
23. It is clear from the record that the District never received
the "copious amounts of data" referenced by Dr. Sutton, despite
repeated requests, including one request made at the
administrative hearing itself. Tr. Vol. 2, at 239:17-240:3; Tr.
Vol. 4, at 133:4-135:8. The District's own uncertainty about the
winter break data made the spring break data all the more
necessary for the IEP team to base their determination on
measurable data and documented evidence, as required by the
District's ESY policy and the state regulations.

Even if the District had been able to review the Hawaiian
data, the IEP team would still have needed to base their decision
on the regression/recoupment data collected by the District
because the Oregon IEP revised Student's goals and objectives.
Tr. Vol. 2, 30:19-21. The Hawaiian data was collected and

22 - ORDER

analyzed in the context of Student's previous IEP goals and
objectives and the determination of Student's ESY eligibility was
made according to Hawaiian, rather than Oregonian, standards.
The necessity of basing ESY determinations on current data,
rather than past eligibility, was recognized the ALJ in *CP-1*.  DP
14-102, at 18-19.

I conclude that the IEP team properly considered the 2014
spring break data in making their decision on Student's ESY
eligibility for summer 2014.  The ALJ improperly disregarded the
spring break data in her Final Order of *CP-2*.

### 3. Predictions Based on Professional Judgment

Consistent with state regulations, the District's ESY policy
requires that the IEP team base their ESY determination on
measurable data, unless no data is available.  In the absence of
data, the IEP team may base their ESY determination on
"predictions according to the professional judgment of the team."
Ex. D1, at 1.  In this case, the IEP team had measurable
regression/recoupment data from both spring and winter breaks.
State regulations and the District policy therefore required that
the IEP team base their decision on that data.  Nevertheless, the
April 10, 2014 IEP meeting notes indicate that the IEP team
members carefully considered Student's ESY eligibility in each of
the relevant areas before making their determination.  Ex. D11.

### Conclusion

Upon review of the record and considering both the high
threshold for ESY eligibility and the deference due to the
educational authorities, I conclude that Student's IEP, including
the District's ultimate ESY determination, was reasonably

23 - ORDER

calculated to provide Student with FAPE.  The decision of the Administrative Law Judge in Oregon Department of Education Case No. DP 14-104 is REVERSED.

IT IS SO ORDERED.

DATED this **29** day of April, 2015.

Owen M. Panner
United States District Judge